IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br>HIGHWAY TECHNOLOGIES, INC., *et al.*,<br>Debtors.[1] | Chapter 11<br>Case No.: 13-11326 (___)<br>(Joint Administration Requested) |

### DECLARATION OF ROBERT HOOKSTRA
### IN SUPPORT OF FIRST DAY MOTIONS

I, Robert Hookstra, hereby declare that the following is true to the best of my knowledge, information and belief:

1.   I am the Interim President, Interim Treasurer, Secretary and Controller of Highway Technologies Inc. ("Highway Technologies") and the Interim Chief Executive Officer, Interim Chief Financial Officer and Secretary of HTS Acquisition Inc. ("AcquisitionCo" and, together with Highway Technologies, the "Debtors" or the "Company"). I have served as Controller since October 2010 and was appointed to serve as Secretary on April 24, 2013. On May 20, 2013, upon the resignation of the prior Interim Chief Executive Officer and Interim Chief Financial Officer, I was appointed to those positions for AcquisitionCo and the positions of Interim President and Interim Treasurer for Highway Technologies. I have been with the Company for approximately fourteen years and am familiar with the day-to-day operations, business affairs and books and records of the Debtors, in a manner consistent with my tenure at the Debtors.

---

[1] The Debtors in these proceedings and the last four digits of each Debtor's federal taxpayer identification number are as follows: Highway Technologies, Inc. (6608); and HTS Acquisition, Inc. (9831). The Debtors' mailing address is 6800 Dixie Drive, Houston, Texas 77087.

DOCS_SF:83117.8

2. In order to enable the Debtors to minimize the adverse effects of the commencement of their Cases (defined below) on their businesses, the Debtors have requested various types of relief in "first-day" applications and motions (collectively, the "<u>First Day Motions</u>"). The First Day Motions seek relief that is: (a) necessary to enable the Debtors to conduct an orderly liquidation; and (b) essential to maximizing the value of the Debtors' assets for the benefit of their estates and creditors.

3. I submit this declaration (the "<u>Declaration</u>") in support of the Debtors' petitions and First Day Motions. Except as otherwise indicated, all statements in this Declaration are based upon my personal knowledge, my review of the Debtors' books and records, relevant documents and other information prepared or collected by the Debtors' employees at my direction, or my opinion based on my experience with the Debtors' operations and financial condition. In making my statements based on my review of the Debtors' books and records, relevant documents and other information prepared or collected by the Debtors' employees, I have relied upon these employees' accurately recording, preparing, or collecting any such documentation and other information.

4. If I were called to testify as a witness in this matter, I could and would competently testify to each of the facts set forth herein based upon my personal knowledge, review of documents, or opinion. I am authorized to submit this Declaration on behalf of the Debtors.

5. Part I of this Declaration describes the business of the Debtors and the developments that led to their filing for relief under chapter 11 of Title 11 of the United States

Code (the "Bankruptcy Code"). Part II of this Declaration sets forth the relevant facts in support of the First Day Motions filed concurrently herewith.

# PART I

## I. BACKGROUND

6. On the date hereof (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code and a motion to procedurally consolidate their chapter 11 cases (the "Cases") for administrative purposes only. The Debtors are continuing to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No request has been made for the appointment of a trustee or examiner and no official committee of creditors has been appointed in these Cases.

## II. OVERVIEW OF THE DEBTORS AND THEIR OPERATIONS

### A. INTRODUCTION

7. The Company was founded over 30 years ago. Prior to the Petition Date, Highway Technologies was one of the largest traffic safety companies in the United States and a national leader in providing temporary and permanent roadway traffic management and safety services, including pavement marking installations, permanent installations of highway guardrails, barrier walls and signage, and traffic control services for special events. The Company provided such special event services for the Democratic & Republican National Conventions, the Super Bowl, the Lollapalooza Music Festival and Ironman competitions. In addition, the Company offered a complete line of rental products including traffic control devices, trucks, signage and related and equipment. Prior to the

Petition Date, the Company operated from 32 locations in 13 states (Arizona, California, Colorado, Florida, Illinois, Louisiana, Minnesota, Missouri, Montana, Nevada, New Jersey, Oregon and Texas).

