IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| HIGHWAY TECHNOLOGIES, INC., *et al.*, | Case No.: 13-11326 (___) |
| Debtors.[1] | (Joint Administration Requested) |

### MOTION OF THE DEBTORS FOR ENTRY OF AN ORDER: (I) AUTHORIZING THE DEBTORS TO (A) PAY WAGES, SALARIES, AND CERTAIN OTHER COMPENSATION, WITHHOLDINGS, AND BENEFITS CONTRIBUTIONS; (B) PAY CERTAIN RELATED ADMINISTRATIVE OBLIGATIONS; AND (C) PAY REIMBURSABLE EMPLOYEE EXPENSES; AND (II) AUTHORIZING BANKS AND OTHER FINANCIAL INSTITUTIONS TO PAY ALL CHECKS AND ELECTRONIC PAYMENT REQUESTS MADE BY THE DEBTORS <u>RELATING TO THE FOREGOING</u>

Highway Technologies, Inc. and its affiliated chapter 11 debtors and debtors and

debtors in possession (collectively, the "<u>Debtors</u>"), hereby move (the "<u>Motion</u>") the Court for

entry of an order:  (a) authorizing, but not requiring the Debtors to (i) pay and/or honor and remit

prepetition wages, salaries, and certain other compensation, payroll withholdings and benefits

contributions, (ii) pay certain related administrative obligations, (iii) pay prepetition payroll and

benefits administrative fees and expenses; (iv) make health and welfare contributions; and (v)

pay reimbursable employee expenses; and (b) authorizing banks and other financial institutions

to receive, process, honor, and pay all checks presented for payment and electronic payment

requests relating to the foregoing.  In support of this Motion, the Debtors respectfully state as

follows:

---

[1]  The Debtors in these proceedings and the last four digits of each Debtor's federal taxpayer identification number are as follows: Highway Technologies, Inc. (6608); and HT Acquisition, Inc. (9831).  The Debtors' mailing address is 6800 Dixie Drive, Houston, Texas 77087.

## Jurisdiction

1.      This Court has jurisdiction over this Motion under 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  Venue of these proceedings and this Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

2.      The statutory bases for the relief requested herein are sections 105(a), 363(b) and 507(a) of title 11 of the United States Code (as amended, the "Bankruptcy Code") and Rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (as amended, the "Bankruptcy Rules").

## Background

3.      On the date hereof (the "Petition Date"), each of the Debtors filed with this Court a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  Concurrently herewith, the Debtors have filed a motion with this Court requesting joint administration of the Debtors' chapter 11 cases (the "Cases") for procedural purposes only.  The Debtors are operating their business and managing their properties as debtors and debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No request has been made for the appointment of a trustee or an examiner in these cases, and no official committee has yet been appointed by the Office of the United States Trustee (the "U.S. Trustee").

4.      With over 30 years of experience, prior to the Petition Date, Highway Technologies was one of the largest traffic safety companies in the United States and a national leader in providing temporary and permanent roadway traffic management and safety services, including pavement marking installations, permanent installations of highway guardrails, barrier

walls and signage, and traffic control services for special events. The Company provided such special event services for the Democratic & Republican National Conventions, the Super Bowl, the Lollapalooza Music Festival and Ironman competitions. In addition, the Company offered a complete line of rental products including traffic control devices, trucks, signage and related and equipment. Prior to the Petition Date, the Company operated from 32 locations in 13 states (Arizona, California, Colorado, Florida, Illinois, Louisiana, Minnesota, Missouri, Montana, Nevada, New Jersey, Oregon and Texas).

5.    Just prior to the Petition Date, the Debtors ceased operations, terminated approximately 740 employees and began the process of securing their assets for sale. The Company intends to offer its inventory and assets for sale piecemeal through private sales and auctions and also branch by branch on a turnkey basis ("Turnkey Branch Sales"). To the extent that the Company is successful at accomplishing some Turnkey Branch Sales, employees could be rehired by the buyers of the branches.

6.    The factual background regarding the Debtors, including their current and historical business operations and the events precipitating their chapter 11 filings, are set forth in detail in the *Declaration of Robert Hookstra in Support of First Day Motions* (the "Hookstra Declaration") filed concurrently herewith and fully incorporated herein by reference.[2]

### The Debtors' Employees and Unions

7.    The Debtors previously employed approximately 825 employees in hourly, salaried, supervisory, management, sales, administrative and production positions to

---

[2] Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Hookstra Declaration.

perform the functions necessary to effectively and efficiently operate the Debtors' business (collectively, the "Employees"), approximately 135 of whom were members of various unions (the "Union Employees").

