## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| HIGHWAY TECHNOLOGIES, INC., *et al.*, | Case No.: 13-11326 (___) |
| Debtors.[1] | (Joint Administration Requested) |

## MOTION OF DEBTORS FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING DEBTORS TO OBTAIN POSTPETITION FINANCING AND USE CASH COLLATERAL, (II) GRANTING ADEQUATE PROTECTION, (III) SCHEDULING A FINAL HEARING, AND (IV) GRANTING CERTAIN RELATED RELIEF

The debtors and debtors in possession in the above-captioned cases (collectively, the "Debtors") hereby submit this motion (the "Motion") for entry of an interim order (the "Interim Order"), substantially in the form attached hereto as **Exhibit 1**,[2] and a final order (the "Final Order," and together with the Interim Order, the "DIP Orders"):

(a) authorizing the Debtors to obtain secured postpetition superpriority financing (the "DIP Facility") on an interim basis pursuant to the terms and conditions of that certain *Priming Superpriority Debtor-in-Possession Credit Facility Term Sheet* dated as of May 20, 2013, by and among the Debtors and each lender party thereto (collectively, the "DIP Lenders"), attached to the Interim Order as **Exhibit A** (as amended, supplemented, restated or otherwise modified from time to time in accordance therewith, the "DIP Term Sheet," and together with the other documents, agreements and instruments delivered pursuant thereto or executed or filed

---

[1] The Debtors in these proceedings and the last four digits of each Debtor's federal taxpayer identification number are as follows: Highway Technologies, Inc. (6608) ("Highway Technologies"); and HTS Acquisition, Inc. (9831) ("AcquisitionCo"). The Debtors' mailing address is 6800 Dixie Drive, Houston, Texas 77087.

[2] The terms of the attached Interim Order have been approved by the DIP Agent (as defined below), subject to non-substantive changes. Capitalized terms used but not otherwise defined in this Motion shall have the meanings set forth in the DIP Term Sheet (as defined herein) or the Interim Order, as applicable.

in connection therewith, all as may be reasonably requested by the DIP Lenders (as the same

may be amended, supplemented, restated or otherwise modified from time to time, the "DIP

Loan Documents);

      (b) authorizing the Debtors to execute the DIP Loan Documents, and to perform

such other acts as may be necessary or desirable in connection therewith,

      (c) granting to the DIP Agent, for itself and for the ratable benefit of the DIP

Lenders first priority security interests in and liens on all of the DIP Collateral (as defined below)

to secure the DIP Facility and all obligations owing and outstanding thereunder and under the

DIP Loan Documents, as applicable, and the DIP Orders, as applicable (collectively, the "DIP

Obligations");

      (d) granting allowed superpriority administrative expense claims to the DIP Agent

and the DIP Lenders;

      (e) authorizing the Debtors to use Cash Collateral (as defined below) (together

with the DIP Facility, the "Postpetition Financing Arrangement");

      (f) authorizing the Debtors to grant adequate protection to Ableco Finance LLC,

in its capacity as administrative and collateral agent (in such capacity, the "Prepetition Agent")

on behalf of the lenders (collectively, the "Prepetition Lenders") under that certain Financing

Agreement, dated as of February 15, 2007  among (i) Highway Technologies, Inc. ("HT Corp."

or the "Prepetition Borrower"), (ii) HTS Acquisition, Inc., ("HTS Acquisition"), HTS Holding,

Inc. ("HTS") and each subsidiary of HTS listed as a guarantor on the signature pages to the

Financing Agreement (collectively, the "Prepetition Guarantors"), (iii) the Prepetition Lenders

and (iv) the Prepetition Agent (as amended, supplemented or otherwise modified from time to time prior to the date hereof (the "Prepetition Financing Agreement") and together with all agreements, documents, notes, mortgages, security agreements, pledges, guarantees, subordination agreements, instruments, amendments, and any other agreements delivered pursuant thereto or in connection therewith, the "Prepetition Loan Documents"); and

(g) scheduling a hearing (the "Final Hearing"), pursuant to Rule 4001(c)(2) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), to consider entry of the Final Order, *inter alia*, approving and authorizing the Postpetition Financing Arrangement (including, without limitation, the advance of the financing pursuant to the Interim Order) on a final basis pursuant to the DIP Loan Documents;

## JURISDICTION

1.      This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2), in that this is a matter concerning the administration of the Debtors' estate.  Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      The statutory bases for the relief sought herein are sections 105, 361, 362, 363 and 364 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"), Rules 2002, 4001 and 9014 of Bankruptcy Rules and Rule 4001-2 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules").

## BACKGROUND

3.　　On the date hereof (the "Petition Date"), each of the Debtors filed with this Court a voluntary petition for relief under chapter 11 of the Bankruptcy Code. Concurrently herewith, the Debtors have filed a motion with this Court requesting joint administration of the Debtors' chapter 11 cases (the "Cases") for procedural purposes only. The Debtors are operating their business and managing their properties as debtors and debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No request has been made for the appointment of a trustee or an examiner in these Cases, and no official committee has yet been appointed by the Office of the United States Trustee.

4.　　The factual background regarding the Debtors, including their current and historical business operations and the events precipitating their chapter 11 filings, are set forth in detail in the *Declaration of Robert Hookstra in Support of First Day Motions* (the "Hookstra Declaration") filed concurrently herewith and fully incorporated herein by reference.[3]

## THE DEBTORS' PREPETITION CAPITAL STRUCTURE AND SECURED DEBT

5.　　Prior to the commencement of these Cases, the Debtors entered into the Prepetition Financing Agreement with the Agent on behalf of the Prepetition Lenders to extend credit to the Borrowers consisting of (a) a term loan "A" in the aggregate original principal amount of $18,000,000, (b) a term loan "B" in the aggregate original principal amount of $2,900,000, (c) a revolving credit facility "A" in an aggregate principal amount not to exceed $3,000,000 at any time outstanding (not including any PIK Amount (as defined in the Prepetition

---

[3]　Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Hookstra Declaration.

Financing Agreement), (d) a "second out" revolving credit facility in an aggregate principal amount not to exceed $24,000,000 at any time outstanding (not including any PIK Amount), and (e) a revolving credit facility "B" in an aggregate principal amount not to exceed $10,000,000 at any time outstanding (not including any PIK Amount). The proceeds of the Prepetition Financing Agreement were used (a) to finance a portion of the acquisition of the Debtors from their prior owners (b) for general working capital requirements and other general corporate purposes of the Borrowers and (c) to pay fees and expenses related to the acquisition and the Prepetition Financing Agreement.

6.      All of the obligations owing to the Prepetition Lenders under the Prepetition Financing Agreement are secured by liens (the "Prepetition Liens") on substantially all of the Debtors' assets (the "Prepetition Collateral"), including cash collateral as defined in section 363(a) of the Bankruptcy Code ("Cash Collateral") The Prepetition Liens are subject to certain "Permitted Liens" as defined in the Prepetition Financing Agreement, including liens arising from purchase money equipment financing and liens on cash in favor of issuers of letters of credit permitted under the Prepetition Financing Agreement. In addition, as of the Petition Date, the Debtors believe that the Prepetition Lenders had not perfected their security interests in the Debtors' titled vehicles (the "Rolling Stock").

7.      As of the Petition Date, the Debtors' obligations under the Prepetition Loan Documents included principal in the amount of $66,756,208.79 and accrued interest in the amount of $352,827.36.

