IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| HIGHWAY TECHNOLOGIES, INC., *et al.*, | Case No.: 13-11326 (KJC) |
| Debtors.[1] | (Jointly Administered) |
| | **Objection Deadline:  June 20, 2013 at 4:00 p.m. (Eastern)**<br>**Hearing Date:  June 27, 2013 at 3:00 p.m. (Eastern)** |

## MOTION OF DEBTORS PURSUANT
## TO SECTIONS 105(A) AND 363 OF THE BANKRUPTCY CODE FOR
## AUTHORITY TO (A) ENTER INTO PRIVATE SALE TRANSACTIONS OR
## CONDUCT AUCTIONS FOR PERSONAL PROPERTY ASSETS AND BULK ASSETS
## AND (B) SELL SUCH ASSETS FREE AND CLEAR OF ALL ENCUMBRANCES

The above-captioned debtors and debtors in possession (the "Debtors") hereby

submit this motion (the "Motion") for the entry of an order, in the form annexed hereto as

**Exhibit A**, pursuant to sections 105(a) and 363 of title 11 of the United States Code (the

"Bankruptcy Code"), authorizing the Debtors to conduct private sales and auctions for (a) its

personal property assets located in various locations that were formally used to conduct and run

the Debtors' business prior to the commencement of these chapter 11 cases (collectively, the

"Personal Property Assets") and/or (b) bulk or bundled Personal Property Assets ("Bulk Assets")

("Bulk Assets" together with the Personal Property, the "Assets"), free and clear of all liens,

claims, and encumbrances in accordance with the auction procedures described herein.  In

support of the Motion, the Debtors respectfully represent as follows:

---

[1]  The Debtors in these proceedings and the last four digits of each Debtor's federal taxpayer identification number
are as follows: Highway Technologies, Inc. (6608); and HTS Acquisition, Inc. (9831).  The Debtors' mailing
address is 6800 Dixie Drive, Houston, Texas 77087.

## JURISDICTION

1. The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

2. The bases for the relief requested herein are sections 105(a) and 363 of the Bankruptcy Code, Rules 6004(h) and 6005 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 6005-1 of the Local Rules for the United States Bankruptcy Court for the District of Delaware (the "Local Rules").

## RELIEF REQUESTED

3. By this Motion, the Debtors seek the entry of an order (the "Order"), substantially in the form annexed hereto as **Exhibit A**, authorizing the Debtors to (a) conduct private sales and auctions for (i) the Personal Property Assets (the "Personal Property Sales") and (ii) Bulk Assets (the "Bulk Sales") and (b) sell such Assets to the purchasers free and clear of all Encumbrances (defined below) pursuant to the proposed auction procedures described herein.  A list of the Assets that could potentially be sold pursuant to the procedures proposed herein will be filed separately and available upon request and downloaded from the website of the Debtors' notice and claims agent at: http://www.kccllc.net/HighwayTech.

4. The sales contemplated by this motion do not include the "going concern" sales of the Debtors' various "Branches."  Instead, the Debtors are seeking authorization to sell their various inventory and equipment to the extent they are not successful selling such assets as part of a sale of a Branch or Branches.

## BACKGROUND

5.      On May 22, 2013 (the "Petition Date"), each of the Debtors filed with this Court a voluntary petition for relief under chapter 11 of the United States Code (the "Bankruptcy Code"). The Debtors' chapter 11 cases (the "Chapter 11 Cases") are being jointly administered for procedural purposes only. The Debtors are managing their properties as debtors and debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No request has been made for the appointment of a trustee or an examiner in these Chapter 11 Cases.

6.      With over 30 years of experience, prior to the Petition Date, Highway Technologies was one of the largest traffic safety companies in the United States and a national leader in providing temporary and permanent roadway traffic management and safety services, including pavement marking installations, permanent installations of highway guardrails, barrier walls and signage, and traffic control services for special events. The Company has provided such special event services for the Democratic & Republican National Conventions, the Super Bowl, the Lollapalooza Music Festival and Ironman competitions. In addition, the Company offered a complete line of rental products including traffic control devices, trucks, signage and related and equipment. Prior to the Petition Date, the Company operated from 32 locations in 13 states (Arizona, California, Colorado, Florida, Illinois, Louisiana, Minnesota, Missouri, Montana, Nevada, New Jersey, Oregon and Texas).

7.      Prior to the Petition Date, the Debtors ceased operating and terminated approximately 740 employees and began the process of securing their assets for sale. To the extent the Debtors are successful at accomplishing sales of their "Branches," employees could be rehired by the purchasers.

3

8.      The factual background regarding the Debtors, including their current and historical business operations and the events precipitating their chapter 11 filings, are set forth in detail in the *Declaration of Robert Hookstra in Support of First Day Motions* (the "Hookstra Declaration") filed concurrently herewith and fully incorporated herein by reference.

