IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| HIGHWAY TECHNOLOGIES INC., *et al.*, | Case No.: 13-11326 (KJC) |
| Debtors.[1] | (Jointly Administered) |

**Proposed Procedures Hearing: June 10, 2013 at 11:00 a.m.**
**Sale Hearing Objection Deadline: June 20, 2013 at 4:00 p.m. ET**
**Sale Hearing: June 27, 2013 at 3:00 p.m. ET**

**MOTION FOR AN ORDER: (I) APPROVING BIDDING PROCEDURES, BID PROTECTIONS, AND LEASE OF ASSETS, (II) APPROVING ASSET PURCHASE AGREEMENTS AND AUTHORIZING THE SALE OF CERTAIN OF THE DEBTORS' BRANCHES; (III) AUTHORIZING THE SALES FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND INTERESTS PURSUANT TO SECTIONS 363(B), (F) AND (M) OF THE BANKRUPTCY CODE; (IV) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (V) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (collectively, the

"Debtors") file this *Motion for an Order: (I) Approving Bidding Procedures, Bid Protections,*

*and Lease of Assets, (II) Approving Asset Purchase Agreements and Authorizing the Sale of*

*certain of the Debtors' Branches; (III) Authorizing the Sales of the Debtors' Branches Free and*

*Clear of All Liens, Claims, Encumbrances and Interests Pursuant to Sections 363(a), (f) and (m)*

*of the Bankruptcy Code, (IV) Authorizing the Assumption and Assignment of Certain Executory*

*Contracts and Unexpired Leases; and (V) Granting Related Relief* (the "Sale Motion"). The

Sale Motion seeks authority to sell certain of the Debtors' assets to (a) SSJS, Inc. ("SSJS"),

---

[1] The Debtors in these proceedings and the last four digits of each Debtor's federal taxpayer identification number are as follows: Highway Technologies, Inc. (6608); and HTS Acquisition, Inc. (9831). The Debtors' mailing address is 6800 Dixie Drive, Houston, Texas 77087.

including the inventory, equipment, and certain contracts and leases (the "MN Branch Assets")

located in or associated with the Debtors' operating branch in Minnesota (the "MN Branch"), all

as set forth in that certain Asset Purchase Agreement, dated June 4, 2013 (the "SSJS APA")

executed by and between Debtor Highway Technologies, Inc. and SSJS, a copy of which is

annexed hereto as **Exhibit A** and (b) Mountain West Holding Company ("Mountain West" and

together with SSJS, the "Buyers"), including the inventory and equipment (the "MT Assets" and

together with the MN Branch Assets, the "Acquired Assets") located in or associated with the

Debtors' operating branch in Montana (the "MT Branch"), all as set forth in that certain Asset

Purchase Agreement, dated June 5, 2013 (the "Mountain West APA" and together with the SSJS

APA, the "APAs") executed by and between Debtor Highway Technologies, Inc. and Mountain

West, a copy of which is annexed hereto as **Exhibit B**.  In support of this Sale Motion, the

Debtors respectfully state as follows:

### JURISDICTION

1.    This Court has jurisdiction over this Sale Motion pursuant to 28 U.S.C.

§§ 157 and 1334.  This proceeding is a core proceeding within the meaning of 28 U.S.C.

§§ 157(b)(2)(A), (M), (N) and (O).

2.    Venue of these cases and this Sale Motion is proper in this District

pursuant to 28 U.S.C. §§ 1408 and 1409.

3.    The statutory predicates for the relief sought herein are sections 105, 363,

365, 1107 and 1108 of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"),

Rules 2002(a)(2), 6004, 6006 and 9014 of the Federal Rules of Bankruptcy Procedure (the

"Bankruptcy Rules"), and Rules 2002-1(b) and 9006-1 of the Local Rules of Bankruptcy Practice

and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local

Rules").

## RELIEF REQUESTED

4.       The Debtors request that this Court authorize and approve, pursuant to

sections 363(b), (f) and (m) and 365 of the Bankruptcy Code and Bankruptcy Rules 6004 and

6006, (a) bidding procedures, bid protections, and the lease of assets, (b) the sale of the Acquired

Assets to the Buyers pursuant to the respective APAs free and clear of all liens, claims,

encumbrances or other interests, other than the assumed liabilities, with such liens, claims, rights,

interests, and encumbrances (collectively, the "Encumbrances") to attach to the sale proceeds of

the Acquired Assets with the same validity (or invalidity), priority and perfection as existed

immediately prior to such sale; (c) the assumption and assignment of the assumed executory

contracts and unexpired leases, subject to, and at the time of, closing under the respective APAs

(or, in certain instances, post-closing); and (d) grant such other relief as may be necessary or

appropriate.

5.       Contemporaneously with the filing of this Sale Motion, the Debtors have

filed a motion to shorten time and fix hearing date (the "Motion to Shorten") for the Sale Motion

but only as it pertains the bid procedures, bid protections and the leasing of assets (the

"Procedural Relief").  As set forth in the Motion to Shorten, the Debtors are requesting the Court

to schedule the hearing regarding the Procedural Relief on June 10, 2013 at 11:00 a.m.  A

proposed form of order regarding the Procedural Relief is annexed hereto as **Exhibit C**.  The

remainder of the relief sought by this Sale Motion will be heard on regular notice at the hearing

scheduled for June 27, 2013 at 3:00 p.m. (the "Sale Hearing").  A proposed form of order

regarding the approval of the SSJS APA and Mountain West APA is annexed hereto as **Exhibit**

**D**.

## BACKGROUND

6.      On May 22, 2013 (the "Petition Date"), each of the Debtors filed with this

Court a voluntary petition for relief under chapter 11 of the United States Code (the "Bankruptcy

Code").  The Debtors' chapter 11 cases (the "Chapter 11 Cases") are being jointly administered

for procedural purposes only.  The Debtors are managing their properties as debtors and debtors

in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No request has

been made for the appointment of a trustee or an examiner in these Chapter 11 Cases.

7.      On May 30, 2013, the office of the United States Trustee (the "U.S.

Trustee") appointed an official committee of unsecured creditors consisting of the following

members:  Ennis Paint, Inc., TrueBlue, Inc., Traffix Devices Inc., 3M Company, Automotive

Rentals, Inc., The Sherwin Williams Company, and Aspen American Insurance Company (the

"Creditors' Committee").

8.      With over 30 years of experience, prior to the Petition Date, Highway

Technologies was one of the largest traffic safety companies in the United States and a national

leader in providing temporary and permanent roadway traffic management and safety services,

including pavement marking installations, permanent installations of highway guardrails, barrier

walls and signage, and traffic control services for special events. The Company has provided

such special event services for the Democratic & Republican National Conventions, the Super Bowl, the Lollapalooza Music Festival and Ironman competitions. In addition, the Company offered a complete line of rental products including traffic control devices, trucks, signage and related and equipment. Prior to the Petition Date, the Company operated from 32 locations in 13 states (Arizona, California, Colorado, Florida, Illinois, Louisiana, Minnesota, Missouri, Montana, Nevada, New Jersey, Oregon and Texas).