8.  Just prior to the Petition Date, the Debtors ceased operations, terminated approximately 740 employees and began the process of securing their assets for sale. As discussed more fully below, the Company intends to offer its inventory and assets for sale piecemeal through private sales and auctions and also branch by branch on a turnkey basis ("Turnkey Branch Sales"). To the extent that the Company is successful at accomplishing some Turnkey Branch Sales, employees could be rehired by the buyers of the branches.

### B.  CORPORATE STRUCTURE

9.  AcquisitionCo is incorporated under the laws of the State of Delaware. Highway Technologies is incorporated under the laws of the State of Massachusetts. A chart setting forth the Debtors' corporate structure is attached as **Exhibit A** to this declaration. As indicated on **Exhibit A**, HTS Holding Inc. ("Holdings"), a non-debtor, is the direct parent of AcquisitionCo, which in turn is the direct parent of Highway Technologies.

### C.  OPERATIONS

10. Prior to the Petition Date, the Company consisted of five core business segments:

(i)  Traffic Control Contract and Protection. Through long-term contracts, the Debtors provided temporary traffic equipment (*e.g.*, barricades, barrels, street construction signs and electronic arrow and message boards) and flagging operations for various road

construction projects, including road and lane closures, railroad crossing reconstruction and bridge and road construction.

  (ii) <u>Daily Rental of Traffic Control and Protection</u>. The Debtors provided daily rental of Traffic Control and Protection devices for road detours, special events and emergency road closures.

  (iii) <u>Pavement Striping and Markings</u>. The Debtors provided installation and removal services in paint, epoxy, thermoplastic, pavement tape and pavement markers using a variety of large striping trucks and hand-operated machinery and equipment.

  (iv) <u>Permanent Installations</u>. The Debtors installed roadside structures using and-operated and truck-mounted equipment, including guardrails, signs and barriers.

  (v) <u>Sale of Work Zone Products</u>. The Debtors sold permanent and temporary traffic control equipment, such as arrow and message boards, barricades, attenuators, signs and other safety equipment, and engaged in the manufacturing of barricades and signs in the support of their traffic control contracts, rentals and sales.

  11. On May 17, 2013, with the termination of substantially all employees, the Debtors effectively ceased operations and began preparing for the orderly liquidation of their assets.

  **D.** **EMPLOYEES**

  12. As of May 11, 2013, the Company employed approximately 825 full and part-time employees. Prior to the Petition Date, the Company also hired additional employees and contractors on a project-by-project basis.

13. On May 17, 2013, the Company terminated all but approximately 85 employees at 28 locations. Thus, as of the Petition Date, the Company employs approximately 85 full and part-time employees.

### III. SIGNIFICANT INDEBTEDNESS

14. As of March 31, 2013, the Company reported total balance sheet assets of approximately $55 million. As of the same date, the Company reported total balance sheet liabilities in the approximate amount of $102 million. The Debtors' primary sources of indebtedness are described below.

#### A. PREPETITION CREDIT FACILITY

15. Highway Technologies, as borrower, and Holdings, AcquisitionCo, and each subsidiary listed as a guarantor on the signature pages to the Prepetition Financing Agreement (defined below), as guarantors, entered into a financing agreement (the "Prepetition Financing Agreement"), dated as of February 15, 2007, with Ableco Finance LLC, a Delaware limited liability company ("Ableco"), in its capacity as administrative and collateral agent (in such capacity, the "Prepetition Agents"), on behalf of the lenders (the "Prepetition Lenders") to extend credit (the "Prepetition Credit Facility") to the Borrowers consisting of: (a) a revolving credit facility in an aggregate principal amount not to exceed $3,000,000 (excluding the PIK Amount as defined in the Prepetition Financing Agreement); (b) a revolving credit facility in an aggregate principal amount not to exceed $24,000,000 at any time outstanding (excluding the PIK Amount); (c) a revolving credit facility in an aggregate principal amount not to exceed $10,000,000 at any time outstanding (excluding the PIK Amount); (d) a term loan in the aggregate original principal amount of $18,000,000; and (e) a term loan in the aggregate

original principal amount of $2,900,000. The proceeds of the term loans and the loans made under the revolving credit facilities were used (a) to finance a portion of the acquisition of the Debtors from their prior owners, (b) for general working capital requirements and other general corporate purposes of the Borrowers and (c) to pay fees and expenses related to the acquisition and the Prepetition Credit Facility.