8.      Prior to the Petition Date, the Debtors terminated all but approximately 85 of their Employees in connection with the Debtors' wind-down of their operations and sale of their assets.

9.      Also prior to the Petition Date, Robert Meehan served as Interim Chief Executive Officer and Chief Operating Officer of the Debtors and Arthur Ferreira served as Interim Chief Financial Officer of the Debtors pursuant to an *Interim CEO/COO and CFO Services Agreement with Meehan Management* with the Debtors, dated as of August 6, 2011 (the "Interim Services Agreement"), as amended (the "Amendment").  The Amendment expired on December 31, 2011; however the Debtors and Messrs. Meehan and Ferreira continued to perform under the terms of the Amendment even though that agreement was not formally extended.  Mssrs. Meehan and Ferreira were not Employees of the Debtors and provided their respective services, as individual contractor consultants, pursuant to the terms of the Amendment.  On a weekly basis, the Debtors paid Meehan an hourly consulting fee of $240 per hour for services performed by Mr. Meehan and paid Ferreira $220 per hour for services performed by Mr. Ferreira.  The Debtors provided 1099 statements to Ferreira and Meehan at the end of each calendar year with respect to payments paid to each of them.

10.      Messrs. Meehan and Ferreira resigned their positions as officers immediately prepetition.  Contemporaneously with their resignations, Robert Hookstra, who had

4

been serving as controller and secretary of the Debtors, was elected Interim President of the

Debtor Highway Technologies, Inc. and Interim Chief Executive Officer of HT Acquisition, Inc.

(and non-debtor, HTS Holding, Inc.) and his salary was increased commensurately with his

increased responsibilities.

11.    The Debtors intend to continue to utilize the services of Messrs. Meehan

and Ferreira postpetiton, on a very interim basis in the ordinary course of their business.

Although Messrs. Meehan and Ferreira will be paid as independent contractors and not as

employees, the Debtors by this Motion, in an abundance of caution, are requesting approval of

the postpetition payments on account of Messrs. Meehan's and Ferreira's services on such

reduced basis.  The Debtors by this Motion do not seek payment of any prepetition amounts

owing under the Interim Services Agreement or the Amendment.

12.    The Debtors pay their Employees weekly on Fridays.  The postpetition

payroll scheduled to be paid on Friday, May 24, 2013 includes amounts payable to all

Employees who were employed during that payroll period, both those who have been retained

postpetition and those who were terminated prepetition.  The May 31, 2013 payroll covers only

the retained Employees.

13.    The Debtors previously paid or made available certain health, insurance,

vacation and other paid time off benefits, and other benefits (collectively, the "Benefits") to

Employees.  The Debtors have terminated their Benefits programs and the Debtors do not seek to

pay (1) any prepetition Benefits claims or (2) any benefits to any retained non-union Employees

postpetition.  Instead the Debtors have provided a $500 per month benefit stipend to retained

5

non-union Employees (pro-rated for any partial month) in lieu of providing such benefits to the retained Employees. The Debtors also intend by subsequent motion to seek approval of the establishment of the "Prepetition Priority Health Benefit Fund" (as defined below).

14.    The Debtors previously gave, and have terminated, vacation and other paid time off Benefits to Employees. The Debtors do not seek by this Motion to continue or pay prepetition or postpetition vacation, paid time off or any similar Benefit to any retained or terminated Employees.

15.    The Debtors' prepetition healthcare plan was self-insured. Under the healthcare Benefit previously provided to Employees, the first $300,000 of medical claims per year, per Employee, was paid directly by the Debtors through a plan administrator and was not covered by third-party insurance. The Debtors maintained "stoploss" coverage for amounts in excess of $300,000 per employee per year. The Debtors anticipate that a number of claims for prepetition healthcare benefits will be submitted to the administrator by Employees for payment by the Debtors postpetition. These benefits would be entitled to priority under § 507(a)(5). If certain conditions are satisfied (including repayment of the DIP Obligations, a minimum distribution to the Prepetition Lenders and court approval), the Prepetition Lenders have agreed to subordinate up to $400,000 (inclusive of any costs of administering such benefits) of their secured claims to the payment of allowed prepetition priority health benefits to be paid (the "Prepetition Priority Health Benefit Fund"). The Debtors are not seeking authority to establish the Prepetition Priority Health Benefit Fund through this Motion -- it will be the subject of a separate motion.