5

8.      Surety Bonds/Indemnification Agreements.   The Debtors also have
contingent liabilities to certain surety companies that supplied payment and performance bonds
("Surety Bonds") for certain of the Debtors' projects prior to the Petition Date including:  ACE-
USA/ACE Bond Services, Argonaut Insurance Company, Aspen American Insurance Company,
Berkley Surety Group, LLC, Hanover Insurance Group, International Fidelity Insurance
Company, Travelers Casualty and Surety Company of America  and Zurich American Insurance
Company (collectively, the "Sureties").  Each of the indemnity agreements with the Sureties give
the surety various rights against the principal/indemnitor in the event of a default.  Those
contractual rights include: (1) the specifically enforceable right to require the
principal/indemnitor to deposit collateral for any claims against the surety under the bonds by the
obligee (the "Collateral Deposit Clauses"); (2) an assignment by the principal/indemnitor of its
rights under contracts and ownership of property ("Assignment Clauses"); and (3) the grant of a
security interest in the principal/indemnitor's property.  No collateral was deposited pursuant to
the Collateral Deposit Clauses prior to the Petition Date.  With respect to the Assignment
Clauses in certain of the agreements, those clauses do not create a present assignment and the
Debtors were not requested to nor did they execute assignment agreements prior to the Petition
Date.  In addition, a UCC search in each of the Debtors' states of incorporation (Delaware and
Massachusetts) did not reveal any perfection of an interest in the personal property collateral.

9.      However, the Sureties have asserted or will likely assert rights of equitable
subrogation with respect to receivables that relate to projects for which the respective Surety

posted a bond and there will be a question regarding the relative priority of the equitable subrogation rights of the Sureties and the liens of the Prepetition Lenders.

10.    Accordingly, the Debtors are not requesting to and do not intend to use any proceeds of receivables related to bonded projects ("Bonded Receivables") pending further court order. The Debtors intend to segregate collections on any Bonded Receivables pending further order of the Court.

11.    The Debtors estimate that the total amount of outstanding Surety Bonds is approximately $88,707,448 as of the Petition Date and that the Bonded Receivables (including amounts owed on unbilled projects) is $3,975,548.

## NEED FOR THE POSTPETITION FINANCING ARRANGEMENT

12.    The Debtors have an immediate and critical need to obtain postpetition financing under the DIP Facility and to use Cash Collateral in order to effectuate an orderly sale process that will maximize value for creditors. The Debtors have ceased operating and are seeking to sell their assets either by auction or through turnkey sales of individual branches ("Turnkey Branch Sales"). However, the Debtors' operations and assets are spread across many states and locations. Accordingly, the Debtors must incur costs for items such as payroll, security and rent, in order to liquidate their assets in an orderly and responsible manner. In addition, if the Debtors are able to complete Turnkey Branch Sales, employees may be rehired and certain key contracts may be assumed. Without access to the Postpetition Financing Arrangement, the Debtors and their estates would suffer immediate and irreparable harm because

7

they could not effectuate an orderly sale process to maximize value for creditors and the possibility of re-rehiring employees through Turnkey Branch Sales would be eliminated.

13.    The use of Cash Collateral alone would be insufficient to meet the Debtors' postpetition liquidity needs.  The Debtors are unable to obtain (i) adequate unsecured credit allowable either (a) under sections 364(b) and 503(b)(1) of the Bankruptcy Code or (b) under section 364(c)(1) of the Bankruptcy Code, (ii) adequate credit secured by (x) a senior lien on unencumbered assets of the Debtors' estates under section 364(c)(2) of the Bankruptcy Code and (y) a junior lien on encumbered assets under section 364(c)(3) of the Bankruptcy Code, or (iii) secured credit under section 364(d)(1) of the Bankruptcy Code from sources other than the DIP Lenders on terms more favorable than the terms of the DIP Facility.  The only source of secured credit available to the Debtors, other than the use of Cash Collateral, is the DIP Facility. The Debtors require both additional financing under the DIP Facility and the continued use of Cash Collateral in order to satisfy their postpetition liquidity needs.

14.    The DIP Lenders have indicated a willingness to provide the Debtors with certain financing commitments, but solely on the terms and conditions set forth in the DIP Term Sheet and the Interim Order.  After considering all of their alternatives, including seeking financing from a prospective buyer, the Debtors have concluded, in an exercise of their sound business judgment, that the financing to be provided by the DIP Lenders pursuant to the terms of the DIP Term Sheet and the Interim Order represents the best financing presently available to the Debtors.  These funds will be used to maintain the Debtors' assets and knowledge base pending an orderly sale process.

8

15.     The Debtors have negotiated the Postpetition Financing Arrangement and the DIP Term Sheet in good faith and at arm's-length with the Secured Lenders.  The Debtors believe that the terms of the Postpetition Financing Arrangement are fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and fair consideration.  The Debtors anticipate that the Prepetition Lenders will consent to the relief requested herein.

### SUMMARY OF PRINCIPAL TERMS OF THE DIP FACILITY

16.     The DIP Facility consists of a postpetition multi-draw term loan facility in an aggregate principal amount of up to $3,000,000, of which an aggregate principal amount of $2,000,000 will be available on an interim basis as set forth in the DIP Term Sheet and the Interim Order.

17.     The Debtors' DIP Obligations are to be secured by valid and perfected first priority liens and security interests, subject only to (a) Permitted Liens (as set forth in the DIP Term Sheet), and (b) the Carve-Out (as defined below).  The collateral for the DIP Facility is all of the assets of the Debtors' estates, including the Prepetition Collateral and, subject to the entry of the Final Order, Avoidance Actions (collectively with all proceeds and products of any or all of the foregoing, the "DIP Collateral").

18.     The following is a summary of the terms of the DIP Facility:[4]

---

[4]  This summary of the DIP Facility and the Interim Order is provided for the benefit of the Court and other parties in interest.  To the extent there are any conflicts between this summary and the Interim Order or the DIP Term Sheet, the terms of the Interim Order or DIP Term Sheet shall govern, as applicable.

| | |
|---|---|
| <u>Borrowers</u>: | Highway Technologies and AcquistionCo. |
| <u>Guarantor(s)</u>: | None |

<u>DIP Lenders</u>: Oak Hill Special Opportunities Fund, L.P.; Oak Hill Special Opportunities Fund (Management), L.P. ; and Wynnchurch Capital Partners II, L.P.

<u>Closing Date</u>: "<u>Interim Closing Date</u>" means the date on which the "<u>Conditions Precedent to the Interim DIP Loan</u>" set forth under below are satisfied or waived by the DIP Lenders.

"<u>Final Closing Date</u>" means the date on which the conditions precedent to the Final DIP (including, without limitation, entry of the Final Order (as defined below)) shall have been satisfied or waived.

<u>Type and Amount</u>: A multiple draw term loan facility in an aggregate principal amount, before giving effect to the Roll Up (as defined below), of $3,000,000 (the "<u>Maximum Commitment</u>") (a) $2,000,000 of which shall be available to borrow in accordance with the Approved Budget (the "<u>Budgeted Line</u>"); and (b) $1,000,000 of which shall be available to borrow in amounts and for purposes approved by the DIP Lenders in their sole and absolute discretion (the "<u>Discretionary Line</u>").

<u>Availability</u>: In accordance with the DIP Term Sheet, to be made available to Borrower as follows:

<u>Interim DIP Loan</u>: A term loan facility to be available in a single drawing commencing on the Interim Closing Date in aggregate principal amounts necessary to fund the Approved Budget until the Final Closing Date (as defined below),and any amounts authorized by the DIP Lenders under the Discretionary Line, all subject to the provisions of the DIP Term Sheet (the "<u>Interim DIP Loan</u>"); and

<u>Final DIP Loan</u>: A term loan facility in an aggregate principal amount not to exceed (i) the amount of any Roll-Up (defined below); plus (ii) the Maximum Commitment (inclusive of all draws under the Interim DIP Loan), such Maximum Commitment to be made available to the Debtors in multiple draws of not less than $100,000 (and not more frequently than twice a week), subject to the terms and on the conditions set forth in the DIP Loan Documentation (the "<u>Final DIP Loan</u>" and, collectively with the Interim DIP Loan, the "<u>DIP Loans</u>").