## THE DEBTORS' INVENTORY AND OPERATING EQUIPMENT

9.      In the operation of the Debtors' traffic safety and special event service businesses, the Debtors utilized inventory and equipment that included cones, barricades, delineation devices, message boards, arrow boards, thermo trucks, epoxy/poly trucks, paint trucks, grinder trucks, barricade lights, signs and sign-stands, barricade trucks, barrier walls, guardrail trucks, among other things. The inventory and equipment is not easily or readily movable due to its size, weight, or quantity or is currently being used on active highway projects and other job site locations. In certain cases, the Debtors believe that moving the equipment might result in a safety hazard. In most cases, the inventory and equipment is not in a centralized location but is located in one or more of the thirteen states that the Debtors operated their businesses. Furthermore, if the Debtors removed the inventory or equipment from certain locations, their customers would be required to have a new traffic or special event operators remove and replace the same equipment, which could result in counterclaims against the Debtors' estates.

10.     Prior to the Petition date, the Debtors operated approximately thirty-two branches (each a "Branch" and together "Branches") Branches each of which were within a respective city and/or the surrounding area. The Branches were managed by a general manager who oversaw an operational staff that performed the day-to-day operations of the Branch. Each

4

Branch was operated in accordance with its particular business line, which generally included one or all of the following:  (a) pavement marking, (b) traffic control, (c) daily rental traffic control, (d) work zone product sales, and (e) permanent installation of guardrails and sign fixtures.

11.     The Debtors believe that the best means to preserve and maximize value and mitigate any potential claims against the estates is to effectuate sales of their Assets on an "as is" basis.  To this end, the Debtors are separately attempting to sell one or more of their Branches more or less "intact" to competitors and other strategic buyers in the industry. If the Debtors are successful at accomplishing the sale of one or more Branches, former employees could be rehired by the buyers of the Branches and certain contracts could be assumed and assigned to such buyers.  However, if the Debtors are not able to sell the assets associated with each Branch as an intact package, the Debtors intend to liquidate their Assets through piecemeal bulk sales pursuant to the procedures discussed herein.  The sales would be effectuated through private sale transactions or auctions to the extent the Debtors have more than one potential buyer interested in purchasing the applicable Assets.

12.     Because the Debtors are no longer operating their businesses, the Debtors plan to work with their sureties, customers, lenders, and other interested parties to sell the Assets in the most efficient and cost effective manner possible, which might include sales on current job sites, Branches, or at a location where the Debtors and their advisors believe they will receive the highest and best offer for the Assets.

13.     Since the Debtors' announced shutdown, they have received numerous inquiries to purchase their assets either on a piecemeal basis, in bulk, or as part of an operating

5

branch. To date, the Debtors or their proposed financial advisors, Imperial Capital, LLC

("Imperial") have received approximately sixty-five (65) sale inquiries in which prospective

buyers are seeking to purchase assets on a piecemeal basis, in bulk, or purchase the assets and

operations relating to one more of the Debtors' Branches. Over half of these parties have

executed non-disclosure agreements and are currently conducting due diligence.

## THE SALE PROCEDURES

14.    The Debtors have determined that the marketing of the Assets by a

liquidator and investment banker will likely realize the greatest value because they have

extensive expertise in the marketing and conducting the auction of the Assets.

15.    The Debtors propose to sell the assets in private transactions or conduct

auctions or a series of auctions (each, an "Auction" and collectively, the "Auctions") to the

extent there is interest from more than one potential buyer for the applicable Assets. The

Debtors would enter into the private sale transactions or begin conducting auctions as soon as

practicable after entry of an order approving this Motion. The Debtors request the authority to

schedule additional Auctions in their reasonable business judgment to effectuate the sales of any

of the Assets that are not sold at any of the initial Auctions. The Debtors propose the

implementation and approval of the following procedures (the "Sale Procedures"):

a.    Assets. The private sale transactions or Auctions resulting in sale transactions
      will include all Personal Property Assets and Bulk Assets discussed herein.

b.    Pricing. The private sale transactions and Auctions will be conducted on an asset-
      by-asset basis, in lots, or combinations of lots, as determined by the Debtors, their
      proposed marketing and sales liquidating agent, Hilco Industrial, LLC ("Hilco"),

6

and Imperial.[2]  The Debtors, in consultation with Hilco and Imperial, will either negotiate the purchase price of the subject Assets to the extent they sold pursuant to a Private Sale Transaction (as defined below) or in the context of an Auction, set the initial bid on subject Assets.