9.      Prior to the Petition Date, the Debtors ceased operating and terminated approximately 740 employees and began the process of securing their assets for sale. To the extent the Debtors are successful at accomplishing sales of their "Branches," employees could be rehired by the purchasers.

10.     The factual background regarding the Debtors, including their current and historical business operations and the events precipitating their chapter 11 filings, are set forth in detail in the *Declaration of Robert Hookstra in Support of First Day Motions* [Docket No. 3] (the "Hookstra Declaration") filed on the Petition Date and fully incorporated herein by reference.

## CORPORATE STRUCTURE

11.     Debtor HTS Acquisition, Inc. ("AcquisitionsCo") is incorporated under the laws of the State of Delaware. Debtor Highway Technologies is incorporated under the laws of the State of Massachusetts. The Ultimate parent of the Debtors is HTS Holding Inc. ("Holdings"), a non-debtor, and is the direct parent of AcquisitionCo, which in turn is the direct parent of Highway Technologies.

## BUSINESS OPERATIONS

12.    In the operation of the Debtors' traffic safety and special event service businesses, the Debtors utilized inventory and equipment that included cones, barricades, delineation devices, message boards, arrow boards, thermo trucks, epoxy/poly trucks, paint trucks, grinder trucks, barricade lights, signs and sign-stands, barricade trucks, barrier walls, guardrail trucks, among other things. The inventory and equipment is not easily or readily movable due to its size, weight, or quantity or is currently being used on active highway projects and other job site locations. In certain cases, the Debtors believe that moving the equipment might result in a safety hazard. In most cases, the inventory and equipment is not in a centralized location but is located in one or more of the thirteen states that the Debtors operated their businesses. Furthermore, if the Debtors removed the inventory or equipment from certain locations, their customers would be required to have a new traffic or special event operators remove and replace the same equipment, which could result in counterclaims against the Debtors' estates.

13.    Prior to the Petition date, the Debtors operated approximately thirty-two branches (each a "Branch" and together "Branches") each of which were within a respective city and/or the surrounding area. The Branches were managed by a general manager who oversaw a staff that performed the day-to-day operations of the Branch. Each Branch was operated in accordance with its particular business line, which generally included one or all of the following five core operations:

a.    <u>Traffic Control and Protection</u>. Through long-term contracts, the Debtors provided temporary traffic equipment (*e.g.*, barricades, barrels, street construction signs and electronic arrow and message boards) and flagging operations for various road construction projects, including road and lane closures, railroad crossing reconstruction and bridge and road construction.

b.    <u>Daily Rental of Traffic Control and Protection</u>.  The Debtors provided daily rental of Traffic Control and Protection devices for road detours, special events and emergency road closures.

c.    <u>Pavement Striping and Markings</u>.  The Debtors provided installation and removal services in paint, epoxy, thermoplastic, pavement tape and pavement markers using a variety of large striping trucks and hand-operated machinery and equipment.

d.    <u>Permanent Installations</u>.  The Debtors installed roadside structures using operated and truck-mounted equipment, including guardrails, signs and barriers.

e.    <u>Sale of Work Zone Products</u>.  The Debtors sold permanent and temporary traffic control equipment, such as arrow and message boards, barricades, attenuators, signs and other safety equipment, and engaged in the manufacturing of barricades and signs in the support of their traffic control contracts, rentals and sales.

14.    In the months prior to the Petition Date, the Debtors were actively seeking capital from its existing lenders and sponsors, as well as potential new lenders.  In addition, in

the weeks prior the Petition Date, the Debtors were in negotiations regarding a sale of

substantially all of its assets with a key competitor, with which it had engaged in such

discussions as early as 2008.  The key competitor performed extensive due diligence in May

2013, and the Debtors continued to proceed with these negotiations until May 14, 2013, when the

key competitor informed the Debtors that it had determined not to purchase the Debtors' assets.

In addition, the Debtors were unable to obtain a commitment to finance its ongoing operations or

to pursue a sale of its assets.  Accordingly, on May 17, 2013, the Debtors ceased operations,

terminated approximately 740 employees and thereafter commenced these Chapter 11 Cases to

conduct an orderly liquidation of its assets and wind down its business as contemplated by this

Motion.

15.     In this regard, the Debtors believe that the best means to preserve and

maximize value and mitigate any potential claims against the estates is to effectuate sales of their

assets on an "as is" basis.  To this end, the Debtors entered into the respective APAs with the

Buyers to sell Branches operating in Minnesota and Montana, respectively.  If the Debtors are

successful at accomplishing the sale of one or more Branches, the buys have agreed to rehire

terminated employees subject to their internal operating needs.

16.     Because the Debtors are no longer operating their businesses, the Debtors

plan to work with their sureties, customers, lenders, and other interested parties to sell the Assets

in the most efficient and cost effective manner possible and also so that the operations are not

subject to any immediate safety hazard.  In this regard, time is of the essence.

17.    Since the Debtors' announced their shutdown, they have received over 60

inquiries to purchase some or all of their assets or Branches.  Notwithstanding the Debtors' entry

into the APAs, the Debtors and their advisor will continue to market and sell the subject assets

and hold auctions to the extent there is interest to purchase some or all of the assets or Branches

from multiple parties.

<b><u>THE TERMS OF THE PURCHASE AGREEMENT</u></b>[2]

18.    The terms of the Buyers' respective offers to purchase the Acquired

Assets are set forth in the respective APAs, copies of which are annexed hereto as **<u>Exhibit A</u>** and

**<u>Exhibit B</u>**, and are summarized below.  The descriptions below only summarize certain

provisions of the APAs, and the terms of the APAs control in the event of any inconsistency.

| SSJS APA | |
| --- | --- |
| **Provision** | **Summary Description** |
| Purchase Price | $2,500,000, plus an assumed liabilities or cure costs associated with the assumption and assignment of contracts or leases.  SSJS's payment of cure claims shall not reduce or offset the purchase price. |
| Assets | At the closing, and upon the terms and conditions set forth in the SSJS APA and subject to the approval of the Court pursuant to a sale order (the "Sale Order") to be entered at the hearing approving the proposed sale of the MN Branch Assets, including accounts receivable that are not backed by bonds, the Debtors shall sell, convey, assign, transfer and deliver to SSJS, and the SSJS shall purchase, acquire and accept, all of the right, title and interest in the MN Branch Assets, free and clear of all Encumbrances except for certain assumed liabilities  The sale shall not include |

---

[2]  Unless otherwise noted, capitalized terms have the same meanings used in the respective APAs.