16.    The Prepetition Credit Facility is secured by liens on substantially all of the Debtors' assets. However, as of the Petition Date, the Prepetition Lenders had not perfected their security interests in the Debtors' titled vehicles.

17.    As of the Petition Date, the Debtors' obligations in respect of the Prepetition Credit Facility included principal in the amount of $66,756,208.59 and accrued interest in the amount of $352,827.36.

### B.    UNSECURED TRADE DEBT

18.    The Debtors estimate that as of the Petition Date, they were indebted to unsecured creditors on account of goods and services delivered prior to the Petition Date in the approximate amount of approximately $23 million.

### C.    SURETY BONDS/INDEMNIFICATION AGREEMENTS

19.    The Debtors also have contingent liabilities to certain surety companies that supplied payment and performance bonds ("Surety Bonds") for certain of the Debtors' projects prior to the Petition Date, including: ACE-USA/ACE Bond Services, Argonaut Insurance Company, Aspen American Insurance Company, Berkeley Surety Group, LLC, Hanover Insurance Group, International Fidelity Insurance Company, Travelers Casualty and Surety Company of America, CNA and Zurich American Insurance Company (collectively, the

"Sureties"). Each of the indemnity agreements with the Sureties give the surety various rights against the principal/indemnitor in the event of a default. Those contractual rights include: (1) the specifically enforceable right to require the principal/indemnitor to deposit collateral for any claims against the surety under the bonds by the obligee (the "Collateral Deposit Clauses"); (2) an assignment by the principal/indemnitor of its rights under contracts and ownership of property (the "Assignment Clauses"); and (3) the grant of a security interest in the principal/indemnitor's property. No collateral was deposited pursuant to the Collateral Deposit Clauses prior to the Petition Date. With respect to the Assignment Clauses in certain of the agreements, those clauses do not create a present assignment and the Debtors were not requested to nor did they execute assignment agreements prior to the Petition Date. In addition, a UCC search in each of the Debtors' states of incorporation (Delaware and Massachusetts) did not reveal any perfection of an interest in the personal property collateral.

20.     However, the Sureties have asserted or will likely assert rights of equitable subrogation with respect to receivables that relate to projects for which the respective Surety posted a bond and there will be a question regarding the relative priority of the equitable subrogation rights of the Sureties and the liens of the Prepetition Lenders.

21.     Accordingly, the Debtors are not requesting to and do not intend to use any proceeds of receivables related to bonded projects ("Bonded Receivables") pending further court order. The Debtors intend to segregate collections on any Bonded Receivables pending further order of the Court.

22. The Debtors estimate that the total amount of outstanding Surety Bonds is approximately $88,707,448 as of the Petition Date and that the Bonded Receivables (including amounts owed on unbilled projects) is $3,975,548.

### D. OTHER CONTINGENT OBLIGATIONS

23. The Debtors also have other contingent obligations to various parties; including obligations to pay the self-insured retention on account of prepetition liability claims that are insured. As set forth in the Cash Management Motion in more detail, the Debtors have posted letters of credit (secured by a segregated cash collateral account) to secure this obligation.

### E. EQUITY

24. Holdings, a non-debtor, is authorized to issue a total of 100,000 shares of common stock and 100,000 shares of preferred stock. As of April 30, 2013, Holdings currently has 10,000 shares of common stock issued and outstanding and 77,000 shares of series A, B and C preferred stock issued and outstanding. Holdings owns 100% of the shares of AcquisitionCo and AcquisitionCo in turn owns 100% of Highway Technologies.

## IV. EVENTS LEADING TO CHAPTER 11

25. An interim management team joined the Company in August 2010 after certain financial irregularities and unreported losses were discovered. At that time, the Company was in financial distress, but believed that perhaps the business could be saved. Since then, with the exception of the time period from November 2011 through January 2012 during which a different management team was in place, the interim management team attempted to turn around the business.

26. Since February 2012, the Company undertook the following efforts to improve EBITDA and cash flow by closing unprofitable branches, liquidating non-core assets; implementing new marketing strategies and new safety program, replacing over 50% of the branch managers, acquiring equipment and a significant new services contract, and restructuring certain operations. As a result of these efforts, the Company generated positive EBIDTA in 2011 and 2012 (which were the first profitable years since 2008 and represented a dramatic increase from 2009 and 2010), and projected a significant increase in 2013 EBITDA. Nonetheless, the Company needed additional liquidity, particularly during the high season from May to October, and to meet the requirements of its newly acquired contract.