16.     To minimize the personal hardships that the Employees (both those who have been terminated and those are being retained) will suffer if their prepetition employment-related obligations are not paid or honored, to maintain the morale of the retained Employees during this critical time, and to minimize disruptions to the Debtors' ongoing business operations and the administration of the Debtors' estates, the Debtors, by this Motion, seek authority, in their sole discretion, to:  (i) pay unpaid prepetition claims for wages, salaries, and other compensation including Employees' 401(k) plan contributions (collectively, the "Unpaid Wages") to the Employees (both those who have been terminated and those who are being retained) up to $12,475 per employee; (ii) pay and remit the Withholding Obligations (defined below) to the proper third parties; (iii) pay the Payroll Administrative Fees and the Benefits Administrative Fees (each as defined below); (iv) pay and remit the Union Health and Welfare Contributions (defined below) with respect to the retained Employees; (v) reimburse certain unpaid business Expense Reimbursement Obligations (defined below) incurred prepetition by the Employees; and (vi) pay all costs incident to the foregoing as set forth in detail below.

### The Debtors' Compensation and Benefits Programs

**A.     The Debtors' Compensation Procedures; Unpaid Wages and Withholding Obligations; Payroll Admnistrative Fees**

17.     The Debtors' aggregate weekly payroll including wages and salaries and Employee 401(k) Plan deductions (collectively, "Wages") was approximately $875,000 prior to the prepetition Employee terminations.  Employees are paid one week in arrears, on a weekly basis every Friday, with direct deposits or checks issued on the Friday after the close of each pay

7

period.  Thus, the Debtors' last payroll was made to Employees on May 17, 2013 and covered

Wages earned for the week of May 5 through May 11, 2013, for both retained and terminated

Employees.  The payroll proposed to be made on May 24, 2013 will cover Wages earned for the

week of May 12 through May 18, 2013, and the payroll proposed to be made on May 31, 2013

will cover Wages for the week of May 19 through May 25, 2013, each for retained Employees

only.  The Debtors pay their Employees through an outside payroll administrator, Automated

Data Processing, Inc. ("ADP").

18.    As of the Petition Date, the Debtors owe an estimated $875,200 for the

gross amount of earned but Unpaid Wages for Employees.[3]  The Debtors seek authority to pay

the total amount of Unpaid Wages for Employees up to a total and aggregate amount of

$890,000.

19.    In the ordinary course of their business, the Debtors routinely both

withhold from Wages certain amounts that the Debtors are required to transmit to taxing

authorities for purposes such as Social Security and Medicare, federal and state or local income

taxes, and make the employer tax payments on account of such taxes (collectively, the

"Employer Tax Obligations").  The Employer Tax Obligations are remitted directly by ADP to

the various governmental entities.

20.    The Debtors previously withheld contributions to the Debtors' health,

vision, dental benefit plans and insurance plans, 401(k) contributions and 401(k) loan

repayments, employee medical contributions, flexible spending contributions (all of which

---

[3]  No Employee is owed more than $12,475 in Unpaid Wages.

benefits programs have been terminated), contributions required to be made with respect to Union Employees, and withholdings for garnishment, or child support or similar obligations pursuant to court order or law (the "<u>Benefits Withholdings</u>" and, together with the Employer Tax Obligations, the "<u>Withholding Obligations</u>"). The 401(k) plan contributions and Withholding Obligations have not yet been remitted and will be payable with respect to the May 24 and May 31, 2013 payrolls.

21.    The Debtors estimate that approximately $365,000 of Employer Tax Obligations were routinely withheld or incurred and are unpaid in connection with the Unpaid Wages for May 17, May 24, and May 31, 2013 payrolls. The Debtors request authority to pay the Employer Tax Obligations, up to $385,000, with respect to those payrolls, plus any amounts subsequently deemed to be due and owing pursuant to any audit of the Employer Tax Obligations which occurs after the Petition Date.