<u>Purpose</u>: DIP Loans will be used for (a) working capital and general corporate purposes of the Debtors, (b) bankruptcy-related costs and expenses (subject to the Carve-Out), (c) costs and expenses related to the Sale, in the case of (a), and (c), in accordance with the Approved Budgets (defined below) and, (d) for any other purpose agreed upon in the DIP Loan Documentation.

None of the proceeds of the DIP Loans shall be used in connection with the investigation (including discovery proceedings), initiation or prosecution of any claims, causes of action, adversary proceedings or other

DOCS_SF:83212.5 36024/001

litigation against the DIP Lenders (in any capacity), including in connection with the validity of the liens granted to the DIP Lenders, except up to the amount of $25,000 as set forth in the DIP Orders.

Budget and Projections:

Use of cash shall be subject to a weekly budget for the period commencing on the Target Petition Date and ending on the Outside Date (defined below), each in form and substance acceptable to the Prepetition Lenders and the DIP Lenders in their sole and absolute discretion (the "Approved Budget").

By not later than three (3) business days after the end of the week following the Petition Date, Borrowers shall deliver to the DIP Lenders and the Prepetition Agent a variance report in form and substance acceptable to the Secured Creditors in their sole and absolute discretion (an "Approved Variance Report") showing comparisons of actual results for each line item against such line item in the Approved Budget. Thereafter, Borrowers shall deliver to the DIP Lenders and the Prepetition Agent, by not later than three (3) business days after the close of each weekly period after the Petition Date, an Approved Variance Report for the trailing four (4) week period (or, if fewer than four weeks have lapsed since the Petition Date, then for the trailing one, two or three week period, as applicable).

Each Approved Variance Report shall indicate whether there are any adverse variances that exceed the allowed variances, which means, in each case measured on a cumulative basis, (x) up to 10% on a line-item basis, or (y) 10% in the aggregate for all cash receipts and cash disbursements ("Permitted Variance").

Priority:

All DIP Loans and other liabilities and obligations of the Borrowers to the DIP Lenders under or in connection with this Term Sheet, the DIP Loan Documentation, the Interim Order or Final Order (collectively, the "DIP Obligations") shall be:

(i)     pursuant to section 364(c)(1) of the Bankruptcy Code, entitled to superpriority administrative expense claim status in the chapter 11 Cases of the Debtors with priority over any and all administrative expenses, whether heretofore or hereafter incurred, of the kind specified in sections 503(b) or 507(b) of the Bankruptcy Code and including the proceeds of Avoidance Actions (as defined below) only from and after the Final Closing Date and subject to entry of the Final Order (but in all cases subject to the Carve-Out);

(ii)    pursuant to sections 364(c)(2), secured by a perfected first-priority lien on the Collateral (as defined below) to the extent that such Collateral is not subject to valid, perfected and non-avoidable liens as of the Petition Date (but in all cases subject to the Carve-Out);

(iii)   pursuant to section 364(c)(3) of the Bankruptcy Code, secured by a perfected second priority lien on the Collateral, to the extent that such Collateral is subject to valid, perfected and

11

non-avoidable liens in favor of third parties in existence as of the Petition Date or to valid liens in existence as of the Petition Date that are perfected subsequent to such date as permitted by section 546(b) of the Bankruptcy Code, and to the extent such liens are expressly permitted in writing by the Prepetition Lenders and the DIP Lenders in their sole and absolute discretion (but in all cases subject to the Carve-Out); and

(iv)     pursuant to section 364(d) of the Bankruptcy Code, secured by a perfected first priority, priming and senior security interest and lien granted to the DIP Lenders (the "Priming DIP Liens") in and on all the Collateral (but in all cases subject to the Carve-Out). All existing liens, rights and interests granted to or for the benefit of: the Prepetition Lenders shall be primed and made subject to and subordinate to the Priming DIP Liens (but in all cases subject to the Carve-Out).

(v)      The Priming DIP Liens shall not be subject to being treated *pari passu* with or subordinated to any other liens or security interests (whether currently existing or hereafter created), subject in each case only to permitted exceptions to be expressly agreed upon in writing by the DIP Lenders in their sole and absolute discretion or imposed by applicable non-bankruptcy law (collectively, the "Permitted Liens"), and the Priming DIP Liens shall be junior and subordinate to payment of the Carve-Out, as defined below.

Under the proposed Interim Order, the term "Carve-Out" means, collectively: (i) fees payable to the United States Trustee pursuant to 28 U.S.C. § 1930(a)(6) or to the Clerk of the Bankruptcy Court (the "Case Administration Fees"), (ii) unpaid professional fees and expenses ("Debtor Professional Fees") payable to each legal or financial advisor retained by the Debtors (the "Debtor Professionals") that are incurred or accrued prior to the date of the occurrence of a Termination Event (as defined below), but subject to the aggregate amount(s) set forth in the Approved Budget and ultimately allowed by the Court pursuant to sections 328, 330, 331 and 503 of the Bankruptcy Code or any order of the Court (whenever such fees may be actually incurred prior to the Termination Event), provided however, as long as Permitted Variances are at all times maintained, amounts set forth in the Approved Budget for Debtor Professional Fees shall be permitted a ten (10%) percent allowed variance, provided further that the DIP Lenders shall not be obligated to fund any amounts in excess of the Maximum Commitment; (iii) unpaid professional fees and expenses (together with the Debtor Professional Fees, the "Professional Fees") payable to each legal or financial advisor retained by the Committee that are incurred or accrued prior to the date of the occurrence of a Termination Event (as defined in the Interim Order or Final Order as in effect) but subject to the aggregate amount(s) set forth in the Approved Budget and ultimately allowed by the Court pursuant to sections 328, 330, 331 and 503 of the Bankruptcy Code or any order of the Court (whenever such fees

12

may be actually incurred prior to the Termination Event), and (iv) Case Administration Fees and Professional Fees paid on or after the date of the occurrence of a Termination Event in an aggregate amount not to exceed $50,000. Prior to the occurrence of a Termination Event, the Debtors shall fund the amount set forth in the "Fees Paid" section of the Approved Budget (A) for payment of Professional Fees weekly to a trust account held by Debtors' counsel, which funds may be released to professionals upon Court approval (the "Trust Account"); and (B) for payment of Secured Parties' Fees and Expenses (as defined in the DIP Order) weekly to DIP Lenders' counsel and Prepetition Agent's counsel, each respectively. Nothing herein limits the ability of the Debtor Professionals and the Secured Parties to agree to additional budgeted amounts for Debtor Professional Fees in connection with the negotiation and consummation of a going concern Sale of substantially all of the Debtors' assets.

To the extent sufficient unencumbered funds are not available from the Debtors' estates, and after $500,000 has been paid to the Prepetition Agent on account of the Prepetition Liens, the Prepetition Liens shall be subject and subordinate to, in accordance with the priority set forth in the DIP Orders, and proceeds of the Prepetition Collateral may be used, up to the amount of $400,000, to pay unreimbursed claims incurred prior to the Petition Date by employees or former employees of the Debtors, to the extent customarily presented and payable under the Debtors' medical, dental and vision plans in effect prior to the Petition Date, including costs and expenses of processing and administration thereof (the "Medical Claim Carve-Out"), which Medical Claim Carve-Out shall be subject to further order of the Court to be made on appropriate application and notice.

| | |
|---|---|
| Roll-Up of Prepetition Financing Agreement: | Subject to the entry of the Final Order, on the Final Closing Date the indebtedness of Borrowers under, connection with, or with respect to the Prepetition Financing Agreement and all related documents, whether for borrowed money, fees, expenses, or otherwise shall be converted into DIP Loans (the "Roll-Up"), subject to customary challenge rights in favor of creditors or any statutory committee. The amount of Prepetition Obligations (as defined in the Interim Order and the Final Order that will be subject to the Roll-Up shall be equal to three (3) times the Budgeted Line, subject to the terms and conditions of the DIP Loan Documentation. |
| Adequate Protection: | As adequate protection, and in consideration for continuing to use Cash Collateral (as defined in the Interim Order) and for consenting to subordinate the Prepetition Obligations to the DIP Loan Obligations, the Prepetition Agent (for the ratable benefit of the Prepetition Lenders) shall receive, inter alia, replacement liens and adequate protection as set forth in the DIP Order pursuant to sections 361, 363(e), and 364(d)(l) of the Bankruptcy Code, in respect of the Prepetition Financing Agreement, which shall be junior only to (i) the claims and liens of the DIP Lenders as described under "Priority" above, (ii) payment of the Carve Out and (iii) after receipt of the sum of $500,000, payment of the Medical Claim Carve-Out. |