c.    <u>Private Sale Transactions</u>.  If the Debtors do not have interest from more than one potential buyer, the Debtors will not conduct an auction for the sale of the subject Assets. Instead, the Debtors will enter into a private sale transaction ("<u>Private Sale Transaction</u>") with the private buyer (the "<u>Private Buyer</u>") and submit the proposed private sale transaction for approval pursuant to a Post-Sale Disclosure (as defined and discussed below).

d.    <u>Auction Participation Requirements</u>.  To the extent the Debtors receive multiple bids on a lot or group of Assets, the Debtors intend to conduct Auctions pursuant to the following procedures.  Any person that wishes to bid at the Auction must become a "Qualified Bidder." As a prerequisite to becoming a Qualified Bidder, a potential Qualified Bidder must deliver to the satisfaction of the Debtors:

(i)    A list of Personal Property Asset(s) or Bulk Assets on which the bidder seeks to bid;

(ii)   Sufficient information as may be requested by the Debtors (including, without limitation, agreement to such terms and conditions as may be required by the Debtor, Hilco, or Imperial to register to bid and participate in the Auctions), to allow them to determine that the potential Qualified Bidder has the financial wherewithal and any required authorizations to close the sale, including without limitation, such entity's current audited (if applicable) financial statements and a good faith, cash deposit (the amount of which shall to be set by the Debtors in consultation with Hilco and Imperial) (the "<u>Good Faith Deposit</u>"); and

(iii)  Notwithstanding anything herein to the contrary, nothing herein shall prejudice the rights of any secured creditor to credit bid on any Personal Property Asset or Bulk Assets (including with respect to the Good Faith Deposit), subject to such creditor(s) making payment in cash of the buyer's premium payable to the Hilco.

e.    <u>Auction:</u>  Hilco will be authorized to commence an Auction or Auctions the day after entry of an order approving this Motion, and, to the extent necessary,

---

[2] On or shortly after the Petition Date, the Debtors filed and are seeking approval of the following retention applications:  (a) *Application to Employ/Retain Hilco Industrial, LLC as Exclusive Marketing and Sales Agent Filed By Highway Technologies, Inc.* [Docket No. 11] and (b) *Application to Employ/Retain Imperial Capital, LLC as Financial Advisor to the Debtors Nunc Pro Tunc to the Petition Date* [Docket No. 64].  Any payments to Hilco or Imperial contemplated by this motion are subject to the Court's approval of the foregoing retention applications.

schedule additional Auctions as necessary to sell the Personal Property Assets or Branch Assets (the "<u>Auction Period</u>").  Only Qualified Bidders will be permitted to bid at the Auction.  The Auction shall be conducted on the following terms:

(i)     To participate in the Auction, each Qualified Bidder shall, to the Debtors' satisfaction, register its acknowledgement of the Auction terms (which shall include a statement that such Qualified Bidders do not have any connection to the Debtors).

(ii)    Each Personal Property Asset or Bulk Assets will be auctioned either separately or in lots determined by Hilco, Imperial, and the Debtors at the Auctions.  During the Auction Period, bidding shall begin at an amount set by the Debtors, Hilco, and Imperial and subsequently continue in minimum bid increments established by the Hilco, Imperial, and the Debtors.

(iii)   None of the bids may contain any financing, due diligence or "material adverse change" contingencies and the bid of any Successful Bidder (as defined below) will be binding whether or not (a) the Successful Bidder has obtained financing or completed its due diligence investigation, or (b) a "material adverse change" has occurred.

(iv)    Pre-Auction Bidding.  All bidding for the Personal Property Assets or Bulk Assets will occur at the Auctions. Notwithstanding the foregoing, a Qualified Bidder shall be permitted to submit a bid to the Hilco prior to the Auction and designate Hilco as their proxy to make such a bid on its behalf at the Auctions.

(v)     The Auctions shall be conducted openly and all creditors will be permitted to attend.

(vi)    Terms of Sale.  The Personal Property Assets or Bulk Assets are being sold, (i) "AS IS, WHERE IS, AND WITH ALL FAULTS AND WITH NO LICENSE," and the Debtors expressly disclaim all warranties, including (but not limited to) warranties of merchantability, warranties of non-infringement, and warranties of fitness for a particular purpose or use, and (ii) "THERE IS NO WARRANTY RELATING TO QUIET ENJOYMENT, OR THE LIKE IN THE DISPOSITION OF ANY OF THE ASSETS." Bidders are advised, and by submitting a bid each bidder is deemed to acknowledge, that Hilco, Imperial, the Debtors, and each of their respective directors, officers, managers, employees, agents, advisors and attorneys have no

8

knowledge with respect to, and have no obligation to investigate, the merchantability or fitness for any particular purpose or use of any of the Personal Property Assets or Branch Assets. NO WARRANTY OR REPAIR PROGRAM FOR THE ASSETS IS BEING OFFERED AS PART OF THE SALE.