| SSJS APA | |
|---|---|
| **Provision** | **Summary Description** |
| | certain excluded assets. A description of the Assets is set forth in Section 1 of the SSJS APA. |
| Assumption and Assignment of Contracts/Leases | Subject to the SSJS's right to not take assignment, certain contracts and leases, as set forth in the applicable schedule annexed to the SSJS APA will be assumed by the Debtors and assigned to SSJS relating to the MN Branch Assets to be acquired by the SSJS as described in the SSJS APA and the cure claim associated with any such contract or lease to be paid by the SSJS on the closing date. |
| Assumed Liabilities | SSJS shall assume certain liabilities, as set forth in Section 3 of the SSJS APA. |
| Pre-Closing SSJS Operations | Pursuant to Section 5 of the SSJS APA, the Debtors shall lease the MN Branch Assets to SSJS pending the closing or termination of the transaction for a monthly rate of $50,000, which amount shall be applied against the purchase price if the transaction closes. |
| Deposit | $250,000 (10% of purchase price). As set forth in Section 4.2 of the SSJS APA, SSJS shall forfeit the entire deposit upon its failure to consummate the sale as provided by the SSJS APA. |
| Closing | Pursuant to Section 6 of the SSJS APA, the closing of the transactions under the SSJS APA shall take place in accordance with the conditions set forth in Section 6 of the Purchase Agreement, which shall not be later than fourteen (14) days after the Court's entry of the Sale Order. The Sale Order will seek relief from the automatic fourteen (14) day stay period imposed under Bankruptcy Rule 6004(h). |
| Representations and Warranties | The SSJS APA contains standard representations and warranties of the parties including as set forth in Sections 7 and 8 of the SSJS APA; provided, however MN Branch Assets are being sold in a "as is" condition. |

| SSJS APA | |
|---|---|
| **Provision** | **Summary Description** |
| Successor Liability | The Sale Order shall provide that SSJS shall not be liable for any claims against the Debtors or any of its predecessors or affiliates, and SSJS shall not have successor or vicarious liabilities of any kind or character, including under any theory of antitrust, environmental, successor or transferee liability, labor law, de facto merger, mere continuation or substantial continuity, whether known or unknown as of the closing date. |
| Record Retention | Section 12.15 of the SSJS APA provides access to records for one (1) year following the closing. |
| Credit Bidding | The SSJS APA does not prejudice the rights of any secured creditor to credit bid on any MN Branch Assets (including with respect to the Deposit), subject to such creditor(s) making payment in cash of the buyer's premium or commission payable to the Debtors' advisors. See Section 11.2 of the SSJS APA. |

| Mountain West APA | |
|---|---|
| **Provision** | **Summary Description** |
| Purchase Price | $2,750,000, plus assumed liabilities. . |
| Assets | At the closing, and upon the terms and conditions set forth in the Mountain West APA and subject to the approval of the Court pursuant to a sale order (the "Sale Order") to be entered at the hearing approving the proposed sale of the MT Assets, excluding all accounts receivable whether or not they are backed by bonds, the Debtors shall sell, convey, assign, transfer and deliver to Mountain West, and the Mountain West shall purchase, acquire and accept, all of the right, title and interest in the MT Assets, free and clear of all Encumbrances except for certain assumed liabilities  The sale shall not include certain excluded assets. |

| Mountain West APA | |
|---|---|
| **Provision** | **Summary Description** |
| Assumed Liabilities | Mountain West shall assume certain liabilities, as set forth in Section 2.5 of the Mountain West APA. |
| Deposit | $275,000 (10% of purchase price). As set forth in Section 2.2 of the Mountain West APA, Mountain West shall forfeit the entire deposit upon its failure to consummate the sale as provided by the Mountain West APA. |
| Closing | The closing of the transactions under the Mountain West APA shall take place in accordance with the conditions set forth in Section 3 of the Mountain West APA, which shall not be later than July 15, 2013. The Sale Order will seek relief from the automatic fourteen (14) day stay period imposed under Bankruptcy Rule 6004(h). |
| Representations and Warranties | The Mountain West APA contains standard representations and warranties of the parties including as set forth in Sections 5 and 6 of the Mountain West APA; provided, however MT Assets are being sold in a "as is" condition. |
| Successor Liability | The Sale Order provides that Mountain West shall not be liable for any claims against the Debtors or any of its predecessors or affiliates, and Mountain West shall not have successor or vicarious liabilities of any kind or character, including under any theory of antitrust, environmental, successor or transferee liability, labor law, de facto merger, mere continuation or substantial continuity, whether known or unknown as of the closing date. |
| Record Retention | Section 13.3 of the Mountain West APA provides access to records for one (1) year following the closing. |
| Credit Bidding | The Mountain West APA does not prejudice the rights of any secured creditor to credit bid on any MT Assets (including with respect to the Deposit), subject to such creditor(s) making payment in cash of the buyer's premium or commission payable to the Debtors' advisors. |

## THE BID PROCEDURES, BUYER PROTECTIONS, LEASE OF ASSETS[3]

19.     Prior to the Petition date and after, approximately 65 parties have initiated contact with the Debtors indicating an interest to purchase certain assets, a Branch or Branches, or substantially all of the assets of the Debtors.  Over half of these parties have executed non-disclosure agreements and currently have access to the Debtors' data room.  In addition, on the date hereof, the Debtors have received approximately over a dozen offers to purchase some or all of the Debtors' assets, of which include the offers by the proposed Buyers and other potential buyers that are seeking to purchase some or all of the Acquired Assets under the respective APAs.

20.     Each of the Buyers have acknowledged and agreed that the sale of the respective Acquired Assets will be subject to higher or better offers.  To address the Debtors' receipt of multiple offers by more than one potential buyer to purchase the same or substantially the same assets, the Debtors and their advisors propose to hold an auction (*"Auction"*) prior to the Sale Hearing at a time and place agreed upon by parties.

21.     Any person that wishes to bid at the Auction must comply with the following procedures (the "*Bidding Procedures*") to become a "*Qualified Bidder*."  As a prerequisite to becoming a Qualified Bidder, a potential Qualified Bidder must deliver to the satisfaction of the Debtors:

- An asset purchase agreement marked against the applicable APA that provides for the purchase of substantially all of the subject assets;

---

[3] The relief sought in this section is being sought on an expedited basis.  The Debtors are requesting the Court schedule June 10, 2013 to consider the bid procedures, bid protections, the lease of assets, and the stay relief.

- Sufficient information as requested by the Debtors (including, without limitation, agreement to such terms and conditions as may be required by the Debtors' advisors to register to bid and participate in the Auction), to allow them to determine that the potential Qualified Bidder has the financial wherewithal and any required authorizations to close the sale, including without limitation, such entity's current audited (if applicable) financial statements and a good faith, cash deposit (in the amount of 10% of the purchase price) (the "*Good Faith Deposit*"); and

- Notwithstanding anything herein to the contrary, nothing herein shall prejudice the rights of any secured creditor to credit bid on any Assets (including with respect to the Good Faith Deposit), subject to such creditor(s) making payment in cash of the buyer's premium payable to the Debtors' liquidator.