27. In the months prior to the Petition Date, the Company was actively seeking capital from its existing lenders and sponsors, as well as potential new lenders. In addition, in the weeks prior the Petition Date, the Company was in negotiations regarding a sale of substantially all of its assets with a key competitor, with which it had engaged in such discussions as early as 2008. The key competitor performed extensive due diligence in May 2013, and the Company continued to proceed with these negotiations until May 14, 2013, when the key competitor informed the Company that it had determined not to purchase the Debtors' assets. In addition, the Company was unable to obtain a commitment to finance its ongoing operations or to pursue a sale of its assets. Accordingly, on May 17, 2013, the Debtors ceased operations, terminated approximately 740 employees and thereafter commenced these Cases in order to conduct an orderly liquidation of its assets and wind down its business.

28. Prior to the Petition Date, the Debtors' assets were located in 32 branches in 13 states. In addition, certain of the Debtors' assets are on active highway

construction sites. Through these Cases, the Debtors have secured DIP financing that will allow them to secure their assets and liquidate such assets in an orderly fashion. The DIP financing will also enable the Debtors to avoid abandoning equipment on active highways that could pose a public safety risk. The Debtors intend to seek to sell their assets on piecemeal basis by private sales and auctions and have engaged liquidators to secure the assets and prepare them for sale. At the same time, the Debtors and their advisors are in negotiations with multiple parties that are interested in purchasing individual branches on a turnkey basis, and intend to request that the Court implement procedures that will allow those sales to proceed as quickly as possible.

## PART II

### I.   FIRST DAY MOTIONS

29.   In order to enable the Debtors to minimize the adverse effects of the commencement of the Cases, the Debtors have requested various types of relief in the First Day Motions filed concurrently with this Declaration.

30.   I have reviewed each of these First Day Motions (including the exhibits and schedules thereto). The facts stated therein are true and correct to the best of my knowledge, information and belief based upon my tenure at the Company, and I believe that the type of relief sought in each of the First Day Motions: (a) is necessary to enable the Debtors to operate in chapter 11 with minimal disruption to permit the orderly liquidation of their assets and wind down of their businesses; and (b) is essential to maximizing the value of the Debtors' assets for the benefit of their estates and creditors. Accordingly, and to this

extent, I incorporate herein by reference the factual statements set forth in the First Day Motions.

31. It is my further belief that, with respect to those First Day Motions requesting the authority to pay discrete prepetition claims (*e.g.*, those First Day Motions seeking relief related to the Debtors' obligations to their employees and banks), the relief requested is essential to the Debtors' efforts to preserve and maximize value in these Cases and avoid immediate and irreparable harm to the Debtors and their estates and creditors.

32. I believe that any diminution in the limited relief requested in the First Day Motions could have an immediate and irreparable harmful impact upon the value of the estates' assets to the detriment of all of the Debtors' stakeholder constituencies. The Debtors believe that payment of those selected prepetition claims identified in the First Day Motions will forestall such irreparable harm and that all creditors of the Debtors will ultimately benefit from the relief requested therein.

## II. DIP FINANCING MOTION[2]

33. As part of the First Day Motions, the Debtors have filed a motion seeking authority to obtain secured postpetition financing (the "DIP Facility") and use of cash collateral as defined in section 363(a) of the Bankruptcy Code ("Cash Collateral" and, together with the DIP Facility, the "Postpetition Financing Arrangement") to ensure that the Debtors have sufficient liquidity to pay operational expenses and meet their other financial obligations

---

[2] Capitalized terms used in the following paragraphs not defined herein shall have the meaning ascribed to them in the *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing Debtors to Obtain Postpetition Secured Financing, (II) Authorizing Use of Cash Collateral, (III) Granting Adequate Protection, (IV) Scheduling Final Hearing and (V) Granting Certain Related Relief* (the "DIP Financing Motion").

during the pendency of these Cases. The proposed DIP Facility would be provided by Oak Hill Special Opportunities Fund, L.P.; Oak Hill Special Opportunities Fund (Management), L.P. and Wynnchurch Capital Partners II, L.P., which are a subset of the Prepetition Lenders.