22.    Included in the Benefits Withholdings are amounts deducted from Employee paychecks in the aggregate amount of approximately $3,000 with respect to the May 17 and May 24, 2013 payrolls for the following: (1) vision benefits administered by EyeMed; and (2) union dues. The Debtors request authority to pay the vision benefits withholdings to EyeMed for payment of vision benefits claims, and the union dues to the applicable union, up to $4,000 in the aggregate with respect to the May 17 and May 24, 2013 payrolls.

23.    Employee Benefits also included supplemental life insurance and/or accidental death and dismemberment insurance administered by CIGNA, the premiums for which were paid by a combination of Benefits Withholdings from Employees paychecks and

9

direct contributions by the Debtors to CIGNA.  Approximately $41,000 is owing to CIGNA

prepetition, consisting of a combination of the Benefits Withholdings and the Debtors' direct

contributions.  The Debtors request authority to pay the Benefits Withholdings with respect to

such insurance to CIGNA or, in the Debtors' discretion, directly to the Employees from whose

paychecks the withholdings were deducted, and to pay the Debtors' direct contributions for such

insurance to CIGNA, up to $45,000 in the aggregate with respect to prepetition amounts

withheld and/or payable ("CIGNA Insurance Payment").

   24. As noted above, ADP processes the Debtors' payroll.  The Debtors fund

payroll to ADP each Wednesday.  The Debtors are responsible for paying all applicable

withholdings and payroll taxes with respect to the Employees and these amounts are wired to

ADP every Friday for remittance to the various federal and local taxing authorities.  In the

ordinary course of business, the Debtors provide applicable schedules in advance of the payroll

payment period, and ADP issues payroll checks.  The Debtors pay approximately $15,000 per

month to ADP on account of payroll processing services ("Payroll Administrative Fees").  The

Debtors do not estimate that they owe ADP anything on account of prepetition services.  By this

Motion, the Debtors request authority to continue to use ADP's payroll processing services and,

in the event that some prepetition amounts may be due to ADP, authority to pay such amounts up

to a total and aggregate amount of $1,000.

**B.** **Benefits Administrative Fees**

   25. The Debtors utilized several Benefits administrators prepetition, in

connection with the administration of their Benefits programs (the "Benefits Administrators"),

10

including Anthem, T&H Benefits, and Payflex Admin.  Prepetition administrative fees

("Benefits Administrative Fees") may be due and owing to one or more of the Benefits

Administrators.  The Debtors request authority to pay, in their discretion, up to $28,000 of

prepetition administrative fees to one or more of the Benefits Administrators as necessary to

ensure that required notices are provided to Employees including those required to advise about

the termination of health Benefits and other Benefits plans, and to provide COBRA notices,

HIPAA certificates of creditable coverage, and other notices in connection with the termination

of the Benefits.

### C.    Union Health and Welfare Contributions

26.    The Debtors were required under the collective bargaining agreements

with the Unions to contribute to the Union health and welfare and other plans (the "Union Health

and Welfare Contributions").  The Debtors request authority to pay, in their discretion, up to

$16,000 of prepetition, unpaid required contributions to the Union health and welfare plans for

union employees continuing in employment with the Debtors on and after May 17, 2013.

### D.    Business Expense Reimbursements

27.    The Debtors customarily reimburse Employees who incur business

expenses in the ordinary course of performing their duties on behalf of the Debtors.  Such

expenses typically include, but are not limited to, business-related travel expenses, including air

travel, auto travel and car rental, lodging, meal charges, business lunches, telephone charges, and

miscellaneous other allowed travel expenses (the "Expense Reimbursement Obligations").[4]

---

[4] Any amounts billed by Employees to corporate charge cards for the purchase supplies, inventory, and equipment on behalf of the Debtors and in support of the Debtors' businesses are addressed in the Debtors' *Motion Pursuant to*

28.     It is difficult for the Debtors to determine the exact amounts of Expense

Reimbursement Obligations that are due and owing for any particular time period since the

expenses incurred by Employees on behalf of the Debtors throughout the year vary on a monthly

basis.  Additionally, there may be some delay (typically up to one month) between when an

Employee incurs an expense and submits the corresponding expense report for processing.

Based on historical experience, the average monthly amount of Expense Reimbursement

Obligations for all Employees was approximately $15,000.