13

| | |
|---|---|
| Collateral | "Collateral" means, collectively, all now owned or hereafter acquired assets and property of each Debtor and its respective chapter 11 estate, whether real or personal, tangible or intangible, or otherwise, and any and all proceeds therefrom, including, without limiting the generality of the foregoing, all cash, accounts, accounts receivable, inventory, property, plant and equipment, real estate, leaseholds, vehicles, trailers, rolling stock, avoidance actions under chapter 5 of the Bankruptcy Code ("Avoidance Actions") (from and after the Final Closing Date and subject to entry of the Final Order), all intercompany claims, any and all proceeds arising from insurance policies (including, without limitation, policies for the benefit of directors and officers of Borrower), all claims and causes of action of each Borrower or its respective estate and any and all proceeds therefrom, all intellectual property, and the equity interests of each direct and indirect subsidiary of each Borrower, which "Collateral," for the avoidance of doubt, shall include, without limiting the generality of the foregoing, all assets of each Borrower that is secured pursuant to the Prepetition Financing Agreement. |
| DIP Fee | A fee (the "DIP Fee") equal to (i) 3% multiplied by (ii) the full aggregate principal amount of the DIP Loans (exclusive of the Roll-Up), fully earned on the date of entry of the Interim Order and payable as set forth in the Approved Budget. |
| Interest Rate: | 10% per annum, with such interest payable monthly in arrears on the monthly anniversary of the Petition Date, computed based on a 360 day year. |
| Default Interest: | At all times while a default exists, principal, interest and other amounts shall bear interest at a rate per annum equal to 2% in excess of the interest rate set forth under "Interest Rate" above. |
| Maturity Date: | The DIP Loans shall mature on the earliest to occur of the following (such date, the "Maturity Date"): |

    (i)     July 31, 2013 (the "Outside Date");

    (ii)    the acceleration of any of the DIP Loans and the termination of the commitments to make the DIP Loans in accordance with the terms of this Term Sheet or the DIP Loan documentation, as applicable (including, without limitation, the non-satisfaction of any Chapter 11 Milestone (as defined in Exhibit A to the DIP Term Sheet) by the applicable specified deadline and the non-waiver of such non-satisfaction by the DIP Lenders); and

    (iii)   the filing of a motion by the Debtors seeking dismissal of any of the chapter 11 Cases, dismissal of any of the chapter 11 Cases, the filing of a motion by the Debtors seeking to convert of any of the chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, or the conversion of the chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code.

14

| | |
|---|---|
| Optional Prepayments: | The Borrowers may prepay the DIP Loans in whole or in part at any time. |
| Mandatory Prepayments: | The following amounts shall be applied, after reserving any amounts in the Approved Budget that have not yet been incurred (whether prior to or after a Sale ("Excess Sale Proceeds"), to prepay the DIP Loans and obligations related thereto (with additions and modifications to permit others which are usual and customary for debtor-in-possession financings of this type) (each, a "Mandatory Prepayment Event"): |

      (i)     100% of the Excess Sale Proceeds simultaneous with the consummation thereof; and

      (ii)    100% of the net proceeds of any other sale, certain extraordinary receipts (including tax refunds, indemnity payments, pension reversions, acquisition purchase price adjustments and insurance proceeds not included as proceeds of asset dispositions in the Approved Budget) by any Debtor.

The Debtors will not seek or support entry of any order that provides for a Sale of the Collateral unless (i) the DIP Lenders and Prepetition Lenders consent to such Sale; and (ii) the Sale Proceeds are paid at the closing of any such Sale to the (a) first, to the DIP Lenders to satisfy or reduce the DIP Obligations, (b) second, subject to the Medical Claim Carve Out after receipt of the sum of $500,000, to the Prepetition Lenders to satisfy or reduce the Adequate Protection Claim set forth in the Interim Order or Final Order (as applicable) and then (c) to the Prepetition Agent who shall distribute such proceeds to the Prepetition Lenders to satisfy or reduce the Prepetition Obligations in accordance with the priorities set forth in the Prepetition Loan Documentation.

| | |
|---|---|
| Representations and Warranties: | Customary and appropriate for financings of this type. |
| Conditions Precedent | Conditions Precedent to Interim DIP Loan.  The obligations of the DIP Lenders to make the Interim DIP Loan will be subject to satisfaction, or waiver by the DIP Lenders in their sole and absolute discretion, of the following conditions precedent: |

      (i)     the Debtors shall have timely delivered to the DIP Lenders and the Prepetition Agent, the Approved Budget;

      (ii)    the Chapter 11 Milestones listed as #1, 2, 3 and 4 in Exhibit A to the DIP Term Sheet (collectively, the "**Interim Chapter 11 Milestones**") shall have been satisfied by the applicable Specified Deadline;

      (iii)   the Interim Order, as entered by the Bankruptcy Court, shall not have been reversed, modified, amended, stayed or vacated, or in the case of any modification or amendment, in a manner, or relating to a matter, without the consent of the DIP Lenders and the Prepetition Lenders.  The Borrowers shall be in

15

compliance in all respects with the Interim Order;

(iv)    all documented, reasonable, out of pocket expenses of the DIP Lenders and the Prepetition Agent relating to the DIP Facility and the Prepetition Financing Agreement (including, without limitation, reasonable fees and expenses of their counsel and advisors) shall have been paid in full;

(v)    the Debtors shall have implemented a cash management system reasonably acceptable to the Secured Parties (as defined in the Interim Order);

(vi)    the Debtors shall have insurance (including, without limitation, commercial general liability and property insurance) with respect to the Collateral in such amounts and scope as is acceptable to the Secured Parties and the Secured Parties shall have received additional insured and loss payee endorsements, as applicable, with respect thereto, in form and substance reasonably acceptable to the Secured Parties; and

no Event of Default shall have occurred and be continuing on the Interim Closing Date.

<u>Covenants:</u>    With respect to Financial Covenants, customary for debtor-in-possession financings of this type and otherwise as specified in the DIP Loan Documentation.

With respect to Affirmative Covenants, customary for debtor-in-possession financings of this type and otherwise as specified in the DIP Loan Documentation; <u>provided</u> <u>that</u>, the Debtors shall:

(i)    satisfy, or cause to be satisfied, each Chapter 11 Milestone on or before the applicable Specified Deadline set forth in <u>Exhibit A</u> to the DIP Term Sheet; <u>provided</u> <u>that</u>, in the event that any order specified to be entered by the Bankruptcy Court by a Specified Deadline is not entered by such Specified Deadline, or a hearing to be held by a Specified Deadline is not held by such Specified Deadline, in either case solely by reason of the unavailability of, or inaction by, the Bankruptcy Court, then the Debtors and Secured Parties shall negotiate in good faith for a reasonable extension of such Specified Deadline; <u>provided</u> <u>further</u> that any such extension shall not cause the Maturity Date to extend past the Outside Date;

(ii)    timely deliver, or cause to be timely delivered, to the Secured Parties the Approved Budget and Approved Variance Reports, all in accordance with the provisions set forth above;

(iii)    deliver, or continue to deliver, to Secured Parties all financial and other information required to be delivered by any Debtor under the DIP Loan Documentation and provide access to such other information (including, without limitation,

16

historical information) and personnel (including, without limitation, through in-person meetings), all as may be reasonably requested by the Secured Parties;

(iv)    comply with the provisions of the DIP Loan Documentation; and

(v)    take, or cause to be taken, all appropriate action, to do or cause to be done all things necessary, proper or advisable under applicable law, and to execute and deliver such documents and other papers, as may be required or reasonably requested by the Secured Parties to carry out the provisions of the DIP Loan Documentation.