(vii)     Bid(s); Backup Bid(s). Upon the conclusion of the Auction, Hilco, Imperial, and the Debtors shall (a) identify and certify the bid or bids that constitutes the highest or best offer or offers for the Personal Property Assets or Branch Assets, as the case may be (each bid a "Prevailing Bid" and each person submitting such bid a "Successful Bidder"), and (b) identify and may, in its discretion, certify the bid or bids that constitute the next highest or best offer or offers for the Personal Property Assets (each bid a "Backup Bid" and each person submitting such a bid a "Backup Bidder"), and, in each case, notify the Successful Bidder(s) and Backup Bidder(s).

(viii)    No Successful Bid will be subject to higher and better offers. The highest cash bid at the Auction is the Successful Bid.

(ix)      All sales of Personal Property Assets or Bulk Assets shall be, subject to section 363 of the Bankruptcy Code, free and clear of all third-party liens, claims, encumbrances and security interests (each an "Encumbrance" and collectively, "Encumbrances"); provided that such Encumbrances shall attach to the net proceeds of the sale of such Personal Property Assets or Bulk Assets with the same enforceability, validity and priority as such Encumbrances had against the Personal Property Assets or Bulk Assets.

f.    Sale Approval Process

(i)      No later than two (2) calendar days after the conclusion of (a) a Private Sale Transaction or (b) each Auction Period, the Debtors shall file with the Court the following (as described below, the "Post-Sale Disclosures"):

- A list of each Private Sale Buyer, Successful Bidder, Backup Bidder (if any), the Personal Property Asset(s) or Bulk Assets, as applicable, purchased by such Private Buyer or Successful Bidder, and the price to be paid by each Private Buyer or Successful Bidder for the subject Assets;

9

- A declaration from the Hilco, Imperial, or Successful Bidder, as applicable, stating that the Private Sale Transaction or Auction was entered into or run without collusion, in good faith and at arms' length with each Private Buyer, Successful Bidder, or Backup Bidder;

- A proposed sale order authorizing the Debtors to consummate and approving the terms of the sale.

- Contemporaneously with the filing of the Post-Sale Disclosures, the Debtors will serve the Post-Sale Disclosures by email and/or facsimile on: (a) counsel to the Debtors, (i) Pachulski Stang Ziehl & Jones LLP, 919 N. Market Street, 17th Floor, Wilmington, DE, 19801, Attn: Bruce Grohsgal and (ii) Pachulski Stang Ziehl & Jones LLP, 150 California Street, 15th Floor, San Francisco, CA 94111, Attn: John W. Lucas; (b) counsel to the DIP Lenders, Hahn & Hessen, 488 Madison Avenue, New York, New York 10022, Attn: Rosanne T. Matzat; (c) counsel to the prepetition lenders, Schulte Roth & Zabel, 919 Third Avenue New York, NY 10022, Attn: David M. Hillman, (d) any party having an Encumbrance in the subject Assets being sold, (e) counsel to the official committee of unsecured creditors, Richards Layton & Finger, 920 North King Street, Wilmington, Delaware 19801, Attn: Mark D. Collins, (f) the Office of the United States Trustee, 844 King Street, Suite 2207 Lockbox 35, Wilmington DE 19801, Attn: Jane Leamy, (g) the governmental authority that has contracted for the work at a particular jobsite or location of the Assets being sold, (h) the Debtors' sureties for the Debtors' work at the particular jobsite or location of the Assets being sold, and (i) those parties requesting notice pursuant to Bankruptcy Rule 2002 (collectively, the "Notice Parties").

(ii)    If no party objects to the Post-Sale Disclosure on or before two (2) business days after filing and service to the Notice Parties, the Debtors may file a declaration of no opposition and submit to the Court a proposed order granting the proposed sales under certification of counsel (the "Sale Order"). Immediately following the entry of the Sale

10

Order, the Debtors may consummate the proposed sales contemplated under the Post-Sale Disclosures.

(iii)   If a party objects to the Post-Sale Disclosure, the objection must contain the factual and legal basis supporting its objection to the sale. The Debtors will have no more than seven (7) days to respond to the objection and, subject to the Court availability, will seek a prompt hearing before the Court to resolve the Objection.

g.   <u>Commission Payable to Hilco and Imperial:</u>

(i)   Hilco Industrial shall be (a) paid a commission equal to seven percent (7%) of the Gross Proceeds[3] from the sale of the Inventory and (b) entitled to charge and retain for its own account an industry standard buyer's premium of fifteen percent (15%) for all of the Debtors' machinery, equipment, rolling stock, furniture, and fixtures (collectively, the "<u>M&E</u>") that is sold (the "<u>Buyer's Premium</u>"). For purposes of clarification, the Buyer's Premium is a fee charged in addition to the sale price of the M&E and is paid for by the buyer.