**Bid Requirements**

- None of the bids may contain any financing, due diligence or "material adverse change" contingencies and the bid of any Successful Bidder (as defined below) will be binding whether or not (a) the Successful Bidder has obtained financing or completed its due diligence investigation, or (b) a "material adverse change" has occurred.

- The initial overbid must be an amount that is equal to or greater than (a) $150,000.00 than the Purchase Price set forth in Section 4.1 of the SSJS APA and (b) $150,000.00 than the Purchase Price set forth in Section 2.1(b) of the Mountain West APA. The amount of any subsequent overbids will be determined at the Auction. Any competing bid must be received on or before June 21, 2013 at 4:00 p.m. (Eastern).

- Copies of all bids shall promptly be provided to Purchaser.

- The Auctions shall be conducted openly and all creditors will be permitted to attend.

- Upon the conclusion of the Auction, the Debtors and their advisors shall (a) identify and certify the bid or bids that constitutes the highest or best offer or offers for the Assets (each bid a "*Prevailing Bid*" and each person submitting such bid a "*Successful Bidder*"), and (b) identify and may, in its discretion, certify the bid or bids that constitute the next highest or best offer or offers for the Personal Property Assets (each bid a "*Backup Bid*" and each person submitting such a bid a "*Backup Bidder*"), and, in each case, notify the Successful Bidder(s) and Backup Bidder(s). Purchaser may elect to be a Backup Bidder but is not required to do so.

**SSJS APA Bid Protections**

- The payment of the SSJS Break-Up Fee (defined below) shall only occur under the following conditions: (a) if and solely to the extent that the Bankruptcy Court enters an order approving such terms and conditions, or such other order as shall be entered approving the allowance and payment of the SSJS Break-Up Fee (it being understood and agreed that the consummation of the transactions contemplated by the SSJS APA shall be conditioned upon the approval by the Bankruptcy Court), (b) if there is a closing of a transaction involving the sale (in a single transaction or a series of transactions) of all or

substantially all of the Assets to any Person other than Purchaser or a designee of Purchaser (an "*Alternative Transaction*"), and (c) the Purchaser is not otherwise in material breach of this SSJS APA. If the conditions set forth in sections 11.3(a) through 11.3(c) of this SSJS APA are satisfied, then the Seller shall pay the Buyer, exclusively out of the proceeds of the Alternate Transaction, a break-up fee equal to One Hundred Twenty-Five Thousand and 00/100 Dollars ($125,000), which is inclusive of any expenses to reimburse the Purchaser for out of pocket expenses of the Purchaser expended prior to the entry of the Sale Approval Order incurred by in preserving the going concern value of the Assets used in the MN Branch (the "*SSJS Break-Up Fee*"). Payment of the SSJS Break-Up Fee pursuant to the previous sentence shall be subject to the closing of the Alternative Transaction and paid from sale proceeds within two (2) business days of the closing of the Alternative Transaction.  The Seller shall use its reasonable commercial efforts to seek approval of the SSJS Break-Up Fee by the Bankruptcy Court, and shall not object to, encourage or cooperate in any way with other parties in interest in objecting to, the approval, allowance or payment of the SSJS Break-Up Fee.  Except in the case of fraud or intentional misconduct by any Seller, the Purchaser's right to receive payment of the SSJS Break-Up Fee from the Seller as herein provided shall be the sole and exclusive remedy available to the Purchaser against the Seller or any of its former, current or future shareholders, directors, officers, affiliates or agents with respect to this SSJS APA and the transactions contemplated hereby in the event that this SSJS APA is terminated pursuant to the terms set forth herein, and upon payment of the SSJS Break-Up Fee in circumstances described herein, neither the Seller nor any of its former, current or future shareholders, directors, officers, affiliates or agents shall have any further liability or obligation relating to or arising out of this SSJS APA or the transactions contemplated hereby.

**Mountain West APA Bid Protections**

- The payment of the MW Break-Up Fee (defined below) shall only occur under the following conditions: (a) if and solely to the extent that the Bankruptcy Court enters an order approving such terms and conditions, or such other order as shall be entered approving the allowance and payment of the MW Break-Up Fee (it being understood and agreed that the consummation of the transactions contemplated by this Mountain West APA shall be conditioned upon the approval by the Bankruptcy Court), (b) if there is a closing of a transaction involving the sale (in a single transaction or a series of transactions) of all or substantially all of the Assets to any Person other than Purchaser or a designee of Purchaser (an "*Alternative Transaction*"), and (c) the Purchaser is not otherwise in material breach of this Mountain West APA. If the conditions set forth in this Section 8.5 are satisfied, then the Seller shall pay the Buyer, exclusively out of the proceeds of the Alternative Transaction, a break-up fee equal to One Hundred Twenty-Five Thousand and 00/100 Dollars ($125,000), which is inclusive of any expenses to reimburse the Purchaser for out of pocket expenses of the Purchaser expended prior to the entry of the Sale Approval Order in preserving the going concern value of the Assets used in the Montana Business (the "*MW Break-Up Fee*").  Payment of the MW Break-Up Fee pursuant to the previous sentence shall be subject to the closing of the Alternative Transaction and paid from sale proceeds within two (2) business days of the closing of the Alternative Transaction.  The Seller shall use its reasonable commercial efforts to

seek approval of the Break-Up Fee by the Bankruptcy Court, and shall not object to, encourage or cooperate in any way with other parties in interest in objecting to, the approval, allowance or payment of the MW Break-Up Fee. Except in the case of fraud or intentional misconduct by any Seller, the Purchaser's right to receive payment of the Break-Up Fee from the Seller as herein provided shall be the sole and exclusive remedy available to the Purchaser against the Seller or any of its former, current or future shareholders, directors, officers, affiliates or agents with respect to this Mountain West APA and the transactions contemplated hereby in the event that this Mountain West APA is terminated pursuant to the terms set forth herein, and upon payment of the MW Break-Up Fee in circumstances described herein, neither the Seller nor any of its former, current or future shareholders, directors, officers, affiliates or agents shall have any further liability or obligation relating to or arising out of this Mountain West APA or the transactions contemplated hereby.

**Leasing of MN Branch Assets**

22.     Prior to the Petition Date, part of the Debtors' operations consisted of leasing traffic safety and other highway maintenance equipment. The Debtors believe that the leasing of their assets is an ordinary course transaction. Nevertheless, the Debtors are seeking authorization to lease the assets being purchased by SSJS out of an abundance of caution and to the extent such transaction is not in in the ordinary course. Accordingly, as part of the relief requested herein, the Debtors are seeking authorization to lease the assets being sold to SSJS pending closing or termination of the transaction at bulk rate of $50,000.00 per month. If SSJS is the successful bidder, the rent will be credited against the purchase price and the first month's rent will also be credited against the Good Faith Deposit paid by SSJS. The Debtors believe that the bulk rental rate is reasonable as it represents approximately 2% of the purchase price and represents a fair monthly bulk rate in light of the book value of the assets.