34. The Debtors have an immediate and critical need to obtain postpetition financing under the DIP Facility and to use Cash Collateral in order to effectuate an orderly liquidation of their assets that will maximize value for creditors. Without access to the DIP Facility and the continued use of Cash Collateral, the Debtors and their estates would suffer immediate and irreparable harm because they could not continue to operate while effectuating an orderly liquidation of their assets.

35. The use of Cash Collateral alone would be insufficient to meet the Debtors' postpetition liquidity needs. The Debtors are unable to obtain (a) adequate unsecured credit, (b) adequate credit secured by a senior lien on unencumbered assets or a junior lien on encumbered assets, or (c) secured credit from parties other than the DIP Lenders on terms more favorable than the terms of the DIP Facility. The only source of secured credit available to the Debtors, other than the use of Cash Collateral, is the DIP Facility. The Debtors require both additional financing and the continued use of Cash Collateral in order to satisfy their postpetition liquidity needs.

36. The DIP Lenders have indicated a willingness to provide the Debtors with certain financing commitments, but solely on the terms and conditions set forth in the DIP Term Sheet and the Interim Order. After considering all of their alternatives, including seeking financing from a prospective buyer and alternative DIP lenders, the Debtors have concluded, in an exercise of their sound business judgment, that the financing to be provided by the DIP

Lenders pursuant to the terms of the DIP Term Sheet and the Interim Order represents the best financing presently available to the Debtors. These funds will be used to maintain the Debtors' assets and knowledge base pending an orderly sale process.

38. The Debtors have negotiated the Postpetition Financing Arrangement and the DIP Term Sheet in good faith and at arm's-length with the DIP Agent, DIP Lenders, Prepetition Agent and Prepetition Lenders. The Debtors believe that the terms of the Postpetition Financing Arrangement are fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and fair consideration.

38. The Debtors have been unsuccessful in obtaining alternative financing. Prior to the Petition Date, the Debtors were unequivocally advised that the Prepetition Lenders would not provide debtor-in-possession financing, but would consent to a priming financing facility from another other party. The Debtors have no material assets that are not encumbered by the liens of the Prepetition Lenders. In view of this fact and the significant negative cash flow of the Debtors, I believe it virtually impossible to secure DIP financing from any source other than the DIP Lenders. Indeed, the Debtors have solicited alternative financing proposals from other parties without success.

39. Based on the foregoing, I believe that the urgent need to preserve the Debtors' business, and avoid immediate and irreparable harm to the estates, makes it imperative that the Debtors be authorized to access postpetition financing under the terms of the DIP Facility and use Cash Collateral immediately upon the first day of these Cases,

Lenders pursuant to the terms of the DIP Term Sheet and the Interim Order represents the best financing presently available to the Debtors. These funds will be used to maintain the Debtors' assets and knowledge base pending an orderly sale process.

37. The Debtors have negotiated the Postpetition Financing Arrangement and the DIP Term Sheet in good faith and at arm's-length with the DIP Agent, DIP Lenders, Prepetition Agent and Prepetition Lenders. The Debtors believe that the terms of the Postpetition Financing Arrangement are fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and fair consideration.

38. The Debtors have been unsuccessful in obtaining alternative financing. Prior to the Petition Date, the Debtors were unequivocally advised that the Prepetition Lenders would not provide debtor-in-possession financing, but would consent to a priming financing facility from another other party. The Debtors have no material assets that are not encumbered by the liens of the Prepetition Lenders. In view of this fact and the significant negative cash flow of the Debtors, I believe it virtually impossible to secure DIP financing from any source other than the DIP Lenders. Indeed, the Debtors have solicited alternative financing proposals from other parties without success.

39. Based on the foregoing, I believe that the urgent need to preserve the Debtors' business, and avoid immediate and irreparable harm to the estates, makes it imperative that the Debtors be authorized to access postpetition financing under the terms of the DIP Facility and use Cash Collateral immediately upon the first day of these Cases,

pending a final hearing on the DIP Financing Motion, in order to continue their operations and administer their Cases.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: May 21, 2013

_____
Robert Hookstra
Interim President, Interim Treasurer, Secretary,
Highway Technologies, Inc.

Interim Chief Executive Officer, Interim Chief
Financial Officer, Secretary
HTS Acquisition, Inc.