29.     By this Motion, the Debtors seek authority to pay, at their discretion, any

prepetition Expense Reimbursement Obligations (including any such amounts due to former

Employees) up to a total amount of $25,000 and to continue to honor Expense Reimbursement

Obligations incurred postpetition in the ordinary course of the Debtors' business.

**E.**     **Payment for Meehan's and Ferreira's Reduced Postpetition Services**

30.     As set forth above, Robert Meehan served as Interim Chief Executive

Officer and Chief Operating Officer of the Debtors and Arthur Ferreira served as Interim Chief

Financial Officer of the Debtors pursuant to the Interim Services Agreement and Amendment

prior to the Petition Date, and resigned prior to the Petition Date.  On a weekly basis, the Debtors

paid an hourly consulting fee of $240 per hour for services performed by Mr. Meehan and paid

$220 per hour for services performed by Mr. Ferreira.  Messrs. Meehan and Ferreira resigned

their positions as officers immediately prepetition.

---

*Sections 105, 345, 363, 1107, and 1108 of the Bankruptcy Code for an Order Authorizing (I) Maintenance of Existing Bank Accounts, (II) Continued Use of Existing Business Forms, (III) Continued Use of Existing Cash Management System, (IV) Continued Performance of Intercompany Transactions and (V) Limited Waiver of Section 345(b) Deposit and Investment Requirements* being filed contemporaneously with this Motion, and authority to pay such amounts is not sought by this Motion.

31.    The Debtors intend to continue to utilize the services of Messrs. Meehan and Ferreira postpetition, in the ordinary course of their business, on a reduced hourly basis. In an abundance of caution, the Debtors by this Motion are requesting approval to make postpetition payments on account of Messrs. Meehan's and Ferreira's postpetition services on such reduced hourly basis. The Debtors estimate that such payments for postpetition services will not exceed $10,000. The Debtors by this Motion do not seek payment of any prepetition amounts owing under the Interim Services Agreement or the Amendment.

**F.    401(k) Savings Plans**

32.    The Debtors maintained three 401(k) plans for the benefit of their Employees, one for non-union and two for union Employees (the "401(k) Plans"). The 401(k) Plans provided for pre-tax salary deductions of eligible compensation up to certain limits set by the Internal Revenue Code. The Debtors utilize plan trustees (the "Plan Trustees") for the 401(k) Plans. As noted above, the Debtors by this Motion seek authority to pay to the Plan Trustees the contributions made by Employees, and such amounts are included in the Unpaid Wages sought to be paid by the Debtors pursuant to this Motion.

33.    The Debtors are discontinuing their 401(k) Plans. The Debtors anticipate that each Plan Trustee with that Plan's administrator will take the actions necessary for the termination of the 401(k) Plan and the distribution and/or rollover of the Plan assets to or on behalf of the participating Employees, and will be paid its fees and expenses from the Plan assets.

**Relief Requested**[5]

34.    Pursuant to sections 105(a), and 363(b)(1) and (c)(1) of the Bankruptcy

Code and the "necessity of payment" doctrine, the Debtors seek authority to pay or remit, in their

sole discretion:

> a)    the Unpaid Wages, and any associated payroll processing obligations;
>
> b)    any Employer Tax Obligations. Benefits Withholdings and CIGNA Insurance Payment attributable to the period prior to the Petition Date and to remit the same to applicable taxing authorities or other appropriate third-parties;
>
> c)    the Payroll Administrative Fees;
>
> d)    the Benefits Administrative Fees;
>
> e)    the Union Health and Welfare Contributions; and
>
> f)    the Expense Reimbursement Obligations;

up to the cap amounts set forth in this Motion with respect to each (with each of the foregoing

referred to collectively as the "Prepetition Employee Obligations.").  In abundance of caution,

the Debtors also seek authority to pay up to $10,000 for the postpetition services of Messrs.

Meehan and Ferreira, on a reduced hourly basis, as set forth above.

35.    The Debtors represent that they will not pay any amounts in excess of the

estimated outstanding amounts for each category of prepetition claim identified herein without

further order from this Court.

36.    To enable the Debtors to accomplish the foregoing, the Debtors request

that the Court authorize the Debtors' banks and other financial institutions to receive, process,

---

[5] Nothing in this Motion is intended to or shall convert any prepetition claim into an administrative claim.

14

honor, and pay all checks presented for payment and electronic payment requests relating to the foregoing.