With respect to negative covenants, customary for debtor-in-possession financings of this type and otherwise as specified in the DIP Loan Documentation, and subject to customary grace periods and cure periods, and materiality thresholds; provided that no Debtor shall, without the express, prior written consent of the Secured Parties, do, cause to be done, or agree to do or cause to be done, any of the following:

(i)    create, incur, assume or suffer to exist any indebtedness, except indebtedness expressly permitted by this Term Sheet, or cause, permit to be caused, or agree to cause or permit to be caused, any direct or indirect subsidiary of Borrower that is not a Debtor to, create, incur, assume or suffer to exist any such indebtedness;

(ii)    create, incur, assume or suffer to exist any lien upon any of its property, assets, income or profits, whether now owned or hereafter acquired, except Permitted Liens, and shall not cause, or permit to be caused, any direct or indirect subsidiary of Borrower that is not a Debtor to, create, incur, assume or suffer to exist any such liens;

(iii)    convey, sell, lease, assign, transfer or otherwise dispose of (including through a transaction of merger or consolidation) any of its property, business or assets, whether now owned or hereafter acquired, out of the ordinary course of business, and shall not cause, or permit to be caused, any sales, transfers or other dispositions to or from any of its foreign direct or indirect subsidiaries or affiliates (whether or not such foreign subsidiary or affiliate is a Debtor hereunder); or

(iv)    incur or make any expenditure (including, without limitation, any capital expenditure), investment or other payment, other than in accordance with the Approved Budget, subject to the Permitted Variances.

Events of Default:    Customary for debtor-in-possession financings of this type, and subject to customary grace periods and cure periods, and materiality thresholds, all

reasonably acceptable to the DIP Lenders and the Prepetition Lenders, or as otherwise specified in the DIP Loan Documentation (collectively, "<u>Events of Default</u>"); <u>provided</u> <u>that</u> "<u>Events of Default</u>" shall include the following:

(i)     the occurrence of any deviation from the Approved Budget that is greater than the Permitted Variances;

(ii)    failure of any of the Chapter 11 Milestones to be satisfied;

(iii)   failure by any Debtor to be in compliance in all respects with any provision of the DIP Loan Documentation

(iv)    reversal, modification, amendment, stay or vacatur of the Interim Order or the Final Order, as entered by the Bankruptcy Court, without the prior written consent of the DIP Lenders and the Prepetition Lenders;

(v)     the filing with the Bankruptcy Court of a plan of reorganization or liquidation in any of the Chapter 11 Cases that does not provide for indefeasible payment in full in cash to the DIP Lenders of the DIP Loan and all other amounts outstanding under this Term Sheet on the effective date of such plan;

(vi)    the appointment in any of the Chapter 11 Cases of a trustee, receiver, examiner, or responsible officer with enlarged powers relating to the operation of the business of any Obligor (powers beyond those set forth in sections 1106(a)(3) and (a)(4) of the Bankruptcy Code);

(vii)   the filing of a motion by the Debtors seeking dismissal of any of the chapter 11 Cases or the conversion of the chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code.

(viii)  the granting of relief from the automatic stay by the Bankruptcy Court as to any material assets of the Debtors to any other creditor or party in interest in the Chapter 11 Cases;

(ix)    failure of all amounts due and owing to the DIP Lenders under, in respect of or in connection with the DIP Facility to be paid in full in cash on the Maturity Date; and

(x)     any provision in this Term Sheet shall cease to be binding on or enforceable against the parties hereto.

| | |
|---|---|
| <u>Remedies Upon Default:</u> | Upon the occurrence and during the continuance of any Event of Default under this Term Sheet or the DIP Order, subject to three (3) business days' notice to the Debtors and an opportunity to seek an expedited hearing before the Bankruptcy Court, (at which hearing the sole issue shall be limited to whether or not an Event of Default has occurred), the Secured |

Parties may take all or any of the following actions without further order of or application to the Bankruptcy Court, and notwithstanding the automatic stay:

(i)     declare the principal of, and accrued interest on, any outstanding DIP Loans to be immediately due and payable;

(ii)    terminate any further commitment to lend to the Borrower;

(iii)   set-off any amounts held as Cash Collateral (including, without limitation, in any Cash Collateral account held for the benefit of the DIP Lenders); or

(iv)    without application or motion to, or further orders from, the Bankruptcy Court or any other court, and without interference from any Debtor or any other party in interest, take any other action or exercise any other right or remedy (including, without limitation, with respect to the Priming DIP Liens and Collateral) permitted under this Term Sheet, in the DIP Loan Documentation or under applicable law, including, without limitation, exercising any and all rights and remedies with respect to the Collateral or any portion thereof.

Other Bankruptcy Matters:

All reasonable out-of-pocket costs and expenses of the DIP Lenders relating to the DIP Credit Facility, whether incurred prepetition or postpetition (including, without limitation, reasonable fees and disbursements of counsel and of third-party appraisers and consultants advising the DIP Lenders, expenses in connection with the appraisal and monitoring of the Collateral, syndication, enforcement of rights and other miscellaneous disbursements) shall be payable by the Borrower promptly upon written demand (together with summary backup documentation supporting such reimbursement request) and without the requirement for Bankruptcy Court approval in the event the transactions contemplated hereby are consummated.  A copy of the summary invoice shall be provided by the Debtors to the Office of the U.S. Trustee and counsel for any statutory committee.

All reasonable out-of-pocket costs and expenses of the Prepetition Lenders and the Prepetition Agent relating to the Prepetition Financing Agreement, whether incurred prepetition or postpetition (including, without limitation, reasonable fees and disbursements of counsel and of third-party appraisers and consultants advising the Prepetition Lenders and the Prepetition Agent, expenses in connection with the appraisal and monitoring of the Collateral, syndication, enforcement of rights and other miscellaneous disbursements) shall be payable by the Borrowers promptly upon written demand (together with summary backup documentation supporting such reimbursement request) and without the requirement for Bankruptcy Court approval in the event the transactions contemplated hereby are consummated.  A copy of the summary invoice shall be provided by the Debtors to the Office of the U.S. Trustee and counsel for any statutory

committee.

The Borrowers shall indemnify, pay and hold harmless the Secured Parties (and their respective directors, officers, employees and agents) against any loss, liability, cost or expense incurred in respect of the financing contemplated hereby or the use or the proposed use of proceeds thereof (except to the extent resulting from the gross negligence or willful misconduct of the indemnified party, as determined by a final, non-appealable judgment of a court of competent jurisdiction).

The DIP Loan Documentation shall contain releases and exculpations for the Secured Parties in respect of any matters arising prior to the Petition Date, subject to customary challenge rights in favor of creditors or any statutory committee.

Governing Law and Jurisdiction | The laws of the State of New York (except as governed by the Bankruptcy Code) shall govern this Term Sheet and the DIP Loan Documentation, except with respect to conflicts of laws.

The DIP Loan Documentation will provide that the Borrowers shall submit to the exclusive jurisdiction of the Bankruptcy Court and shall waive any right to trial by jury.

## **RELIEF REQUESTED**

19.    The Debtors seek entry of the DIP Orders granting the following relief:

    a.    authorizing the Debtors to execute and deliver the DIP Term Sheet and obtain up to $3,000,000 of secured postpetition loans, advances, and other financial accommodations pursuant to the Interim Order;

    b.    granting allowed superpriority expense claims to the DIP Agent and the DIP Lenders pursuant to section 364(c)(1) of the Bankruptcy Code;

    c.    granting to the DIP Agent and the DIP Lenders first priority security interests in, and liens on, all of the DIP Collateral pursuant to section 364(c)(2), 364(c)(3) and 364(d) of the Bankruptcy Code;

    d.    approval of the form and manner of adequate protection to be provided to the Secured Parties pursuant to sections 361(a) and 363(c) of the Bankruptcy Code;

    e.    authorizing the Debtors to use the Cash Collateral pursuant to sections 361 and 363 of the Bankruptcy Code; and

    f.    modifying the automatic stay to the extent necessary to effectuate the provisions of the DIP Orders.