(ii)   If the Debtors file a notice pursuant to a sale procedures motion to approve an intact branch sale within 45 days of the petition date, which sale must include (a) Inventory or M&E and (b) real estate leases, assumption of contracts, and/or rehiring of former employees (each such sale, a "<u>Branch Sale</u>"),[4] the Debtors shall be charged 7.5% on the Gross Proceeds from each such Branch Sale, which amount shall be payable at the applicable closing (the "<u>Sale Transaction Fee</u>"). In exchange for Imperial working with Hilco to finalize any such Branch Sale, the Debtors shall pay Hilco 50% of the Sale Transaction Fee and Imperial 50% of the Sale Transaction Fee. If the Debtors file a notice pursuant to a sale procedures motion to approve a bulk sale of all M&E at a branch (other than as part of a Branch Sale) ("<u>Bulk Sale</u>") within 45 days of the petition date, Hilco shall be entitled to charge the Buyer's Premium as set forth herein (the "<u>Bulk Sale BP</u>"), which Bulk Sale BP shall be payable by the buyer at the applicable closing. In exchange for Imperial working with Hilco to finalize any such sale, Imperial shall be entitled to 25% of such

---

[3] "Gross Proceeds" is defined as cumulative collected gross receipts (cash and non-cash consideration), exclusive of sales taxes and buyer's premiums.

[4] It should be noted that the commission payable in connection with a sale of a Branch do not apply to the proposed sales contemplated by this Motion. A sale of Branch will be sought by a separate motion.

collected Bulk Sale BP. All other sales of Inventory and M&E shall be governed by (g)(i) above. To the extent that notice of Branch Sale or Bulk Sale is not filed within 45 days of the petition date, no portion of the Sale Transaction Fee or Bulk Sale BP shall be payable to Imperial. The Sale Transaction Fee or Bulk Sale BP, as applicable, shall be payable in cash by wire transfer upon the consummation of the Branch Sale or Bulk Sale, as applicable, subject to Bankruptcy Court approval.

h.    <u>Closing Deadline; Asset Removal Deadline</u>. The sale(s) contemplated by the Private Sale Transactions or Successful Bid(s) shall be closed no later than two (2) business days after entry of the Sale Order, or by such other deadline agreed to between the Debtors and the Private Buyer or the Successful Bidder(s) (the "<u>Closing Deadline</u>"). At the closing of the sale of any Personal Property Asset or Bulk Asset, the purchaser shall (a) pay Hilco the full outstanding cash balance of the purchase price, and (b) pay Hilco the amount of any buyer's premium due to Hilco in accordance with these Sale Procedures and the Court's order approving Hilco's employment. Each Successful Bidder's or Backup Bidder's sole remedy in the event that a sale fails to close as a result of the Debtors' refusal or inability to close shall be a refund of the monies deposited by such bidder.

i.    <u>Disbursement of Proceeds</u>. Following the Closing Deadline, Hilco shall promptly disburse to the Debtors the net Auction proceeds owed to the Debtors in accordance with the order approving the Hilco Application, and which amounts shall not include Hilco's asserted buyer's premium or earned sale's commission.

j.    <u>Removal of Personal Property Assets</u>. Any Successful Bidder that is purchasing any Assets shall be required to remove such assets from the current location of such Assets immediately following Closing Deadline, unless such other deadline is agreed to between the Debtors and the Private Buyer or Successful Bidder. Each Successful Bidder shall be solely responsible for any and all fees, costs and expenses associated with any purchased Personal Property Assets or Bulk Assets, as applicable, on and immediately after the Closing Deadline, including, without limitation, any costs and expenses attributable to applicable rent and related expenses for the period of time following the Closing Deadline (regardless of when payment of such rent became due or related expenses of the Debtors were incurred in connection with such Personal Property Asset or Bulk Assets following the Closing Deadline).

k.    <u>Customs and Taxes</u>. Purchasers of the Personal Property Assets or Bulk Assets shall be solely responsible for paying any customs duties and taxes due and owing on any of the Personal Property Assets or Bulk Assets including, without limitation, any sales taxes, stamp taxes, recording taxes, or transfer taxes.

l.    <u>Publicity.</u> The Hilco may, in and at its sole expense, distribute a prospectus (the "<u>Prospectus</u>"), with such disclaimers set forth in sub-paragraphs (d) and (e)

12

above, to all persons who have previously shown an interest in purchasing the Personal Property Assets or Bulk Assets or whom Hilco has identified as a potential bidder. The Prospectus may include, among other things, a listing of the Personal Property Assets or Bulk Assets, the associated suggested pricing, and a copy of the order specifying the date and time of the Auction, if any, and the participation requirements.