**Customer Contracts and the Automatic Stay**

23.    Pursuant to Section 5 of the SSJS APA, the Debtors are not assuming and assigning any of their customer contracts to SSJS (such agreements will be assumed and assigned as part of the sale).  Prior to the closing, SSJS will contract with the Debtors' customers and enter into new agreements that cover some or all of the services the Debtors had agreed to provide to its customers.  As part of the SSJS APA, SSJS has required the Debtor to seek relief from the Court that SSJS's entry into contracts with the Debtors' current customers will not be in violation of the Debtors' agreements with its current customers or section 362 of the Bankruptcy Code.

## BASIS FOR RELIEF

A.    **Approval of the Sales**

24.    Section 363(b)(1) of the Bankruptcy Code provides that a debtor, "after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).  Section 105(a) provides in relevant part that "[t]he Court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).

25.    The sale of a debtor's property should be authorized pursuant to section 363 of the Bankruptcy Code if a sound business purpose exists for doing so.  *See, e.g., Meyers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996), *citing Fulton State Bank v. Schipper (In re Schipper)*, 933 F.2d 513, 515 (7th Cir. 1991)); *In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143 (3d Cir. 1986); *Stephens Indus., Inc. v. McClung*, 789 F.2d 386, 390 (6th Cir.

1986); *In re Lionel Corp.*, 722 F.2d 1063 (2d Cir. 1983); *In re Titusville Country Club*, 128 B.R.

396 (W.D. Pa. 1991); *In re Delaware & Hudson Railway Co.*, 124 B.R. 169, 176 (D. Del. 1991).

The *Delaware & Hudson Railway* court rejected the pre-Code "emergency" or "compelling

circumstances" standard, finding the "sound business purpose" standard applicable and,

discussing the requirements of that test under *McClung* and *Lionel*, observing:

> A non-exhaustive list of factors to consider in determining if there
> is a sound business purpose for the sale include: the proportionate
> value of the asset to the estate as a whole; the amount of elapsed
> time since the filing; the likelihood that a plan of reorganization
> will be proposed and confirmed in the near future; the effect of the
> proposed disposition of the future plan of reorganization; the
> amount of proceeds to be obtained from the sale versus appraised
> values of the property; and whether the asset is decreasing or
> increasing in value.

124 B.R. at 176.

26.    The *Delaware & Hudson Railway* court further held that "[o]nce a court is

satisfied that there is a sound business reason or an emergency justifying the pre-confirmation

sale, the court must also determine that the trustee has provided the interested parties with

adequate and reasonable notice, that the sale price is fair and reasonable and that the purchaser is

proceeding in good faith." *Id.*

27.    The Debtors have proposed the sales of the Acquired Assets to each of the

Buyers after thorough consideration of all viable alternatives, and have concluded that the sale

are supported by a number of sound business reasons.

28.    For the reasons noted above, the immediate sales of the Acquired Assets

are supported by sound business reasons and are in the best interests of the Debtors and their

estates. Accordingly, the Debtors request approval under section 363(b) of the Bankruptcy Code

of the sales to each of the Buyers.

### THE PROPOSED SALES SATISFY
### THE REQUIREMENTS OF SECTION 363(F) OF THE BANKRUPTCY CODE
### FOR A SALE FREE AND CLEAR OF LIENS, CLAIMS, AND INTERESTS

29.    Section 363(f) of the Bankruptcy Code provides:

> The trustee may sell property under subsection (b) or (c) of this section free and clear of any interest in such property of an entity other than the estate, only if –
>
>> (1) applicable nonbankruptcy law permits sale of such property free and clear of such interest;
>>
>> (2) such entity consents;
>>
>> (3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
>>
>> (4) such interest is in a bona fide dispute; or
>>
>> (5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

30.    Section 363(f) of the Bankruptcy Code provides for the sale of property

"free and clear of any interests." The term "any interest," as used in section 363(f), is not

defined anywhere in the Bankruptcy Code. *Folger Adam Security v. DeMatteis/MacGregor, JV*,

209 F.3d 252, 259 (3d Cir. 2000). In *Folger Adam*, the Third Circuit specifically addressed the

scope of the term "any interest." 209 F.3d at 258. The Third Circuit observed that while some

courts have "narrowly interpreted that phrase to mean only *in rem* interests in property," the

trend in modern cases is towards "a broader interpretation which includes other obligations that

may flow from ownership of the property." *Id. at 258, citing 3 Collier on Bankruptcy 363.06*[1].

As determined by the Fourth Circuit in *In re Leckie Smokeless Coal Co.*, 99 F.3d 573, 581-582

(4th Cir. 1996), a case cited approvingly and extensively by the Third Circuit in *Folger Adam*,

the scope of 11 U.S.C. § 363(f) is not limited to *in rem* interests. Thus, the Third Circuit in

*Folger Adam* stated that *Leckie* held that the debtors "could sell their assets under §363(f) free

and clear of successor liability that otherwise would have arisen under federal statute." *Folger*

*Adam*, 209 F.3d at 258.

       31.    Section 363(f) is drafted in the disjunctive. Thus, satisfaction of any of

the requirements enumerated therein will suffice to warrant the sales of the Acquired Assets free

and clear of the Encumbrances (other than Assumed Liabilities). *See Citicorp Homeowners*

*Services, Inc. v. Elliot*, 94 B.R. 343, 345 (E.D. Pa. 1988). The Debtors submit that each

Encumbrance satisfies at least one of the five conditions of section 363(f) of the Bankruptcy

Code, and that any such Encumbrance will be adequately protected by either being paid in full at

the time of closing, or by having it attach to the net proceeds of the Sale, subject to any claims

and defenses the Debtors may possess with respect thereto. The Debtors accordingly request

authority to convey the Acquired Assets to the respective Buyers, free and clear of all

Encumbrances except for the Assumed Liabilities, with such Encumbrances to attach to the

proceeds of the respective sales with the same validity (or invalidity), priority and perfection as

existed immediately prior to the sales. Payment of sale proceeds shall be applied pursuant to the

*Order (Interim) (I) Authorizing Debtors to Obtain Postpetition Secured Financing, (II)*

*Authorizing Use Cash Collateral, (III) Granting Adequate Protection, (IV) Scheduling Final*

*Hearing, and (V) Granting Certain Relief* [Docket No. 55], or any order that amends or supersedes such order..