### Basis for Relief

37.    Statutory support for the requested relief exists pursuant to sections 105(a), 363(b)(1) and (c)(1), and 507(a) of the Bankruptcy Code and the "necessity of payment" doctrine (discussed *infra*).  Bankruptcy Code section 363(b)(1) authorizes a debtor in possession to use property of the estate other than in the ordinary course of business after notice and a hearing.  Bankruptcy Code section 363(c) authorizes a debtor in possession to enter into transactions in the ordinary course of business without notice and a hearing.  Bankruptcy Code section 105(a) further provides, in pertinent part, that this Court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of the Bankruptcy Code.

38.    The relief requested in this Motion is supported by the well-established "necessity of payment" doctrine.[6]  The "necessity of payment" doctrine, which has been embraced by the Third Circuit, "teaches no more than, if payment of a claim which arose prior to reorganization is essential to the continued operation of the [business] during reorganization, payment may be authorized even if it is made out of corpus." *In re Lehigh & New England Ry. Co.*, 657 F.2d 570, 581 (3rd Cir. 1981). *See also In re Sharon Steel Corp.*, 159 B.R. 730, 737 (Bankr. W.D. Pa. 1993) (embracing "necessity of payment" doctrine and citing *Lehigh & New England Ry. Co.* with approval).  Similarly, the court in *In re Ionosphere Clubs, Inc.*, 98 B.R.

---

[6] The doctrine was first articulated by the Supreme Court in railroad reorganization cases, *see Miltenberger v. Logansport Ry.*, 106 U.S. 286 (1882), and it has been held to be equally applicable to non-railroad debtor cases. *See, e.g., Dudley v. Mealey*, 147 F.2d 268, 271 (2d Cir. 1945) (hotel); *In re Gulf Air, Inc.*, 112 B.R. 152, 153 (Bankr. W.D. La. 1989) (airline).

15

174 (Bankr. S.D.N.Y. 1989), stated that the "necessity of payment" doctrine "recognizes the existence of the judicial power to authorize a debtor in a reorganization case to pay prepetition claims where such payment is essential to the continued operation of the debtor." *Id.* at 176. In that case, the court permitted Eastern Air Lines, Inc., to pay its current employees' prepetition wages, salaries, medical benefits, and business expense claims. Judge Lifland relied on his equitable powers under Bankruptcy Code section 105(a) and, in particular, the "necessity of payment" doctrine to authorize such payments, recognizing that the debtor had to make the payments in order to retain its current employees and maintain positive employee moral--two factors that he deemed critical to the rehabilitation of an operating debtor. *Id.* at 176-77 (*citing* H.R. Rep. No. 595 95th Cong. 1st Sess. 16 (1977)). Other courts also have found that the "necessity of payment" doctrine applies to the payment of prepetition employee compensation and benefits. *See In re Chateaugay Corp.*, 80 B.R. 279, 281 (Bankr. S.D.N.Y. 1987) (under the "necessity of payment" doctrine, bankruptcy court should defer to the debtor's business judgment in permitting payment of certain workers' compensation claims).

     39.     This Court similarly has approved the payment of prepetition claims of employees for wages, salaries, expenses, and benefits on the grounds that the payment of such claims was necessary to effectuate a successful reorganization or liquidation. *See, e.g., In re Revstone Industries, LLC,* Case No. 12-13262 (BLS) (Bankr. D. Del. Jan. 10, 2013); *In re Digital Domain Media Group, Inc., et al.,* Case No. 12-12568 (BLS) (Bankr. D. Del. Oct. 22, 2012); *In re Prince Sports, Inc., et al.,* Case No. 12-11439 (KJC) (Bankr. D. Del. May 2, 2012); *In re Summit Business Media Holding Co.*, Case No. 11-10231 (PJW) (Bankr. D. Del. Jan. 28,

2011); *In re CB Holding Corp.*, Case No. 10-13683 (MFW) (Bankr. D. Del. Dec. 13, 2010); *In re Atrium Corp.*, Case No.10-10150 (BLS) (Bankr. D. Del. Feb 22, 2010); *In re Tribune Co.*, Case No. 08-13141 (KJC) (Bankr. D. Del. Dec. 10, 2008); *In re DHP Holdings II Corp.*, Case No. 08-183422 (Bankr. D. Del. Jan. 5, 2009); *In re EZ Lube, LLC.*, Case No. 08-13256 (CSS) (Bankr. D. Del. Dec. 10, 2008); *In re NetEffect, Inc.*, Case No. 08-12008 (KJC) (Bankr. D. Del. Aug. 28, 2008); *In re Western Nonwovens Inc.*, Case No. 08-11435 (PJW) (Bankr. D. Del. July 15, 2008); *In re Global Motorsport Group, Inc.*, Case No. 08-10192 (KJC) (Bankr. D. Del. Feb. 1, 2008).