## BASIS FOR RELIEF

**A.**  **The Debtors Should Be Permitted to Obtain Postpetition Financing Pursuant to Section 364(c) and 364(d)(1) of the Bankruptcy Code.**

20.    Section 364(c) of the Bankruptcy Code requires a finding, made after notice and a hearing, that the debtors seeking postpetition financing on a secured basis cannot "obtain unsecured credit allowable under section, 503(b)(l) of [the Bankruptcy Code] as an administrative expense." 11 U.S.C. § 364(c).  In addition, section 364(d)(1) of the Bankruptcy Code, which governs the incurrence of postpetition debt secured by "priming" liens, provides that the Court, after notice and a hearing, may:

> authorize the obtaining of credit or the incurring of debt
> secured by a senior or equal lien on property of the estate
> that is subject to a lien only if --
>
> (A)    the [debtor] is unable to obtain credit
> otherwise; and
>
> (B)    there is adequate protection of the interest of
> the holder of the lien on the property of the estate
> on which such senior or equal lien is proposed to be
> granted.

11 U.S.C. § 364(d)(l).

21.    In evaluating proposed postpetition financing under sections 364(c) and (d) of the Bankruptcy Code, courts perform a qualitative analysis and generally consider similar factors, including whether:

> a.    unencumbered credit or alternative financing without superpriority
> status is available to the debtor;
>
> b.    the credit transactions are necessary to preserve assets of the estate;

> c.    the terms of the credit agreement are fair, reasonable, and
> adequate;
>
> d.    the proposed financing agreement was negotiated in good faith and
> at arm's-length and entry thereto is an exercise of sound and
> reasonable business judgment and in the best interest of the
> debtors' estate and its creditors; and
>
> e.    the proposed financing agreement adequately protects prepetition
> secured creditors.

*See, e.g., In re Aqua Assoc.*, 123 B.R. 192 (Bankr. E.D. Pa. 1991) (applying the first three factors

in making a determination under section 364(c)); *In re Crouse Group, Inc.*, 71 B.R. 544 (Bankr.

E.D. Pa. 1987) (same); *Bland v. Farmworker Creditors*, 308 B.R. 109, 113-14 (S.D. Ga. 2003)

(applying all factors in making a determination under section 364(d)).

22.    For the reasons discussed below, the Debtors satisfy the standards required

to access postpetition financing on a secured superpriority and priming lien basis under sections

364(c) and 364(d) of the Bankruptcy Code.

**B.    The Debtors Were Unable to Obtain Financing on More Favorable Terms.**

23.    The Debtors face severe liquidity restraints and were forced to file these

chapter 11 Cases to preserve the value of their assets.  The Debtors have solicited alternative

financing proposals from outside parties and the current proposal was on the terms that were

most beneficial to the estate.  Indeed, without the agreement of the DIP Lenders to provide the

Debtors with postpetition financing, the Debtors' liquidation would have to be conducted in

chapter 7, and rather than an orderly liquidation, without the possibility of Turnkey Branch

Sales, the assets would be abandoned, without security.  Given the nature of the Debtors'

business – highway safety – the Debtors wanted to mitigate the potential for serious health and

safety issues.  Instead, with the Postpetition Financing Arrangement, the Debtors intend to

implement an orderly sale process that will maximize the value of estate assets in a secure and responsible manner.

24.    The Debtors respectfully submit that their efforts to obtain postpetition financing therefore satisfy the standard required under section 364(c) of the Bankruptcy Code. *See, e.g., In re Simasko Production Co.*, 47 B.R. 444, 448-9 (D. Colo. 1985) (authorizing interim financing stipulation where debtor's best business judgment indicated financing was necessary and reasonable for benefit of estates); *In re Ames Dept. Stores*, 115 B.R. 34, 38 (Bankr. S.D.N.Y. 1990) (with respect to postpetition credit, courts "permit debtors in possession to exercise their basic business judgment consistent with their fiduciary duties"); *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988) (where few lenders can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing").

**C.    The Postpetition Financing Arrangement Is Necessary to Preserve the Assets of the Debtors' Estates.**

25.    As debtors in possession, the Debtors have a fiduciary duty to protect and maximize their estates' assets. *See Burtch v. Ganz (In re Mushroom Transp. Co.)*, 382 F.3d 325, 339 (3d Cir. 2004). As noted above, the Debtors require access to working capital in the form of postpetition financing to conduct a sale process. Absent additional working capital, the Debtors would be forced to a hard-stop liquidation.

**D.    The Terms of the Postpetition Financing Arrangement Are Fair, Reasonable, and Appropriate Given the Circumstances.**

26.    In considering whether the terms of postpetition financing are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and

23

the potential lender. *In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003);

*see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re*

*Ellingsen MacLean Oil Co.)*, 65 B.R. 358, 365 (W.D. Mich. 1986) (a debtor may have to enter

into hard bargains to acquire funds).

       27.    The Postpetition Financing Arrangement was negotiated in good faith and

at arm's-length between the Debtors and the Secured Lenders, resulting in an agreement

designed to permit the Debtors to maximize the value of their assets through an orderly sale

process. *See, e.g., Bray v. Shenandoah Fed. Sav. and Loan Ass'n (In re Snowshoe Co.)*, 789 F.2d

1085, 1088 (4th Cir. 1986) (stating that section 364(d) of the Bankruptcy Code imposes no duty to

seek credit from every possible lender, particularly when "time is of the essence to preserve a

vulnerable seasonal enterprise"); *In re Western Pacific Airlines, Inc.*, 223 B.R. 567 (Bankr. D.

Colo. 1997) (authorizing postpetition financing to preserve value of aircraft leaseholds where to

hold otherwise would result in the elimination of their value and the "immediate collapse of the

Debtor as a going concern").

**E.**    **Entry Into the DIP Facility Reflects the Debtors' Sound Business Judgment.**

       28.    A debtor's decision to enter into a postpetition lending facility under

section 364 of the Bankruptcy Code is governed by the business judgment standard. *See, e.g.,*

*Trans World Airlines, Inc. v. Travelers Int'l AG (In re Trans World Airlines, Inc.)*, 163 B.R. 964,

974 (Bankr. D. Del. 1994) (approving postpetition credit facility because such facility

"reflect[ed] sound and prudent business judgment"); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34,

38 (Bankr. S.D.N.Y. 1990) (financing decisions under section 364 of the Bankruptcy Code must reflect a debtor's business judgment).

29.    Bankruptcy courts routinely accept a debtor's business judgment on many business decisions, including the decision to borrow money. *See, e.g., Group of Inst. Investors v. Chicago, Mil., St. P. & Pac.*, 318 U.S. 523, 550 (1943) (holding that decisions regarding assumption or rejection of leases are left to the business judgment of the debtor); *In re Simasko Prod. Co.*, 47 B.R. 444, 449 (D. Colo. 1985) ("[b]usiness judgments should be left to the board room and not to this Court"). Further, one court has noted that "[m]ore exacting scrutiny [of the debtors' business decisions] would slow the administration of the debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially." *Richmond Leasing Co. v. Capital Bank, N.A.,* 762 F.2d 1303, 1311 (5th Cir. 1985).