m.    <u>Return of Good Faith Deposit</u>. All Good Faith Deposits will be held in a non-interest-bearing account and will be returned to any Qualified Bidder who is not a Successful Bidder; *provided, however*, that if a Successful Bidder fails to consummate a transaction within five calendar (5) days after the Closing Deadline with respect to a Private Sale Transaction or Successful Bid (other than as a result of the failure of the Debtors to convey title to the applicable Personal Property Assets or Bulk Assets to the applicable Private Buyer or Successful Bidder), the Debtors will not have any obligation to return the Good Faith Deposit and such Good Faith Deposit shall irrevocably become the property of the Debtors.

n.    <u>Additional Requirements</u>. The Debtors shall, in consultation with the Notice Parties, be permitted to adopt such additional reasonable rules and procedures that will serve to maximize the value of the Personal Property Assets or Bulk Assets.

o.    <u>Modification</u>. Hilco and Imperial may determine, in their business judgment, but only following the receipt of the Debtors' consent, which bid or bids, if any, constitute the highest or otherwise best offer(s) for the Personal Property Assets or Branch Assets, and may reject at any time any bid that, in Hilco's and Imperial's discretion, but subject to the Debtors' consent, is (i) inadequate or insufficient, (ii) not in conformity with the requirements of the Sale Procedures or the terms and conditions of sale, or (iii) contrary to the best interests of the Debtors. At any time before or at the Auction, and subject to the consent of the Debtors and in consultation with the Notice Parties, the Hilco and Imperial (y) may impose such other bidding procedures and terms and conditions as it may determine are in the best interests of the Debtors and other parties in interest, and (z) may modify or amend these Sale Procedures.

## **BASIS FOR RELIEF**

**B.    <u>Applicable Legal Standards for the Auction and the Sale Procedures</u>**

16.    Section 363(b)(1) of the Bankruptcy Code provides, in relevant part, that a debtor in possession, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Section 363(b) does not set forth a standard for determining when it is appropriate for a court to authorize the

13

disposition of a debtor's assets prior to confirmation of a plan. However, courts in this Circuit and others have required that the decision to sell assets outside the ordinary course of business be based upon a debtor's sound business judgment. *See In re Martin,* 911 F.3d 389, 395 (3d Cir. 1996); *In re Lionel Corp.,* 722 F.2d 1063, 1071 (2d Cir. 1983); *In re Delaware & Hudson Ry. Co.,* 124 B.R. 169, 175-76 (D. Del, 1991); *In re Trans World Airlines Inc.,* No, 01-0056, 2001 Bankr. LEXIS 980, at *29 (Bankr. D. Del. Apr, 2, 2001).

17.    In structuring bidding procedures, auctions, and sales pursuant to section 363(b) of the Bankruptcy Code, a debtor has broad discretion to construct a transaction that, in its business judgment, will deliver the most value to the entire estate, including its creditors and all stakeholders. *See In re Quality Stores, Inc.,* 272 B.R. 643, 647 (Bankr. W.D. Mich. 2002) (noting that debtors have "wide business discretion" in selling assets under section 363); *In re Wilson Freight Co.,* 30 B.R. 971, 975 (Bankr. S.D.N.Y. 1983) (in approving a debtor's right to set a minimum price threshold at an auction conducted pursuant to section 363(b), the court noted that "the Code grants the debtor substantial discretion as to the method of conducting the sale and as to negotiating and obtaining bids."); *see also In re Williams,* 152 B.R. 123, 127 (Banks. N.D. Tex. 1992) (holding that a debtor in possession has fiduciary obligations to the entire estate).

18.    Furthermore, a debtor's showing of a sound business purpose need not be unduly exhaustive but, rather, a debtor is "simply required to justify the proposed disposition with sound business reasons." *In re Baldwin United Corp.,* 43 B.R. 888, 906 (Bankr. S.D. Ohio 1984). Whether there are sufficient business reasons to justify a transaction depends upon the facts and circumstances of each case. *Lionel,* 722 F.2d at 1071. A sound business purpose for

14

the sale of a debtor's assets outside the ordinary course of business may be found where the sale

maximizes the value of the debtor's estate. *See In re Integrated Resources, Inc.*, 147 B.R. 650,

659 (S.D.N.Y. 1992) (citing *In re Atlanta Packaging Products, Inc.,* 99 B.R. 124, 130 (Bankr.

N.D. Ga. 1988) ("It is a well-established principle of bankruptcy law that the . . . [debtor's] duty

with respect to such sales is to obtain the highest price or greatest overall benefit possible for the

estate.").