32.    The Debtors are informed and believe that their prepetition secured lenders either have consented or will consent to the sales. *See* 11 U.S.C. § 365(f)(2). Accordingly, this Court should approve the Sale of the Acquired Assets to the Buyer free and clear of Interests under section 363(f) of the Bankruptcy Code (except for Assumed Liabilities), and any potential claimants should be compelled to look exclusively to the proceeds of the Sale for satisfaction of their claims.

**B.    Bidding Procedures and Protections**

33.    The Debtors propose to sell the Acquired Assets in accordance with the Bidding Procedures described above. The Debtors believe that the consummation of the sales to the respective Buyers or to a successful overbidder, in accordance with the Bidding Procedures, will provide their creditors and other stakeholders with the best possible opportunity for maximizing value through a sale as a Branch or Branches rather an a piecemeal liquidation.

34.    As indicated above, the Debtors hereby request that the Court approve the Bidding Procedures they intend to employ prior the hearing on the Sale Motion. To compensate the Buyers for serving as the stalking horse bidders whose bid will be subject to higher or better offers, the Debtors seek approval of the Bidding Procedures in accordance with the terms of the respective APAs, which only differ in the amount of the break up fees (each a "Break-Up Fee" and together "Break-Up Fees"). The Debtors and the Buyers believe that the amounts of the Break-Up Fees, which are inclusive of expense reimbursements are reasonable, given the

benefits to the Debtors' estates of having a "stalking horse" bidder by virtue of the definitive

asset purchase agreements with each Buyer, and the risk to each Buyer that a third-party offer

may ultimately be accepted, and that approval of the Break-Up Fee under the terms of the

respective APAs is necessary to preserve and enhance the value of the Debtors' estates.  The

Debtors believe that the agreement to pay the Break-Up Fees on the terms of the respective

APAs is necessary to induce the Buyers to enter into the transactions encompassed by the APAs

and thus to enable the Debtors to obtain the highest and best possible price for the Acquired

Assets.

35.    The Bidding Procedures are reasonably calculated to encourage a buyer to

submit a final bid within the range of reasonably anticipated values.  The Buyer will be the

stalking horse bidder and the Bidding Procedures will encourage competitive bidding, and will

perhaps leading to further competition and the establishment of a baseline against which higher

or otherwise better offers can be measured.

36.    Bidding incentives encourage a potential purchaser to invest the requisite

time, money and effort to negotiate with the Debtors and perform the necessary due diligence

attendant to the acquisition of the Debtors' assets, despite the inherent risks and uncertainties of

the chapter 11 process.  Historically, bankruptcy courts have approved bidding incentives similar

to the Break-Up Fee, under the "business judgment rule," which proscribes judicial second-

guessing of the actions of a corporation's board of directors taken in good faith and in the

exercise of honest judgment.  *See, e.g., In re 995 Fifth Ave. Assocs., L.P.*, 96 B.R. 24, 28 (Bankr.

S.D.N.Y. 1989) (bidding incentives may "be legitimately necessary to convince a white knight to

enter the bidding by providing some form of compensation for the risks it is undertaking")
(internal quotation marks and citation omitted).

37.     The Third Circuit has established standards for determining the
appropriateness of bidding incentives in the bankruptcy context.  In *Calpine Corp. v. O'Brien
Envtl. Energy, Inc.*, 181 F.3d 527 (3d Cir. 1999), the court held that even though bidding
incentives are measured against a business judgment standard in nonbankruptcy transactions, the
administrative expense provisions of section 503(b) of the Bankruptcy Code govern in the
bankruptcy context.  Accordingly, to be approved, bidding incentives must provide some benefit
to the Debtors' estates.  *See id.* at 533.

38.     The *O'Brien* court identified at least two instances in which bidding
incentives may provide benefit to an estate.  First, benefit may be found if "assurance of a break-
up fee promoted more competitive bidding, such as by inducing a bid that otherwise would not
have been made and without which bidding would have been limited." *Id.* at 537.  Second,
where the availability of bidding incentives induces a bidder to research the value a debtor's
assets and submit a bid that serves as a minimum or floor bid on which other bidders can rely,
"the bidder may have provided a benefit to the estate by increasing the likelihood that the price at
which the debtor is sold will reflect its true worth." *Id.*

39.     Whether evaluated under the "business judgment rule" or the Third
Circuit's "administrative expense" standard, the Break-Up Fees pass muster.  The APAs and the
Debtors' agreement to pay the Break-Up Fees pursuant to the terms thereunder are the product of
good faith, arm's-length negotiations between the Debtors and the respective Buyers.  The

Break-Up Fees are fair and reasonable in amount, and are reasonably intended to compensate for the risk to the Buyers of being used as a stalking horse bidder.

40.    Further, the Break-Up Fees have already encouraged competitive bidding in that the Buyers would not have entered into the respective APAs without these provisions. The Break-Up Fees thus have "induc[ed] a bid that otherwise would not have been made and without which bidding would [be] limited." *O'Brien*, 181 F.3d at 537. Similarly, the Buyer's offer provides a minimum bid on which other bidders can rely, thereby "increasing the likelihood that the price at which the [Property will be] sold will reflect [its] true worth." *Id.*

41.    Finally, the Bidding Procedures are fair and reasonable procedures reasonably intended to encourage competitive bidding, and the Break-Up Fees will permit the Debtors to insist that competing bids for the Acquired Assets, made in accordance with the Bidding Procedures, be materially higher or otherwise better than the applicable APA (or competing agreement), which is a clear benefit to the Debtors' estates.

42.    Furthermore, the Break-Up Fees, which at maximum would total approximately 5% of the purchase price proposed under the respective APAs, are within the spectrum of termination fees approved by bankruptcy courts in chapter 11 cases. *See e.g., In re Global Motorsport Group, Inc., et al.*, (Case No. 08-10192 (KJC) (Bankr. D. Del. February 14, 2008) (Court approved a break-up fee of approximately 4%, or $500,000 in connection with sale); *In re Global Home Products*, Case No. 06-10340 (KG) (Bankr. D. Del. July 14, 2006) (Court approved a break-up fee of 3.3%, or $700,000, in connection with sale); *In re Ameriserve*, Case No. 00-0358 (PJW) (Bankr. D. Del., September 27, 2000) (Court approved a break-up fee