40.     The "necessity of payment" doctrine authorizes the Debtors to pay the amounts it seeks authority to pay pursuant to this Motion because the Debtors' Employees are critical assets necessary both to the Debtors' operations and the successful prosecution of these Chapter 11 Cases.

41.     Pursuant to sections 507(a)(4) of the Bankruptcy Code, claims of Employees of the Debtors for "wages, salaries, or commissions, including vacation, severance, and sick leave pay" earned within 180 days before the Petition Date are afforded priority unsecured status to the extent of $12,475 per Employee.  The Debtors do not seek to pay Unpaid Wages to any Employee in excess of $12,475.  When combined, Sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code entitle the Unpaid Wages to priority treatment.  To confirm a chapter 11 plan, the Debtors must pay priority claims in full.  See 11 U.S.C. § 1129(a)(9)(B) (requiring payment of certain allowed unsecured claims for (a) wages, salaries, or commissions, including vacation, severance, and sick pay earned by an individual, and (b)

17

contributions to an employee benefit plan).  Thus, granting the relief sought herein affects only

the timing of payments to Employees, and does not negatively affect recoveries for general

unsecured creditors.  Indeed, the Debtors submit that payment of Employee claims at this time

enhances value for the benefit of all interested parties.

42.    Many Employees live from paycheck to paycheck and rely exclusively on

receiving their full compensation or reimbursement of their expenses in order to continue to pay

their daily living expenses.  These Employees may be exposed to significant financial and

healthcare related problems if the Debtors are not permitted to pay and/or honor the Unpaid

Wages and Benefits, and the expenses associated therewith, in the ordinary course of the

Debtors' business.  Moreover, the Debtors believe that if they are unable to honor accrued

Unpaid Wages described above, Employee morale and loyalty will be jeopardized at a time when

support by the remaining Employees is critical.

43.    The Employer Tax Obligations and other amounts either voluntarily or

involuntarily withheld from Employee paychecks (collectively, the "Withholding Obligations")

do not constitute property of the Debtors' estate and principally represent employee earnings that

governments (in the case of taxes), and judicial authorities (in the case of involuntary

Withholding Obligations), have designated for deduction from Employee paychecks.  The failure

to transfer these withheld funds could result in hardship to certain Employees.  The Debtors

expect inquiries from garnishers regarding the Debtors' failure to submit, among other things,

child support and alimony payments, which are not the Debtors' property but, rather, have been

withheld from Employee paychecks. Moreover, if the Debtors cannot remit these amounts, the Debtors' Employees may face legal action due to the Debtors' failure to submit these payments.

44.     Finally, the Debtors submit that with respect to the wage-related taxes that constitute "trust fund" taxes, the payment of such taxes will not prejudice other creditors of the Debtors' estate given that the relevant taxing authorities would have a priority claim under section 507(a)(8) of the Bankruptcy Code in respect of such obligations. Moreover, the monies payable for trust fund taxes, as well as the other funds that are held in trust for the benefit of third parties, and the withheld funds with respect to the 401(k) Plan, are not property of the Debtors' estate. *See, e.g., Begier v. IRS*, 496 U.S. 53 (1990) (withholding taxes are property held by a debtor in trust for another and, as such, are not property of the debtor's estates).

45.     The remaining Employees have an intimate knowledge of the operation of the Debtors' business and are critical components to the success of these Chapter 11 Cases. Deterioration in the morale and welfare of the Employees at this critical time undoubtedly would adversely impact the Debtors and their ability to maximize the value of their assets. Satisfaction of the Unpaid Wages, as described herein, is necessary to maintain the Employees' morale during the case and to insure continued, efficient operation in order to maximize value for all creditor.