30.    Bankruptcy courts generally will defer to a debtor in possession's business judgment regarding the need for and the proposed use of funds, unless such decision is arbitrary and capricious, *In re Curlew Valley Assocs.,* 14 B.R. 506, 511-13 (Bankr. D. Utah 1981); *see also Trans World Airlines, Inc.,* 163 B.R. at 974 (approving interim loan, receivables facility and asset-based facility based upon prudent business judgment of the debtor), and generally will not second-guess a debtor in possession's business decisions involving "a business judgment made in good faith, upon a reasonable basis, and within the scope of his authority under the Code." *Curlew Valley,* 14 B.R. at 513-14 (footnotes omitted).

31.     As described above, the Debtors have exercised sound business judgment in determining the appropriateness of the DIP Facility and submit they have satisfied the legal prerequisites to incur debt on the terms and conditions set forth in the DIP Facility. The Debtors believe that the DIP Facility contains terms that are the best available under the circumstances.

32.     The funds provided by the DIP Facility are essential to enable the Debtors to avoid irreparable harm to the Debtors' assets and business by effectuating an orderly sale process.

33.     Accordingly, pursuant to sections 364(c) and (d)(1) of the Bankruptcy Code, the Debtors respectfully submit that they should be granted authority to enter into the DIP Facility and obtain funds from the DIP Lenders on the secured and administrative superpriority basis described herein.

**F.     The Debtors' Request to Use Cash Collateral and the Proposed Adequate Protection Being Provided to Prepetition Lenders Is Appropriate and Meets the Required Standard.**

34.     In exchange for, the Debtors' use of the Prepetition Collateral, including Cash Collateral, and their priming of the Prepetition Liens, the Debtors propose to provide the Prepetition Lenders with adequate protection in accordance with sections 364(d) and 361 of the Bankruptcy Code. To that end, the Debtors request that the Court approve and authorize the Debtors' proposed adequate protection of the Prepetition Lenders' interest, in respect of and as consideration for, (a) the incurrence of the priming DIP Loan Obligations, (b) the use of Cash Collateral, (c) the granting of the DIP Liens and the DIP Superpriority Claim, (d) the subordination of the Prepetition Obligations to the Carve-Out and the Medical Claim Carve-Out, (e) any other diminution in the value of the Prepetition Collateral, and (f) the imposition of the

26

automatic stay pursuant to section 362 of the Bankruptcy Code.  (*See Interim Order,* paragraph

10*).*

       35.    In exchange for the consideration provided by the Prepetition Lenders, the

Interim Order provides adequate protection of the interests of the Prepetition Lenders in the

Prepetition Collateral in the form of valid, binding, enforceable, non-avoidable and automatically

perfected replacement security liens on all of the DIP Collateral.  The Debtors will also grant the

Prepetition Lenders as set forth in the Interim Order:  (i) a superpriority adequate protection

claim, (ii) the right for the Prepetition Agent to credit bid the full amount of the Prepetition

Obligations on behalf of the Prepetition Lenders, and (iii) payment of certain fees and expenses.

       36.    The Debtors believe that such adequate protection is fair and reasonable.

In reliance upon and conditioned upon the granting of such adequate protection, the Prepetition

Lenders have consented to the proposed Interim Order.  The consent of the Prepetition Lenders

(which is conditioned upon the granting of adequate protection as described more fully in the

DIP Orders) to the entry of the proposed Interim Order permits the Debtors to (i) obtain the use

of Cash Collateral and (ii) avoid potentially time consuming and unpredictable priming

litigation. *See In re Swedeland Dev. Group, Inc.*, 16 F.3d 552, 564 (3d Cir. 1994) (requiring a

substantial evidentiary foundation to be laid in connection with the debtors' request to grant a

priming lien and finding there was not adequate protection of a prepetition lenders' interest in

collateral where there was a projected increase in the value of such collateral).  The Prepetition

Lenders' consent to the proposed Interim Order thus permits the Debtors to save considerable

resources, not to mention avoid a delay, in obtaining postpetition financing.  The proposed

adequate protection is provided for the Diminution (as such term is defined in paragraph 10 of the Interim Order). Accordingly, based upon the foregoing, the Debtors respectfully request that the Court authorize the Debtors to provide the above described adequate protection to the Prepetition Lenders in accordance with the terms set forth in the DIP Order and DIP Facility.

G.    **The Debtors Are Authorized to Use Cash Collateral.**

37.    In addition to the need for the DIP Facility, the Debtors have a critical need for the immediate use of Cash Collateral. The Debtors require use of the Cash Collateral to pay present operating expenses including payroll, security and expenses necessary for the safe marshaling of assets for sale. If unable to use the Cash Collateral pending the Final Hearing, the Debtors will be unable to effectuate an orderly sale process designed to maximize value.

38.    Under section 363(c)(2) of the Bankruptcy Code, the Debtors may not use Cash Collateral without the consent of the Prepetition Lenders or authority granted by the Court. As noted above, the Debtors expect to have consent of the Prepetition Lenders to the continued use of Cash Collateral and therefore the Debtors have satisfied the requisite standards.

H.    **Provisions To Be Highlighted Pursuant to Local Rule 4001-2.**

39.    Local Rule 4001-2 requires the Debtors to affirmatively advise the Court of any deviations from certain proscribed provisions to be included in financing and cash collateral orders. The Interim Order deviates from Local Rule 4001-2 by virtue of the following provisions:

a.    subject to the entry of the Final Order, granting liens and superpriority claims in favor of the DIP Lenders and the Prepetition Lenders on proceeds of avoidance actions (paragraphs 7, 8 and 10 of the Interim Order);

28

    b.       subject to the entry of the Final Order, granting a roll-up of the obligations under the Prepetiton Financing Agreement up to three (3) times the amount committed under the DIP Facility (page 5 of DIP Term Sheet);

    c.       granting the Secured Parties a waiver of any "equities of the case" claims under section 552(b) of the Bankruptcy Code and, subject to the entry of the Final Order, a waiver of the provisions of section 506(c) of the Bankruptcy Code (paragraphs 20, 22 of the Interim Order); and

    d.       providing for various stipulations by the Debtors in favor of the Prepetition Lenders as to their prepetition liens and claims, subject to the challenge rights of a committee, or if none is appointed, any party in interest, with all challenges occurring within the Challenge Period as defined in the Interim Order Recital D and paragraph 15 of the Interim Order); and

    e.       providing disparate treatment for the professionals retained by a creditors' committee with respect to a professional fee carve-out by budgeting lower amounts for such professionals than for the Debtors' professionals. All estate professionals are entitled to share in an additional$50,000 carve-out amount after a Termination Event (Paragraph 13 of Interim Order and Approved Budget).

40.     The Debtors submit that the Postpetition Financing Arrangement is the best available under the circumstances and that entry into Postpetition Financing Arrangement is in the best interest of the Debtors and their estates. Substantially all of the Debtors' personal property assets are encumbered by the liens and security interests of the Prepetition Lenders. The Debtors are confident that no other lender was willing to extend credit on a junior priority basis.

41.     Courts in this district and elsewhere have supported the granting of liens on avoidance action proceeds at the final hearing. *See In re ACG Holdings, Inc.,* Case No. 08-11467 (Bankr. D. Del. July 16, 2008) (approving the granting of liens on avoidance actions to postpetition lenders); *In re Tropicana Entm't, LLC,* Case No. 08-10856 (KJC) (Bankr. D. Del. June 5, 2008) (approving the granting of liens on avoidance actions to postpetition lenders); *In re*

*Silver Cinemas Int'l, Inc.,* No. 00-1978 (Bankr. D. Del. Aug. 11, 2000) (same); *In re Trans World Airlines,* 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving the granting of liens on avoidance actions to postpetition lenders); *In re Movie Gallery, Inc.,* No. 07-33849 (Bankr. E.D. Va. Nov. 16, 2007) (secured lenders' collateral includes proceeds and property that is the subject of successful avoidance actions); *In re NTELOS Inc.,* No. 03-32094 (DOT) (Bankr. E.D. Va. Mar. 24, 2003) (same); *In re Enron Corp.,* No. 01-16034 (Bankr. S.D.N.Y. July 2, 2002) (granting secured lenders liens on avoidance action proceeds); *In re AMF Bowling Worldwide, Inc.,* No. 01-61119 (Bankr. E.D. Va. Aug. 8, 2001) (secured lenders' collateral includes avoidance actions and proceeds); *In re Ellingsen MacLean Oil Co.,* 98 B.R. 284, 291-92 (Bankr. W.D. Mich. 1989). Accordingly, the Debtors believe that granting liens on the Avoidance Actions subject to entry of the Final Order is appropriate.