       19.    In evaluating whether a debtor has exercised sound business judgment in

the context of section 363(b), courts often scrutinize the propriety of the sale process. *See In re*

*Summit Global Logistics, Inc.,* No 08-11566, .2008 WL 819934, at *14 (Bankr. D.N.J. March 26,

2008) ("The Debtors and the Secured Lenders have proposed a transaction that is the result of a

fair and open sale process facilitated by the investment bankers that maximizes value and return

to interested parties,"); *In re Castre, Inc.,* 312 B.R. 426, 428 (Bankr. D. Colo. 2004) (citing *In re*

*Gulf States Steel Inc. of Alabama,* 285 B.R. 497 (Bankr. D. Ala. 2002) (noting that most of the

factors considered by courts for section 363(b) purposes focus on "process" issues — such as

adequate procedures, proper notice to interested parties, proper market exposure and the

preparation for and conduct during the auction "rather than the business rationale for why the

successful bid was chosen."); *Quality Stores,* 272 B.R. at 643 ("a sale of assets is appropriate if

all provisions of § 363 are followed, the bid is fair, and the sale is in the best interests of the

estate and its creditors.").

       20.    Courts typically consider the following factors in determining whether a

proposed sale satisfies this standard: (a) whether a "sound business purpose" justifies the sale of

assets outside the ordinary course of business; (b) whether adequate and reasonable notice has

15

been provided to interested persons; (c) whether the debtor has obtained a fair and reasonable price; and (d) whether the parties have acted in good faith. *See Abbotts Dairies*, 788 F.2d 143 (3d Cir. 1986); *Delaware & Hudson Ry.*, 124 B.R. at 176; *In re Phoenix Steel Corp.*, 82 B.R. 334, 335-36 (D. Del. 1987); *In re Sovereign Estates. Ltd.*, 104 B.R. 702, 704 (Bankr. E.D. Pa. 1989); *In re Industrial Valley Refrigeration and Air Conditioning Supplies, Inc.*, 77 B.R. 15, 17 (Bankr. E.D. Pa. 1987).

21.    Section 105(a) of the Bankruptcy Code provides a bankruptcy court with broad powers in the administration of a case under the Bankruptcy Code. Section 105(a) provides that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a). Provided that a bankruptcy court does not employ its equitable powers to achieve a result not contemplated by the Bankruptcy Code, the exercise of its section 105(a) power is proper. *See In re Fesco Plastics Corp.,* 996 F.2d 152, 154 (7th Cir. 1993); *In re Pincus,* 280 B.R. 303, 312 (Bank. S.D.N.Y. 2002). Pursuant to section 105(a), a court may fashion an order or decree that helps preserve or protect the value of a debtor's assets. *See, e.g., In re Chinichian,* 784 F. 2d 1440, 1443 (9th Cir. 1986) ("Section 105 sets out the power of the bankruptcy court to fashion orders as necessary pursuant to the purposes of the Bankruptcy Code."); *In re Cooper Props. Liquidating Trust, Inc.,* 61 B.R. 531, 537 (Bankr. W.D. Tenn. 1986) (noting that bankruptcy court is "one of equity and as such it has a duty to protect whatever equities a debtor may have in property for the benefit of its creditors as long as that protection is implemented in a manner consistent with the bankruptcy laws.").

A.    **The Private Sale and Sale Procedures**
      **Should Be Approved:  A "Sound Business Purpose"**
      **Justifies the Auction and the Sale of the Personal Property Assets**

22.    The Debtors submit that the Sale Procedures set forth herein are a sound exercise of their business judgment, which is in the best interests of their estates and all parties in interest.  The Sale Procedures would allow the Debtors to expeditiously liquidate the Personal Property Assets and Bulk Assets in the most efficient and cost-effective manner.

23.    The Sale Procedures provide sufficient protections for the Debtors' estates.  First, the Debtors developed the Sale Procedures to maximize return to their estates. Second, immediately after the Private Sale Transactions or Auctions, the Debtors will make the requisite disclosures to the Court and key parties, which will be required to show that (a) the Private Sale Transactions or Auctions were conducted in good faith, and (b) the Private Sale Transaction or Auction complied with the Sale Procedures.  In addition, the Debtors will not be permitted to close on any Private Sale Transaction or Successful Bid until the Post-Sale Disclosures are filed with the Court and served on the Notice Parties and the Court enters an order authorizing the sale of the subject Personal Property Assets or Bulk Assets.

24.    The Debtors submit that the Sale Procedures are a sound exercise of their business judgment.  At this stage of the Debtors' chapter 11 cases, a fair and expedited sale process is crucial to maximizing creditor recoveries by selling the Personal Property Assets or Bulk Assets and minimizing costs.  Accordingly, the Debtors submit that approval of the Sale Procedures is in the best interests of the Debtors estates and all parties in interest.