of 3.64%, or $4,000,000, in connection with $110,000,000 sale); *In re Montgomery Ward Holding Corp.*, et al., Case No. 97-1409 (PJW) (Bankr. D. Del., June 15, 1998) (Court approved termination fee of 2.7%, or $3,000,000, in connection with $110,000,000 sale of real estate assets); *In re Medlab, Inc.*, Case No, 97-1893 (PJW) (Bankr. D. Del. April 28, 1998) (Court approved termination fee of 3.12%, or $250,000, in connection with $8,000,000 sale transaction); *In re Anchor Container Corp. et al.*, Case Nos. 96-1434 and 96-1516 (PJW) (Bankr. D. Del. Dec. 20, 1996) (Court approved termination fee of 2.43%, or $8,000,000, in connection with $327,900,000 sale of substantially all of debtors' assets); *In re FoxMeyer Corp. et al.*, Case No. 96-1329 (HSB) through 96-1334 (HSB) (Bankr. D. Del., Oct. 9, 1996) (Court approved termination fee of 7.47%, or $6,500,000, in connection with $87,000,000 sale of substantially all of debtors' assets); *In re Edison Bros. Stores. Inc. et al.*, Case No. 95-1354 (PJW) (Bankr. D. Del., Dec. 29, 1995) (Court approved termination fee of 3.5%, or $600,000, in connection with $17,000,000 sale of debtors' entertainment division); *In re NetEffect, Inc.,* Case No. 08-12008 (KJC) (Bankr. D. Del., Sept. 11, 2008) (Court approved break-up fee of 3%, or $240,000.00 in connection with sale of debtor's assets for purchase price of $8,000,000); *In re Champion Enterprises, et al.*, Case No. 09-14019 (KG) (Bankr. D. Del., Feb. 8, 2010) (Court approved break-up fee of less than credit bid or $3,000,000.00 in connection with sale of debtor's assets for purchase price of approximately $80,000,000); *In re Filene's Basement, Inc., et al.*, Case No. 09-11525 (MFW) (Bankr. D. Del., May 15, 2009) (Court approved break-up fee and expense reimbursement of 3.68%, or $810,000 in connection with sale of debtor's assets for purchase price of $22,000,000); *In re Western Nonwovens, Inc.*, et al., Case No. 08-11435 (PJW) (Bankr.

D. Del., July 28, 2009) (Court approved break-up fee and expense reimbursement or $250,000 in

connection with sale of debtor's assets for purchase price of $4,000,000 to $6,500,000 purchase

price); and *In re Point Blank Solutions, Inc., et al.*, Case No. 10-11255 (PJW) (Bankr. D. Del,

Oct. 5, 2011) (Court approved break-up and expense reimbursement of 3.75% or $750,000 in

connection with sale of debtor's assets for purchase price of $20,000,000).

   43. For these reasons, the Debtors request approval of the Break-Up Fees

pursuant to the terms and conditions in the respective APAs.

**C.** **Good Faith Under Section 363(m) of the Bankruptcy Code**

   44. Section 363(m) of the Bankruptcy Code provides:

> The reversal or modification on appeal of an authorization under
> subsection (b) or (c) of this section of a sale or lease of property
> does not affect the validity of a sale or lease under such
> authorization to an entity that purchased or leased such property in
> good faith, whether or not such entity knew of the pendency of the
> appeal, unless such authorization and such sale or lease were
> stayed pending appeal.

11 U.S.C. § 363(m). While the Bankruptcy Code does not define "good faith", the Third Circuit

in *In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143 (3d Cir. 1986) has held that:

> [t]he requirement that a purchaser act in good faith . . . speaks to
> the integrity of his conduct in the course of the sale proceedings.
> Typically, the misconduct that would destroy a purchaser's good
> faith status at a judicial sale involves fraud, collusion between the
> purchaser and other bidders or the trustee, or an attempt to take
> grossly unfair advantage of other bidders.

788 F.2d at 147 (citations omitted).

   45. The APAs were each negotiated, arm's-length transactions, in which the

Buyers acted in good faith and in compliance with the *Abbotts Dairies* standards.   Prior to the

hearing on this Motion, the Debtors and each Buyer will either submit a declaration or provide

testimony at the Sale Hearing in support of the sales contemplated by each of the APAs, or any

other buyer that might result from the auctions contemplated by this Motion. The Debtors thus

request that the Court find that each Buyer with respect to each of the APAs purchased the

Acquired Assets in good faith within the meaning of section 363(m) of the Bankruptcy Code.

**D.**     **Authorization of Assumption and Assignment of Assumed Executory Contracts**

46.     As required by the APAs, the Debtors request approval of the assumption

and assignment of the designed executory contracts and unexpired leases set forth in the

schedules annexed to the respective APAs to the Buyer upon the closing of the transactions

contemplated under the respective APAs.

47.     The Debtors will serve a proposed cure notice, substantially the form of

**Exhibit E** annexed hereto (the "Cure Notices") on each counterparty to an assumed executory

contract or unexpired lease. The Cure Notice will identify the amounts, if any, that the Debtors

believe are owed to each counterparty to an assumed executory contract or unexpired lease

necessary to cure any defaults that exist under such contract (the "Cure Costs"). If a contract or

lease is assumed and assigned pursuant to the Court's order approving same, then unless the

affected counterparty properly files and serves an objection to the Cure Costs contained in the

Cure Notice, the counterparty will receive at the time of the Closing (or as soon as reasonably

practicable thereafter), the Cure Costs as set forth in the Cure Notice, with payment made

pursuant to the terms of the applicable APA. If an objection is filed by a counterparty to an

assumed executory contract or unexpired lease, the Debtors propose that such objection must set

forth a specific default in any executory contract or unexpired lease and claim a specific monetary amount that differs from the amount (if any) specified by the Debtors in the Cure Notice or, alternatively, state why the counterparty believes any Cure Cost is owing.

48.     Pursuant to the terms of the APAs, the Buyers shall be exclusively responsible for payment of Cure Costs with respect to any assumed executory contract or unexpired lease under the respective APAs.  The Buyers shall be responsible for satisfying any requirements regarding adequate assurances of future performance that may be imposed under section 365(b) of the Bankruptcy Code in connection with the proposed assignment of any of the respective assumed executory contracts or unexpired leases.  The Debtors propose that the Court make its determinations concerning adequate assurance of future performance under the assumed executory contract or unexpired lease pursuant to 11 U.S.C. § 365(b) at the Sale Hearing for those contracts to be assumed/assigned at closing.

49.     If any counterparty objects for any reason to the assumption and assignment of an assumed executory contract or unexpired lease, the Debtors propose that the counterparty must file any such objection by no later than (i) seven (7) days prior to the Sale Hearing or (ii) the date otherwise specified in the Cure Notice.

50.     The Debtors further request that the Sale Order provide that the assumed executory contract or unexpired lease will be assigned to, and remain in full force and effect for the benefit of the Buyer, notwithstanding any provisions in the assumed executory contracts or unexpired leases, including those described in sections 365(b)(2) and (f)(1) and (3) of the Bankruptcy Code, that prohibit such assignment.

51.     Section 365(f) of the Bankruptcy Code provides, in pertinent part, that:

The trustee may assign an executory contract or unexpired lease of the debtor only if –

(A)     the trustee assumes such contract or lease in accordance with the provisions of this section; and

(B)     adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease.

11 U.S.C. § 365(f)(2).  Under section 365(a), a debtor, "subject to the court's approval, may

assume or reject any executory contract or unexpired lease of the debtor."  11 U.S.C. § 365(a).