46.     Messrs. Meehan and Ferreira also have an intimate knowledge of the operation of the Debtors' business and are critical components to the success of these Chapter 11 Cases. The Debtors believe that the continued utilization of Messrs. Meehan's and Ferreira's services under the Interim Services Agreement and Amendment is in the ordinary course of the

19

Debtors' business under Bankruptcy Code § 363(a).  In an abundance of caution, the Debtors

seek approval including under Bankruptcy Code § 363(b) of the postpetition payments for those

postpetition services on a reduced hourly basis as set forth in this Motion.

### Satisfaction of Bankruptcy Rule 6003 and Waiver of Bankruptcy Rule 6004

47.    Finally, pursuant to Rule 6003(b) of the Federal Rules of Bankruptcy

Procedure, which became effective December 1, 2007, "a motion to pay all or part of a claim that

arose before the filing of the petition" shall not be granted by the Court within 21 days of the

Petition Date "[e]xcept to the extent that relief is necessary to avoid immediate and irreparable

harm . . . ." Fed. R. Bankr. P. 6003(b).  For the reasons described more fully above and as

supported by the Knight Declaration, the Debtors submit that the requirements of Rule 6003

have been met and that the relief requested in this Motion is necessary to avoid immediate and

irreparable harm.

48.    To implement the foregoing successfully and insure the wages and

benefits owed to Employees are not interrupted, the Debtors seek a waiver of the notice

requirements under Bankruptcy Rule 6004(a) and the fourteen-day stay of an order authorizing

the use, sale, or lease of property under Bankruptcy Rule 6004(h), to the extent these rules are

applicable.

**Request for Authority for Banks and Other Financial Institutions
to Honor Checks Issued to Pay Wages and Benefits, to Honor All
Fund Transfer Requests Relating to the Foregoing, and to Pay All
Processing Fees Associated with Payment of Employee Wages and Benefits**

49.    The Debtors request that all applicable banks and other financial

institutions be authorized to receive, process, honor, and pay all checks presented for payment

20

and to honor all fund transfer requests made by the Debtors to Employees and/or on account of any benefits programs, whether such checks were presented or fund transfer requests were submitted prior to, on, or after the Petition Date.  The Debtors represent that they have (or will have) sufficient postpetition funding to pay promptly all Unpaid Wages, to the extent described herein, on an ongoing basis and in the ordinary course of business.  Nothing contained in this Motion, however, shall constitute a request for authority to assume any agreements, policies, or procedures relating to Unpaid Wages.  Further, the Debtors seek to retain the discretion to decide which Unpaid Wages it will pay and honor, and nothing in this Motion shall be deemed an admission by the Debtor that any Unpaid Wages will in fact be paid or honored.

50.     Finally, the Debtors request authority to pay all of the processing fees associated with payment of the Unpaid Wages as described in this Motion.

**Notice**

51.     Notice of this Motion has been given to (i) the Office of the United States Trustee and (ii) the Debtors' prepetition and postpetition secured lenders or, in lieu thereof, to their counsel, if known.  As the Motion is seeking "first day" relief, within two business days of the hearing on the Motion, the Debtors will serve copies of the Motion and any order entered respecting the Motion as required by Del. Bankr. LR 9013-1(m).  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

**No Prior Request**

52.     No prior motion for the relief requested herein has been made to this or any other court.

WHEREFORE the Court should authorize, but not require, the Debtors to pay all of the above listed in this Motion, including: prepetition wages, salaries, and other compensation, benefits withholdings, payroll and benefits administrative fees, union health and welfare contributions, and reimbursable employee expenses, and authorize banks and other financial institutions to receive, process, honor, and pay all checks presented for payment and electronic payment requests relating to the foregoing, and grant such other and further relief as is just and proper.

Dated:    May 22, 2013

PACHULSKI STANG ZIEHL & JONES LLP

Richard M. Pachulski (CA Bar No. 90073))
Debra I. Grassgreen (CA Bar No. 169978)
Bruce Grohsgal (DE Bar No. 3583)
Maria A. Bove (NY Bar No. 8687)
John W. Lucas (NY Bar No. 4288379)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE  19899-8705
Telephone: 302/652-4100
Facsimile: 302/652-4400
E-mail:    rpachulski@pszyjw.com
          dgrassgreen@pszjlaw.com
          bgrohsgal@pszjlaw.com
          mbove@pszjlaw.com
          jlucas@pszjlaw.com

[Proposed] Counsel for the Debtors and Debtors in Possession