42.    Finally, in light of the Secured Parties' agreement to subordinate their liens and superpriority claims to the Carve-Out and to finance the Debtors' chapter 11 Cases and allow the use of Cash Collateral, the section 506(c) and 552(b) waivers are justified.

## I.    Modification of the Automatic Stay Is Warranted.

43.    The proposed Interim Order provides certain circumstances under which the automatic stay could be vacated without further order of the Court. Specifically, the proposed Interim Order provides that upon the occurrence of an Event of Default or upon a default of the terms of the Interim Order, but subject to three (3) business days prior written notice, the automatic stay is modified or vacated to allow for the termination of the commitments under the DIP Term Sheet, declare all DIP Obligations immediate due and payable and/or take

30

any actions necessary to foreclose or otherwise enforce their security interests in or liens on any or all of the DIP Collateral.

44.     The Debtors submit that such stay modification is in the best interests of the Debtors and their estates and is the best attainable under the circumstances.  Accordingly, the Court should modify the automatic stay to the extent contemplated by the Postpetition Financing Arrangement and the proposed DIP Orders.

**J.     Interim Approval of Borrowings Should Be Granted.**

45.     It is essential that the Debtors immediately stabilize their operations and cash flow, which will maximize the potential for a sale of their business.  Accordingly, the Debtors are seeking interim approval to access 2,000,000 of the DIP Facility to meet their working capital needs, including making payments to employees and suppliers.

46.     The Debtors submit that this Court also should grant the Debtors' request for immediate authority to use the Cash Collateral to prevent immediate and irreparable harm to the Debtors' estates pending a final hearing on the Motion pursuant to Bankruptcy Rule 4001(c). The ability of the Debtors to finance their operations and the availability to the Debtors of sufficient working capital and liquidity through the use of the Cash Collateral is vital to the preservation and maintenance of the value of the Debtors' estates.  The Debtors, therefore, seek authority to use the Cash Collateral.

47.     Bankruptcy Rule 4001(c)(2) governs the procedures for obtaining authorization to obtain postpetition financing and provides, in relevant part:

> The court may commence a final hearing on a motion for authority to obtain credit no earlier than 14 days after service of the motion.  If the motion so requests, the court

31

> may conduct a hearing before such 14-day period
> expires, but the court may authorize the obtaining of
> credit only to the extent necessary to avoid immediate and
> irreparable harm to the estate pending a final hearing.

48.    In examining requests for interim relief under this rule, courts apply the same business judgment standard applicable to other business decisions. *See, e.g., Ames Dep't Stores,* 115 B.R. at 36; *Simasko,* 47 B.R. at 449.  Under this standard, the Debtors' request for entry of the DIP Orders, in the time periods and for the financing amounts requested herein, is appropriate.  Moreover, courts in this jurisdiction have granted similar relief in other chapter 11 cases. *See e.g., In re Tropicana Entm't, LLC,* Case No. 08-10856 (Bankr. D. Del. May 7, 2008) (allowing interim access to $20 million of the debtors total DIP facility); *In re Sharper Image Corp.,* Case No. 08-10322 (Bankr. D. Del. Feb. 20, 2008) (allowing interim access to $35 million of the debtors' $60 million DIP facility); *In re American LaFrance LLC,* Case No. 08-10178 (Bankr. D. Del. Jan. 30, 2008) (allowing interim access to $30 million of a $285 DIP facility that was approved on a final basis); *In re Pope & Talbot, Inc.,* Case No. 07-11738 (Bankr. D. Del. Nov. 21, 2007) (allowing interim access to $68 million of the debtors' aggregate DIP facility of $89 million).

49.    The Debtors believe that, under the circumstances, the terms and conditions set forth herein are fair and reasonable for the use of Cash Collateral and the approval of the proposed adequate protection.

## REQUEST FOR FINAL HEARING

50.    Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request that the Court set a date for the Final Hearing that is as soon as practicable, but in no

32

event later than twenty-eight days following the entry of the Interim Order, and fix the time and date

prior to the final hearing for parties to file objections to the Motion.

**K.**    **Waiver of Bankruptcy Rule 6004(a) and 6004(h)**

51.    To implement the foregoing successfully, the Debtors seek a waiver of the

notice requirements under Bankruptcy Rule 6004(a) and the fourteen-day stay of an order

authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).

### NO PRIOR REQUEST

52.    No prior motion for the relief requested herein has been made to matter.

### NOTICE

53.    Notice of this Motion will be provided to: (i) the Office of the United

States Trustee; (ii) the Office of the United States Attorney for the District of Delaware; (iii) the

Internal Revenue Service; (iv) the Debtors' thirty-five largest unsecured creditors on a

consolidated basis; (v) counsel to the Prepetition Agent; (vi) counsel to the DIP Lenders, (vii) all

other known parties asserting a lien against the Debtors' assets; and (viii) the Sureties (each as

defined herein), by telecopy, email, overnight courier and/or hand delivery.  Because of the

nature of the relief requested, the Debtors respectfully submit that no other or further notice of

the relief requested in this Motion need be given.

### NOTICE WITH RESPECT TO FINAL HEARING

54.    No trustee, examiner or statutory committee has been appointed in the

Debtors' cases.  Pursuant to Bankruptcy Rule 4001, the Debtors respectfully request that they be

authorized to provide notice of the Final Hearing by serving a copy of this Motion, together with

DOCS_SF:83212.5 36024/001

the Interim Order, by hand or overnight mail or courier service (or for those set up to receive electronic transmissions, by electronic transmission), upon (i) the Office of the United States Trustee; (ii) the Office of the United States Attorney for the District of Delaware; (iii) the Internal Revenue Service; (iv) the Debtors' thirty-five largest unsecured creditors on a consolidated basis; (v) counsel to the prepetition and postpetition lenders; (vi) all other known parties asserting a lien against the Debtors' assets; (vii) the Sureties (each as defined herein), by telecopy, email, overnight courier and/or hand delivery; and (viii) all parties that have filed notices of appearance and requests for notices in the Debtors' chapter 11 cases.  The Debtors respectfully request that such notice is sufficient and request that this Court find that no further notice of the Final Hearing and Final Order is required.

WHEREFORE, the Debtors respectfully request entry of the Interim Order, substantially in the form attached hereto as **Exhibit 1** (a) authorizing the Debtors to obtain secured postpetition financing on a superpriority administrative claim and first priority priming lien basis, (b) authorizing the Debtors' use of Cash Collateral, (c) granting adequate protection to the prepetition secured lenders for the priming of their existing liens, (d) setting the final hearing on the Motion, and (e) granting such other and further relief as the Court deems appropriate.

DOCS_SF:83212.5 36024/001

Dated: May 22, 2013

PACHULSKI STANG ZIEHL & JONES LLP

Laura Davis Jones (DE Bar No. 2436)
Debra I. Grassgreen (CA Bar No. 169978)
Bruce Grohsgal (DE Bar No. 3583)
Maria A. Bove (NY Bar No. 8687)
John W. Lucas (NY Bar No. 4288379)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE  19899-8705
Telephone: 302/652-4100
Facsimile: 302/652-4400
E-mail:    rpachulski@pszyjw.com
           dgrassgreen@pszjlaw.com
           bgrohsgal@pszjlaw.com
           mbove@pszjlaw.com
           jlucas@pszjlaw.com

[Proposed] Counsel for the Debtors and Debtors in Possession