**B.    To the Extent Applicable, the Sale of Encumbered Remaining Personal Property Assets Satisfies the Requirements of Section 363(f) of the Bankruptcy Code**

25.    Under section 363(f) of the Bankruptcy Code, a debtor in possession may sell all or any part of its property free and clear of any and all liens, claims, or interests in such property if:

| | |
|---|---|
| (i) | such a sale is permitted under applicable non-bankruptcy law; |
| (ii) | the party asserting such a lien, claim, or interest consents to such sale; |
| (iii) | the interest is a lien and the purchase price for the property is greater than the aggregate amount of all liens on the property; |
| (iv) | the interest is the subject of a *bona fide* dispute; or |
| (v) | the party asserting the lien, claim or interest could be compelled, in a legal or equitable proceeding, to accept a money satisfaction for such interest. |

*See* 11 U.S.C. § 363(1); *Citicorp Homeowners Services, Inc. v. Elliot (In re Elliot),* 94 B.R. 343, 345 (E.D. Pa. 1988) (noting that section 363(f) is written in the disjunctive; therefore, a court may approve a sale "free and clear" provided at least one of the subsections is met). Any secured creditor that fails to object to the Sale Procedures can be deemed by the Court to have consented to the Sale Procedures. Furthermore, regarding the interests of holders of Encumbrances, such interests are adequately protected by the terms of the Order. Specifically, all Encumbrances on the Personal Property Assets or Bulk Assets will attach with the same priority, enforceability, and validity to the consideration paid by the applicable Private Buyer or Successful Bidder to the Debtors as such Encumbrances currently have with respect to the Personal Property Assets or Bulk Assets.

**C.     Relief From the Fourteen (14) Day**
**        Waiting Period Under Bankruptcy Rule 6004(h) Is Appropriate**

26.     Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." The Debtors request that the Sale Order be effective immediately by providing that the fourteen (14) day stay under Bankruptcy Rule 6004(h) is waived.

27.     The purpose of Bankruptcy Rule 6004(h) is to provide sufficient time for an objecting party to appeal before an order can be implemented. *See* Advisory Committee Notes to Fed. R. Bankr. P. 6004(h). Although Bankruptcy Rule 6004(h) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the fourteen (14) day stay period, *Collier on Bankruptcy* suggests that the stay period should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to the procedure." 10 *Collier on Bankruptcy* 15th Ed. Rev., ¶ 6064.09 (1996), Furthermore, *Collier on Bankruptcy* provides that if an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time actually necessary to file such appeal. *Id.*

28.     Waiver of the Bankruptcy Rule 6004(h) stay is equally critical to the success of the Private Sale Transactions and Auctions. Absent a waiver of the Bankruptcy Rule 6004(h) automatic stay, it is likely that many bidders will refrain from participating in the Auction, or, in the alternative, demand reduced purchase prices. Thus, the Debtors request that the Court waive the fourteen (14) day stay period under Bankruptcy Rule 6004(h).

19

29.    No previous request for the relief sought herein has been made to this or any other Court.

## NOTICE

30.    Notice of this Motion has been given to the following parties:  (a) the Office of the United States Trustee; (b) counsel to the DIP Lenders; (c) counsel to the prepetition secured lender; (d) counsel to the Official Committee of Unsecured Creditors, (e) those parties asserting an Encumbrance in the Personal Property Assets or Bulk Assets; (f) the Debtors' regulatory agencies; (g) the sureties of the Debtors, or their counsel; and (h) those persons who have requested notice pursuant to Bankruptcy Rule 2002.  The Debtors submit that, in light of the nature of the relief requested, no other or further notice be given.

## CONCLUSION

WHEREFORE, the Debtors respectfully requests that the Court enter an order, substantially in the form annexed hereto as **Exhibit A**, authorizing the Debtors to (a) conduct private sales and auctions for (i) their Personal Property Assets and (ii) Bulk Assets, (b) and transfer such assets free and clear of all Encumbrances in accordance with the Sale Procedures described herein, and (c) granting such other and further relief as the Court deems just and proper.

DOCS_SF:83170.6

Dated:    June 5, 2013                PACHULSKI STANG ZIEHL & JONES LLP


                                      _____
                                      Richard M. Pachulski (CA Bar No. 90073))
                                      Debra I. Grassgreen (CA Bar No. 169978)
                                      Bruce Grohsgal (DE Bar No. 3583)
                                      Maria A. Bove (NY Bar No. 8687)
                                      John W. Lucas (NY Bar No. 4288379)

                                      919 North Market Street, 17th Floor
                                      P.O. Box 8705
                                      Wilmington, DE  19899-8705
                                      Telephone: 302/652-4100
                                      Facsimile: 302/652-4400
                                      E-mail:    rpachulski@pszyjw.com
                                                 dgrassgreen@pszjlaw.com
                                                 bgrohsgal@pszjlaw.com
                                                 mbove@pszjlaw.com
                                                 jlucas@pszjlaw.com

                                      Proposed Counsel for the Debtors and Debtors in
                                      Possession