Section 365(b)(1), in turn, codifies the requirements for assuming an unexpired lease or

executory contract of a debtor, providing that:

(b)(1)  If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee --

(A) cures, or provides adequate assurance that the trustee will promptly cure, such default;

(B) compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and

(C) provides adequate assurance of future performance under such contract or lease.

11 U.S.C. § 365(b)(1).

52.     Although section 365 of the Bankruptcy Code does not set forth standards

for courts to apply in determining whether to approve a debtor in possession's decision to

assume an executory contract, courts have consistently applied a "business judgment" test when

reviewing such a decision. *See, e.g., Group of Institutional Investors v. Chicago, Milwaukee, St. Paul & Pacific Railroad Co.*, 318 U.S. 523, 550 (1953); *Matter of Talco, Inc.*, 558 F.2d 1369, 1173 (10th Cir. 1977). A debtor satisfies the "business judgment" test when it determines, in good faith, that assumption of an executory contract will benefit the estate and the unsecured creditors. *In re FCX, Inc.*, 60 B.R. 405, 411 (Bankr. E.D. N.Y. 1986). The assumption and assignment of the assumed executory contracts or unexpired leases, or any of them, set forth in the respective APAs, will be a necessary part of the deal that the Debtors have struck with each Buyer and, as stated above, will benefit the Debtors' estates.

53.     As set forth above, with respect to assumed executory contracts or unexpired leases to be assumed and assigned pursuant to the sale, the Debtors will send the Cure Notices to all counterparties (the "Counterparties") to the assumed executory contracts or unexpired leases. The Cure Notices serve to notify such Counterparties of the potential assumption by applicable Debtors and assignment to the applicable Buyer of the assumed executory contracts or unexpired leases. The Cure Notices set forth the "cure" amounts owing on each of the assumed executory contracts or unexpired leases according to the Debtors' books and records.

54.     The Counterparties will have sufficient opportunity to file an objection to the proposed cure amounts set forth in the Cure Notices. To the extent no objection is filed with regard to a particular cure amount, such cure amount shall be binding on the applicable contract or lease Counterparty. The payment of the cure amounts specified in the Cure Notices (or a different amount either agreed to by the Debtors, the Buyer, and the Counterparties or resolved

by the Court as a result of a timely-filed objection filed by a contract or lease Counterparty) will be in full and final satisfaction of all obligations to cure defaults and compensate the Counterparties for any pecuniary losses under such contracts or leases pursuant to section 365(b)(1) of the Bankruptcy Code, unless the Debtors determine that a particular lease or contract is not truly executory, and does not need to be cured to transfer the Acquired Assets to the Buyer.

55.    As set forth in the respective APAs, the Buyers (or the Successful Bidder(s)), are responsible for providing evidence of "adequate assurances of future performance" to the extent required in connection with the assumption and assignment of any assumed executory contracts or unexpired leases.  The meaning of "adequate assurance of future performance" for the purpose of the assumption of executory contracts and unexpired leases pursuant to section 365 of the Bankruptcy Code depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." *See Carlisle Homes, Inc. v. Arrari (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D.N.J. 1989).  *See also In re Natco Indus., Inc.*, 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (adequate assurance of future performance does not mean an absolute assurance that debtor will thrive and pay rent); *In re Bon Ton Rest. & Pastry Shop, Inc.*, 53 B.R. 789, 803 (Bankr. N.D. Ill. 1985).  If necessary, the Buyer or the Successful Bidder shall provide evidence of its ability to provide adequate assurance to Counterparties.

**NOTICE**

56.     Notice of this Motion has been given to the following parties:  (a) the Office of the United States Trustee; (b) counsel to the DIP Lenders; (c) counsel to the prepetition secured lender; (d) counsel to the Official Committee of Unsecured Creditors, (e) those parties asserting an Encumbrance in the Personal Property Assets or Bulk Assets; (f) the Debtors' Minnesota, Montana and Federal regulatory agencies; (g) the sureties of the Debtors, or their counsel; and (h) those persons who have requested notice pursuant to Bankruptcy Rule 2002. The Debtors submit that, in light of the nature of the relief requested, no other or further notice be given.

57.     The Debtors submit that the notice that it has provided and intends to provide of this Sale Motion and the Sale Hearing is reasonable and appropriate and should be approved by this Court as adequate and sufficient notice.

58.     The Debtors request, pursuant to Bankruptcy Rules 6004(g) and 6006(d), that the order approving this Sale Motion become effective immediately upon its entry.

**CONCLUSION**

59.     The Debtors' proposed sales of the Acquired Assets to the respective Buyers as described in this Sale Motion, including the assumption and assignment of the assumed executory contracts or unexpired leases (as applicable), is supported by sound business reasons, as set forth herein.  The sales are proper, necessary and serve the best interests of the Debtors, their estates and creditors and all parties in interest.  The Debtors thus request that the Court approve the proposed sales of the Acquired Assets free and clear of all Encumbrances

including successor liabilities, but excluding assumed liabilities, as requested, including, without limitation, the assumption and assignment of the assumed executory contracts or unexpired leases, to the respective Buyers.

## NO PRIOR REQUEST

60.    No prior request for the relief sought in this Sale Motion has been made to this or any other court.

WHEREFORE, the Debtors respectfully request that this Court:  (i) grant this Sale Motion and authorize the Sale of the Acquired Assets to the respective Buyers and approve the proposed APAs in substantially the form attached to this Sale Motion, pursuant to the proposed order submitted herewith; (ii) approve the assumption and assignment of the assumed executory contracts or unexpired leases in accordance with each applicable APA; (iii) approve the form and manner of notice of this Sale Motion, and of the proposed Sale and assumptions and assignments; and (iv) grant such other and further relief as is just and proper.

Dated:   June 5, 2013                PACHULSKI STANG ZIEHL & JONES LLP

                                     */s/ Peter J. Keane*
                                     Richard M. Pachulski (CA Bar No. 90073))
                                     Debra I. Grassgreen (CA Bar No. 169978)
                                     Bruce Grohsgal (DE Bar No. 3583)
                                     Maria A. Bove (NY Bar No. 8687)
                                     John W. Lucas (NY Bar No. 4288379)
                                     Peter J. Keane (DE Bar No. 5503)
                                     919 North Market Street, 17th Floor
                                     P.O. Box 8705
                                     Wilmington, DE  19899-8705
                                     Telephone: 302/652-4100
                                     Facsimile: 302/652-4400
                                     E-mail:    rpachulski@pszjw.com
                                                dgrassgreen@pszjlaw.com
                                                bgrohsgal@pszjlaw.com
                                                mbove@pszjlaw.com
                                                jlucas@pszjlaw.com
                                                pkeane@pszjlaw.com

                                     Proposed Counsel for the Debtors and Debtors in
                                     Possession