IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| HIGHWAY TECHNOLOGIES INC., *et al.*, | Case No.: 13-11326 (KJC) |
| Debtors.[1] | (Jointly Administered) |

**Proposed Procedures Hearing: June 27, 2013, 3:00 p.m. ET or June 28, 2013, 1:30 p.m. ET**
**Sale Hearing Objection Deadline: July 5, 2013 at 12:00 p.m. ET**
**Sale Hearing: July 11, 2013 at 1:30 p.m. ET**

**MOTION FOR AN ORDER: (I) APPROVING BIDDING PROCEDURES, BID
PROTECTIONS, AND LEASE OF ASSETS, (II) APPROVING ASSET PURCHASE
AGREEMENT AND AUTHORIZING THE SALE OF CERTAIN OF THE DEBTORS'
DENVER BRANCH; (III) AUTHORIZING THE SALES FREE AND CLEAR OF ALL
LIENS, CLAIMS, ENCUMBRANCES AND INTERESTS PURSUANT TO SECTIONS
363(B), (F) AND (M) OF THE BANKRUPTCY CODE; (IV) AUTHORIZING
THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY
CONTRACTS AND UNEXPIRED LEASES; AND (V) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (collectively, the

"***Debtors***") file this *Motion for an Order: (I) Approving Bidding Procedures, Bid Protections,*

*and Lease of Assets, (II) Approving Asset Purchase Agreement and Authorizing the Sale of*

*certain of the Debtors' Denver Branch; (III) Authorizing the Sales Free and Clear of All Liens,*

*Claims, Encumbrances and Interests Pursuant to Sections 363(b), (f) and (m) of the Bankruptcy*

*Code, (IV) Authorizing the Assumption and Assignment of Certain Executory Contracts and*

*Unexpired Leases; and (V) Granting Related Relief* (the "***Sale Motion***").  The Sale Motion seeks

authority to sell certain of the Debtors' assets to RDP Barricade Company, LLC ("***RDP***"),

---

[1] The Debtors in these proceedings and the last four digits of each Debtor's federal taxpayer identification number
are as follows: Highway Technologies, Inc. (6608); and HTS Acquisition, Inc. (9831).  The Debtors' mailing
address is 6800 Dixie Drive, Houston, Texas 77087.

including the inventory, equipment, and certain contracts and leases (the "***Denver Branch Assets***" as more fully defined in the annexed Exhibit A) located in or associated with the Debtors' operating branch in Denver, Colorado (the "***Denver Branch***" as more fully defined in the annexed Exhibit A), all as set forth in that certain Asset Purchase Agreement, dated June 20, 2013 (the "***APA***") executed by and between Debtor Highway Technologies, Inc. and RDP, a copy of which is annexed hereto as **Exhibit A**.  In support of this Sale Motion, the Debtors respectfully state as follows:

**JURISDICTION**

1.    This Court has jurisdiction over this Sale Motion pursuant to 28 U.S.C. §§ 157 and 1334.  This proceeding is a core proceeding within the meaning of 28 U.S.C. §§ 157(b)(2)(A), (M), (N) and (O).

2.    Venue of these cases and this Sale Motion is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

3.    The statutory predicates for the relief sought herein are sections 105, 363, 365, 1107 and 1108 of chapter 11 of title 11 of the United States Code (the "***Bankruptcy Code***"), Rules 2002(a)(2), 6004, 6006 and 9014 of the Federal Rules of Bankruptcy Procedure (the "***Bankruptcy Rules***"), and Rules 2002-1(b) and 9006-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "***Local Rules***").

### RELIEF REQUESTED

4.    The Debtors request that this Court authorize and approve, pursuant to

sections 363(b), (f) and (m) and 365 of the Bankruptcy Code and Bankruptcy Rules 6004 and

6006, (a) bidding procedures, bid protections, and the lease of assets, (b) the sale of the Denver

Branch Assets to RDP pursuant to the APA free and clear of all liens, claims, encumbrances or

other interests, other than the assumed liabilities, with such liens, claims, rights, interests, and

encumbrances (collectively, the "*Encumbrances*") to attach to the sale proceeds of the Denver

Branch Assets with the same validity (or invalidity), priority and perfection as existed

immediately prior to such sale; (c) the assumption and assignment of the assumed executory

contracts and unexpired leases, subject to, and at the time of, closing under the APA (or, in

certain instances, post-closing); and (d) grant such other relief as may be necessary or

appropriate.

5.    Contemporaneously with the filing of this Sale Motion, the Debtors have

filed a motion to shorten time and fix hearing date (the "*Motion to Shorten*") for the Sale Motion

but only as it pertains the bid procedures, bid protections and the leasing of assets

(the "*Procedural Relief*").  As set forth in the Motion to Shorten, the Debtors are requesting the

Court to schedule the hearing regarding the Procedural Relief on June 27, 2013 at 3:00 p.m. or

June 28, 28, 2013 at 1:30 p.m.  A proposed form of order regarding the Procedural Relief is

annexed hereto as **Exhibit B**.  The remainder of the relief sought by this Sale Motion will be

heard on regular notice at the hearing scheduled for July 11, 2013 at 1:30 p.m. (the "*Sale*

*Hearing*"). A proposed form of order regarding the approval of the APA between the Debtors and RDP is annexed hereto as **Exhibit C**.

## BACKGROUND

6.      On May 22, 2013 (the "*Petition Date*"), each of the Debtors filed with this Court a voluntary petition for relief under chapter 11 of the United States Code (the "*Bankruptcy Code*"). The Debtors' chapter 11 cases (the "*Chapter 11 Cases*") are being jointly administered for procedural purposes only. The Debtors are managing their properties as debtors and debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No request has been made for the appointment of a trustee or an examiner in these Chapter 11 Cases.

7.      On May 30, 2013, the office of the United States Trustee (the "*U.S. Trustee*") appointed an official committee of unsecured creditors consisting of the following members: Ennis Paint, Inc., TrueBlue, Inc., Traffix Devices Inc., 3M Company, Automotive Rentals, Inc., The Sherwin Williams Company, and Aspen American Insurance Company (the "*Creditors' Committee*").

8.      With over 30 years of experience, prior to the Petition Date, Highway Technologies was one of the largest traffic safety companies in the United States and a national leader in providing temporary and permanent roadway traffic management and safety services, including pavement marking installations, permanent installations of highway guardrails, barrier walls and signage, and traffic control services for special events. The Company has provided such special event services for the Democratic & Republican National Conventions, the Super Bowl, the Lollapalooza Music Festival and Ironman competitions. In addition, the Company

offered a complete line of rental products including traffic control devices, trucks, signage and related and equipment. Prior to the Petition Date, the Company operated from 32 locations in 13 states (Arizona, California, Colorado, Florida, Illinois, Louisiana, Minnesota, Missouri, Montana, Nevada, New Jersey, Oregon and Texas).

9.      Prior to the Petition Date, the Debtors ceased operating and terminated approximately 740 employees and began the process of securing their assets for sale. To the extent the Debtors are successful at accomplishing sales of their "Branches," employees could be rehired by the purchasers.

10.     The factual background regarding the Debtors, including their current and historical business operations and the events precipitating their chapter 11 filings, are set forth in detail in the *Declaration of Robert Hookstra in Support of First Day Motions* [Docket No. 3] (the "*Hookstra Declaration*") filed on the Petition Date and fully incorporated herein by reference.

## CORPORATE STRUCTURE

11.     Debtor HTS Acquisition, Inc. ("*AcquisitionCo*") is incorporated under the laws of the State of Delaware. Debtor Highway Technologies is incorporated under the laws of the State of Massachusetts. The Ultimate parent of the Debtors is HTS Holding Inc. ("*Holdings*"), a non-debtor, and is the direct parent of AcquisitionCo, which in turn is the direct parent of Highway Technologies.

## BUSINESS OPERATIONS

12.     In the operation of the Debtors' traffic safety and special event service businesses, the Debtors utilized inventory and equipment that included cones, barricades,

delineation devices, message boards, arrow boards, thermo trucks, epoxy/poly trucks, paint trucks, grinder trucks, barricade lights, signs and sign-stands, barricade trucks, barrier walls, guardrail trucks, among other things.  The inventory and equipment is not easily or readily movable due to its size, weight, or quantity or is currently being used on active highway projects and other job site locations.  In certain cases, the Debtors believe that moving the equipment might result in a safety hazard.  In most cases, the inventory and equipment is not in a centralized location but is located in one or more of the thirteen states that the Debtors operated their businesses.  Furthermore, if the Debtors removed the inventory or equipment from certain locations, their customers would be required to have a new traffic or special event operators remove and replace the same equipment, which could result in counterclaims against the Debtors' estates.

13.    Prior to the Petition date, the Debtors operated approximately thirty-two branches (each a "***Branch***" and together "***Branches***") each of which were within a respective city and/or the surrounding area.  The Branches were managed by a general manager who oversaw a staff that performed the day-to-day operations of the Branch.  Each Branch was operated in accordance with its particular business line, which generally included one or all of the following five core operations:

a.    <u>Traffic Control and Protection</u>. Through long-term contracts, the Debtors provided temporary traffic equipment (*e.g.*, barricades, barrels, street construction signs and electronic arrow and message boards) and flagging operations for various road construction

projects, including road and lane closures, railroad crossing reconstruction and bridge and road construction.

   b. <u>Daily Rental of Traffic Control and Protection</u>.  The Debtors provided daily rental of Traffic Control and Protection devices for road detours, special events and emergency road closures.

   c. <u>Pavement Striping and Markings</u>.  The Debtors provided installation and removal services in paint, epoxy, thermoplastic, pavement tape and pavement markers using a variety of large striping trucks and hand-operated machinery and equipment.

   d. <u>Permanent Installations</u>.  The Debtors installed roadside structures using operated and truck-mounted equipment, including guardrails, signs and barriers.

   e. <u>Sale of Work Zone Products</u>.  The Debtors sold permanent and temporary traffic control equipment, such as arrow and message boards, barricades, attenuators, signs and other safety equipment, and engaged in the manufacturing of barricades and signs in the support of their traffic control contracts, rentals and sales.

   14. In the months prior to the Petition Date, the Debtors were actively seeking capital from its existing lenders and sponsors, as well as potential new lenders.  In addition, in the weeks prior the Petition Date, the Debtors were in negotiations regarding a sale of substantially all of its assets with a key competitor, with which it had engaged in such discussions as early as 2008.  The key competitor performed extensive due diligence in May 2013, and the Debtors continued to proceed with these negotiations until May 14, 2013, when the key competitor informed the Debtors that it had determined not to purchase the Debtors' assets.

In addition, the Debtors were unable to obtain a commitment to finance its ongoing operations or to pursue a sale of its assets. Accordingly, on May 17, 2013, the Debtors ceased operations, terminated approximately 740 employees and thereafter commenced these Chapter 11 Cases to conduct an orderly liquidation of its assets and wind down its business as contemplated by this Motion.

15.    In this regard, the Debtors believe that the best means to preserve and maximize value and mitigate any potential claims against the estates is to effectuate sales of their assets on an "as is" basis. To this end, the Debtors entered into the APA with RDP to sell its Branch in Denver, Colorado (the "***Denver Branch***"). If the Debtors are successful at accomplishing the sale of the Denver Branch, RDP has agreed to rehire terminated employees subject to its internal operating needs.

16.    Because the Debtors are no longer operating their businesses, the Debtors plan to work with their sureties, customers, lenders, and other interested parties to sell their assets in the most efficient and cost effective manner possible and also so that the operations are not subject to any immediate safety hazard. In this regard, time is of the essence.

17.    Since the Debtors' announced their shutdown, they have received over 60 inquiries to purchase some or all of their assets or Branches. Notwithstanding the Debtors' entry into the APA, the Debtors and their advisor will continue to market and sell the subject assets and hold an auction to the extent there is interest to purchase some or all of the assets or Branches from multiple parties.

## THE TERMS OF THE PURCHASE AGREEMENT[2]

18.     The terms of RDP's offer to purchase the Denver Branch are set forth in the APA, a copy of which is annexed hereto as **Exhibit A**, and summarized below.  The descriptions below only summarize certain provisions of the APA, and the terms of the APA control in the event of any inconsistency.

| RDP APA | |
|---|---|
| **Provision** | **Summary Description** |
| Purchase Price | $775,000.00, plus assumed liabilities or cure costs associated with the assumption and assignment of contracts or leases (up to the amount of $43,000).  RDP's payment of cure claims shall not reduce or offset the purchase price. |
| Assets | At the closing, and upon the terms and conditions set forth in the APA and subject to the approval of the Court pursuant to a sale order (the "*Sale Order*") to be entered at the hearing approving the proposed sale of the Denver Branch Assets, the Debtors shall sell, convey, assign, transfer and deliver to RDP, and RDP shall purchase, acquire and accept, all of the right, title and interest in the Denver Branch Assets, free and clear of all Encumbrances except for certain assumed liabilities  The sale shall not include certain excluded assets.  A description of the Denver Branch Assets is set forth in the second Whereas clause and Section 1 of the APA. |
| Assumption and Assignment of Contracts/Leases | Subject to the RDP's right to not take assignment, certain contracts and leases, as set forth in the applicable exhibit annexed to the APA will be assumed by the Debtors and assigned to RDP relating to the Denver Branch Assets to be acquired by the RDP as described in the APA and the cure claim associated with any such contract or lease to be paid, up to an aggregate of $43,000 |

---

[2]  Unless otherwise noted, capitalized terms have the same meanings used in the APA.

| RDP APA | |
|---|---|
| **Provision** | **Summary Description** |
| | by RDP on the closing date. |
| Assumed Liabilities | RDP shall assume certain liabilities, as set forth in Section 3 of the APA. |
| Pre-Closing RDP Operations | Pursuant to Section 5 of the APA, the Debtors shall lease the Denver Branch Assets to RDP pending the closing or termination of the transaction for a 30 day rate of $15,500, which amount shall be applied against the purchase price if the transaction closes. |
| Deposit | $77,500.00 (10% of purchase price). As set forth in Section 4.1 of the APA, RDP shall forfeit the entire deposit upon its failure to consummate the sale as provided by the APA. |
| Closing | Pursuant to Section 6 of the APA, the closing of the transactions under the APA shall take place in accordance with the conditions set forth in Section 9 of the APA, which shall not be later than fourteen (14) days after the Court's entry of the Sale Order. The Sale Order will seek relief from the automatic fourteen (14) day stay period imposed under Bankruptcy Rule 6004(h). |
| Representations and Warranties | The APA contains standard representations and warranties of the parties including as set forth in Sections 7 and 8 of the APA; provided, however Denver Branch Assets are being sold in an "as is" condition. |
| Successor Liability | The Sale Order shall provide that RDP shall not be liable for any claims against the Debtors or any of their predecessors or affiliates, and RDP shall not have successor or vicarious liabilities of any kind or character, including under any theory of antitrust, environmental, successor or transferee liability, labor law, de facto merger, mere continuation or substantial continuity, whether known or unknown as of the closing date. |
| Record Retention | Section 12.15 of the APA provides access to records for one (1) year following the closing. |

| RDP APA | |
|---|---|
| **Provision** | **Summary Description** |
| Credit Bidding | The APA does not prejudice the rights of any secured creditor to credit bid on any Denver Branch Assets (including with respect to the Deposit), subject to such creditor(s) making payment in cash of the buyer's premium or commission payable to the Debtors' advisors. See Section 11.2 of the APA. |

## THE BID PROCEDURES, BUYER PROTECTIONS, LEASE OF ASSETS[3]

19.     Prior to the Petition date and after, over 80 parties have initiated contact with the Debtors indicating an interest to purchase certain assets, a Branch or Branches, or substantially all of the assets of the Debtors.  Over half of these parties have executed non-disclosure agreements and currently have access to the Debtors' data room.  In addition, on the date hereof, the Debtors have received approximately over a dozen offers to purchase some or all of the Debtors' assets, of which include the offer by RDP and other potential buyers that are seeking to purchase some or all of the Denver Branch Assets under the APA.

20.     RDP has acknowledged and agreed that the sale of the Denver Branch Assets will be subject to higher or better offers.  To address the Debtors' receipt of multiple offers by more than one potential buyer to purchase the same or substantially the same assets, the Debtors and their advisors propose to hold an auction (*"Auction"*) prior to the Sale Hearing at a time and place agreed upon by parties.

21.     Any person that wishes to bid at the Auction must comply with the following procedures (the *"Bidding Procedures"*) to become a *"Qualified Bidder."*  RDP shall

---

[3] The relief sought in this section is being sought on an expedited basis.  The Debtors are requesting the Court schedule a hearing on June 27, 2013 to consider the bid procedures, bid protections, and the lease of assets.

be deemed to be a Qualified Bidder without further action on its part.   As a prerequisite to

becoming a Qualified Bidder, a potential Qualified Bidder must deliver to the satisfaction of the

Debtors:

- An asset purchase agreement marked against the applicable APA that provides for the purchase of substantially all of the subject assets (which asset purchase agreement shall indicate the portion of the purchase price allocated to any Rolling Stock[4] that is the subject of such bid); provided, however, that all parties' rights are reserved to object to the buyer's allocation and valuation of the Rolling Stock.  Any party may object to the sale as a whole and/or to the allocation.  The buyer's allocation shall not be determinative of the value of the Rolling Stock.

- Sufficient information as requested by the Debtors (including, without limitation, agreement to such terms and conditions as may be required by the Debtors' advisors to register to bid and participate in the Auction), to allow them to determine that the potential Qualified Bidder has the financial wherewithal and any required authorizations to close the sale, including without limitation, such entity's current audited (if applicable) financial statements and a good faith, cash deposit (in the amount of 10% of the purchase price) (the "**_Good Faith Deposit_**"); and

- Notwithstanding anything herein to the contrary, nothing herein shall prejudice the rights of any secured creditor to credit bid on any Assets (including with respect to the Good Faith Deposit), subject to such creditor(s) making payment in cash of the buyer's premium that is payable.  Notwithstanding any credit bid by the Secured Parties (as defined in the DIP Order), such credit bid shall not prejudice or impair the rights granted to the Committee and other parties in interests pursuant to the DIP Order, including but not limited to paragraph 15 thereof.

**Bid Requirements**

- None of the bids may contain any financing, due diligence or "material adverse change" contingencies and the bid of any Successful Bidder (as defined below) will be binding whether or not (a) the Successful Bidder has obtained financing or completed its due diligence investigation, or (b) a "material adverse change" has occurred.

- The initial overbid must be an amount that is equal to or greater than $50,000.00 than the Purchase Price set forth in Section 4.1 of the APA. The amount of any subsequent overbids will be determined at the Auction.

---

[4] Rolling Stock, as defined in the Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing Debtors to Obtain Postpetition Financing and Use Cash Collateral, (II) Granting Adequate Protection, (III) Scheduling a Final Hearing, and (IV) Granting Certain Related Relief and the Interim Order (I) Authorizing Debtors to Obtain Postpetition Secured Financing, (II) Authorizing Use Cash Collateral, (III) Granting Adequate Protection, (IV) Scheduling Final Hearing, and (IV) Granting Certain Related Relief [Docket No. 55] (the "**_DIP Order_**"), means the Debtors' titled vehicles.

- Any competing bid must be received on or before July 5, 2013 at 12:00 p.m. (Eastern).

- Copies of all bids shall promptly be provided to RDP, Creditors' Committee, DIP Lenders, and Prepetition Agent.

- The Auctions shall be conducted openly and all creditors will be permitted to attend.

- Upon the conclusion of the Auction, the Debtors and their advisors, in consultation with the Creditors' Committee, DIP Lender, and Prepetition Agent, shall (a) identify and certify the bid or bids that constitutes the highest or best offer or offers for the Assets (each bid a "*Prevailing Bid*" and each person submitting such bid a "*Successful Bidder*"), and (b) identify and may, in its discretion, certify the bid or bids that constitute the next highest or best offer or offers for the Personal Property Assets (each bid a "*Backup Bid*" and each person submitting such a bid a "*Backup Bidder*"), and, in each case, notify the Successful Bidder(s) and Backup Bidder(s). RDP may elect to be a Backup Bidder but is not required to do so.

**Bid Protections**

- The payment of the Break-Up Fee (defined below) shall only occur under the following conditions: (a) if and solely to the extent that the Bankruptcy Court enters an order approving such terms and conditions, or such other order as shall be entered approving the allowance and payment of the Break-Up Fee (it being understood and agreed that the consummation of the transactions contemplated by the APA shall be conditioned upon the approval by the Bankruptcy Court), (b) if there is a closing of a transaction involving the sale (in a single transaction or a series of transactions) of all or substantially all of the Denver Branch Assets to any Person other than RDP or a designee of RDP (an "*Alternative Transaction*"), and (c) RDP is not otherwise in material breach of the APA. If the conditions set forth in sections 11.3(a) – (c) of the APA are satisfied, then the Debtors shall pay RDP, exclusively out of the proceeds of the Alternate Transaction, a break-up fee equal to $38,750, which is inclusive of any expenses to reimburse RDP for out of pocket expenses of RDP expended prior to the entry of the Sale Order incurred by in preserving the going concern value of the Denver Branch Assets (the "*Break-Up Fee*"). Payment of the Break-Up Fee pursuant to the previous sentence shall be subject to the closing of the Alternative Transaction and paid from sale proceeds within two (2) business days of the closing of the Alternative Transaction. The Debtors shall use its reasonable commercial efforts to seek approval of the Break-Up Fee by the Bankruptcy Court, and shall not object to, encourage or cooperate in any way with other parties in interest in objecting to, the approval, allowance or payment of the Break-Up Fee. Except in the case of fraud or intentional misconduct by the Debtors, RDP's right to receive payment of the Break-Up Fee from the Debtors as provided herein shall be the sole and exclusive remedy available to RDP against the Debtors or any of their former, current or future shareholders, directors, officers, affiliates or agents with respect to the APA and the transactions contemplated hereby in the event that the APA is terminated pursuant to the terms set forth herein, and upon payment of the Break-Up Fee in circumstances described herein, neither the Debtors nor any of their former, current or future

shareholders, directors, officers, affiliates or agents shall have any further liability or obligation relating to or arising out of the APA or the transactions contemplated hereby.

## Leasing of Denver Branch Assets

22.     Prior to the Petition Date, part of the Debtors' operations consisted of leasing traffic safety and other highway maintenance equipment. The Debtors believe that the leasing of their assets is an ordinary course transaction. Nevertheless, the Debtors are seeking authorization to lease the Denver Branch Assets to be purchased by RDP out of an abundance of caution and to the extent such transaction is not in in the ordinary course. Accordingly, as part of the relief requested herein, the Debtors are seeking authorization to lease the assets being sold to RDP pending closing or termination of the transaction at bulk rate of $15,500.00 per 30 day period. If RDP is the successful bidder, the rent will be credited against the purchase price and the first month's rent will also be credited against the Good Faith Deposit paid by RDP. The Debtors believe that the bulk rental rate is reasonable as it represents approximately 2% of the purchase price and represents a fair monthly bulk rate in light of the book value of the assets.

## BASIS FOR RELIEF

### A.     Approval of the Sales

23.     Section 363(b)(1) of the Bankruptcy Code provides that a debtor, "after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Section 105(a) provides in relevant part that "[t]he Court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).

24.    The sale of a debtor's property should be authorized pursuant to section 363 of the Bankruptcy Code if a sound business purpose exists for doing so. *See, e.g., Meyers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996), *citing Fulton State Bank v. Schipper (In re Schipper)*, 933 F.2d 513, 515 (7th Cir. 1991)); *In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143 (3d Cir. 1986); *Stephens Indus., Inc. v. McClung*, 789 F.2d 386, 390 (6th Cir. 1986); *In re Lionel Corp.*, 722 F.2d 1063 (2d Cir. 1983); *In re Titusville Country Club*, 128 B.R. 396 (W.D. Pa. 1991); *In re Delaware & Hudson Railway Co.*, 124 B.R. 169, 176 (D. Del. 1991). The *Delaware & Hudson Railway* court rejected the pre-Code "emergency" or "compelling circumstances" standard, finding the "sound business purpose" standard applicable and, discussing the requirements of that test under *McClung* and *Lionel*, observing:

> A non-exhaustive list of factors to consider in determining if there is a sound business purpose for the sale include: the proportionate value of the asset to the estate as a whole; the amount of elapsed time since the filing; the likelihood that a plan of reorganization will be proposed and confirmed in the near future; the effect of the proposed disposition of the future plan of reorganization; the amount of proceeds to be obtained from the sale versus appraised values of the property; and whether the asset is decreasing or increasing in value.

124 B.R. at 176.

25.    The *Delaware & Hudson Railway* court further held that "[o]nce a court is satisfied that there is a sound business reason or an emergency justifying the pre-confirmation sale, the court must also determine that the trustee has provided the interested parties with adequate and reasonable notice, that the sale price is fair and reasonable and that the purchaser is proceeding in good faith." *Id.*

26.     For the reasons noted above, the immediate sale of the Denver Branch

Assets is supported by sound business reasons and is in the best interests of the Debtors and their

estates.  Accordingly, the Debtors request approval under section 363(b) of the Bankruptcy Code

of the sale to RDP.

**THE PROPOSED SALE SATISFIES**
**THE REQUIREMENTS OF SECTION 363(F) OF THE BANKRUPTCY CODE**
**FOR A SALE FREE AND CLEAR OF LIENS, CLAIMS, AND INTERESTS**

27.     Section 363(f) of the Bankruptcy Code provides:

> The trustee may sell property under subsection (b) or (c) of this
> section free and clear of any interest in such property of an entity
> other than the estate, only if –

>> (1) applicable nonbankruptcy law permits sale of such
>> property free and clear of such interest;

>> (2) such entity consents;

>> (3) such interest is a lien and the price at which such
>> property is to be sold is greater than the aggregate value of
>> all liens on such property;

>> (4) such interest is in a bona fide dispute; or

>> (5) such entity could be compelled, in a legal or equitable
>> proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

28.     Section 363(f) of the Bankruptcy Code provides for the sale of property

"free and clear of any interests."  The term "any interest," as used in section 363(f), is not

defined anywhere in the Bankruptcy Code.  *Folger Adam Security v. DeMatteis/MacGregor, JV*,

209 F.3d 252, 259 (3d Cir. 2000).  In *Folger Adam*, the Third Circuit specifically addressed the

scope of the term "any interest."  209 F.3d at 258.  The Third Circuit observed that while some

courts have "narrowly interpreted that phrase to mean only *in rem* interests in property," the trend in modern cases is towards "a broader interpretation which includes other obligations that may flow from ownership of the property." *Id. at 258, citing 3 Collier on Bankruptcy 363.06*[1]. As determined by the Fourth Circuit in *In re Leckie Smokeless Coal Co.*, 99 F.3d 573, 581-582 (4th Cir. 1996), a case cited approvingly and extensively by the Third Circuit in *Folger Adam*, the scope of 11 U.S.C. § 363(f) is not limited to *in rem* interests. Thus, the Third Circuit in *Folger Adam* stated that *Leckie* held that the debtors "could sell their assets under §363(f) free and clear of successor liability that otherwise would have arisen under federal statute." *Folger Adam*, 209 F.3d at 258.

29.    Section 363(f) is drafted in the disjunctive. Thus, satisfaction of any of the requirements enumerated therein will suffice to warrant the sales of the Acquired Assets free and clear of the Encumbrances (other than Assumed Liabilities). *See Citicorp Homeowners Services, Inc. v. Elliot*, 94 B.R. 343, 345 (E.D. Pa. 1988). The Debtors submit that each Encumbrance satisfies at least one of the five conditions of section 363(f) of the Bankruptcy Code, and that any such Encumbrance will be adequately protected by either being paid in full at the time of closing, or by having it attach to the net proceeds of the sale, subject to any claims and defenses the Debtors may possess with respect thereto. The Debtors accordingly request authority to convey the Denver Branch Assets to RDP, free and clear of all Encumbrances except for the Assumed Liabilities, with such Encumbrances to attach to the proceeds of the sales with the same validity (or invalidity), priority and perfection as existed immediately prior to the sales.

Payment of sale proceeds shall be applied pursuant to the DIP Order, or any order that amends or supersedes such order..

      30.    The Debtors are informed and believe that their prepetition secured lenders either have consented or will consent to the sales. *See* 11 U.S.C. § 365(f)(2). Accordingly, this Court should approve the sale of the Denver Branch Assets to RDP free and clear of any Encumbrances under section 363(f) of the Bankruptcy Code (except for Assumed Liabilities), and any potential claimants should be compelled to look exclusively to the proceeds of the sale for satisfaction of their claims.

**B.**     **Bidding Procedures and Protections**

      31.    The Debtors propose to sell the Denver Branch Assets in accordance with the Bidding Procedures described above.  The Debtors believe that the consummation of the sales to RDP or to a successful overbidder, in accordance with the Bidding Procedures, will provide their creditors and other stakeholders with the best possible opportunity to maximize the value of such assets rather an a piecemeal liquidation.

      32.    As indicated above, the Debtors hereby request that the Court approve the Bidding Procedures they intend to employ prior the hearing on the Sale Motion.  To compensate RDP for serving as the stalking horse bidder, whose bid will be subject to higher or better offers, the Debtors seek approval of the Bidding Procedures and the Break-Up Fee in accordance with the terms of the APA.  The Debtors and RDP believe that the amount of the Break-Up Fee, which includes expense reimbursements, is reasonable, given the benefits to the Debtors' estates of having a "stalking horse" bidder by virtue of the definitive APA with RDP, and the risk to

RDP that a third-party offer may ultimately be accepted, and that approval of the Break-Up Fee under the terms of the APA is necessary to preserve and enhance the value of the Debtors' estates. The Debtors believe that the agreement to pay the Break-Up Fee on the terms of the APA is necessary to induce RDP to enter into the transaction encompassed by the APA and thus to enable the Debtors to obtain the highest and best possible price for the Denver Branch Assets.

33.     The Bidding Procedures are reasonably calculated to encourage a buyer to submit a final bid within the range of reasonably anticipated values. RDP will be the stalking horse bidder and the Bidding Procedures will encourage competitive bidding, and will perhaps leading to further competition and the establishment of a baseline against which higher or otherwise better offers can be measured.

34.     Bidding incentives encourage a potential purchaser to invest the requisite time, money and effort to negotiate with the Debtors and perform the necessary due diligence attendant to the acquisition of the Debtors' assets, despite the inherent risks and uncertainties of the chapter 11 process. Historically, bankruptcy courts have approved bidding incentives similar to the Break-Up Fee, under the "business judgment rule," which proscribes judicial second-guessing of the actions of a corporation's board of directors taken in good faith and in the exercise of honest judgment. *See, e.g., In re 995 Fifth Ave. Assocs., L.P.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (bidding incentives may "be legitimately necessary to convince a white knight to enter the bidding by providing some form of compensation for the risks it is undertaking") (internal quotation marks and citation omitted).

35.     The Third Circuit has established standards for determining the appropriateness of bidding incentives in the bankruptcy context.  In *Calpine Corp. v. O'Brien Envtl. Energy, Inc.*, 181 F.3d 527 (3d Cir. 1999), the court held that even though bidding incentives are measured against a business judgment standard in nonbankruptcy transactions, the administrative expense provisions of section 503(b) of the Bankruptcy Code govern in the bankruptcy context.  Accordingly, to be approved, bidding incentives must provide some benefit to the Debtors' estates.  *See id.* at 533.

36.     The *O'Brien* court identified at least two instances in which bidding incentives may provide benefit to an estate.  First, benefit may be found if "assurance of a break-up fee promoted more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited."  *Id.* at 537.  Second, where the availability of bidding incentives induces a bidder to research the value a debtor's assets and submit a bid that serves as a minimum or floor bid on which other bidders can rely, "the bidder may have provided a benefit to the estate by increasing the likelihood that the price at which the debtor is sold will reflect its true worth."  *Id.*

37.     Whether evaluated under the "business judgment rule" or the Third Circuit's "administrative expense" standard, the Break-Up Fee pass muster.  The APA and the Debtors' agreement to pay the Break-Up Fee pursuant to the terms thereunder are the product of good faith, arm's-length negotiations between the Debtors and RDP.  The Break-Up Fee is fair and reasonable in amount, and are reasonably intended to compensate for the risk to RDP of being used as a stalking horse bidder.

38.     Further, the Break-Up Fee has already encouraged competitive bidding in that RDP would not have entered into the APA without this provision. The Break-Up Fee thus have "induc[ed] a bid that otherwise would not have been made and without which bidding would [be] limited." *O'Brien*, 181 F.3d at 537. Similarly, RDP's offer provides a minimum bid on which other bidders can rely, thereby "increasing the likelihood that the price at which the [Property will be] sold will reflect [its] true worth." *Id.*

39.     Finally, the Bidding Procedures are fair and reasonable procedures reasonably intended to encourage competitive bidding, and the Break-Up Fee will permit the Debtors to insist that competing bids for the Denver Branch Assets, made in accordance with the Bidding Procedures, be materially higher or otherwise better than the APA (or competing agreement), which is a clear benefit to the Debtors' estates.

40.     Furthermore, the Break-Up Fee, which at maximum would total approximately 5% of the purchase price proposed under the APA, are within the spectrum of termination fees approved by bankruptcy courts in chapter 11 cases. *See e.g., In re Global Motorsport Group, Inc., et al.*, (Case No. 08-10192 (KJC) (Bankr. D. Del. February 14, 2008) (Court approved a break-up fee of approximately 4%, or $500,000 in connection with sale); *In re Global Home Products*, Case No. 06-10340 (KG) (Bankr. D. Del. July 14, 2006) (Court approved a break-up fee of 3.3%, or $700,000, in connection with sale); *In re Ameriserve*, Case No. 00-0358 (PJW) (Bankr. D. Del., September 27, 2000) (Court approved a break-up fee of 3.64%, or $4,000,000, in connection with $110,000,000 sale); *In re Montgomery Ward Holding Corp.*, et al., Case No. 97-1409 (PJW) (Bankr. D. Del., June 15, 1998) (Court approved

termination fee of 2.7%, or $3,000,000, in connection with $110,000,000 sale of real estate

assets); *In re Medlab, Inc.*, Case No, 97-1893 (PJW) (Bankr. D. Del. April 28, 1998) (Court

approved termination fee of 3.12%, or $250,000, in connection with $8,000,000 sale

transaction); *In re Anchor Container Corp. et al.*, Case Nos. 96-1434 and 96-1516 (PJW) (Bankr.

D. Del. Dec. 20, 1996) (Court approved termination fee of 2.43%, or $8,000,000, in connection

with $327,900,000 sale of substantially all of debtors' assets); *In re FoxMeyer Corp. et al.*, Case

No. 96-1329 (HSB) through 96-1334 (HSB) (Bankr. D. Del., Oct. 9, 1996) (Court approved

termination fee of 7.47%, or $6,500,000, in connection with $87,000,000 sale of substantially all

of debtors' assets); *In re Edison Bros. Stores. Inc. et al.*, Case No. 95-1354 (PJW) (Bankr. D.

Del., Dec. 29, 1995) (Court approved termination fee of 3.5%, or $600,000, in connection with

$17,000,000 sale of debtors' entertainment division); *In re NetEffect, Inc.,* Case No. 08-12008

(KJC) (Bankr. D. Del., Sept. 11, 2008) (Court approved break-up fee of 3%, or $240,000.00 in

connection with sale of debtor's assets for purchase price of $8,000,000); *In re Champion*

*Enterprises, et al.*, Case No. 09-14019 (KG) (Bankr. D. Del., Feb. 8, 2010) (Court approved

break-up fee of less than credit bid or $3,000,000.00 in connection with sale of debtor's assets

for purchase price of approximately $80,000,000); *In re Filene's Basement, Inc., et al.*, Case No.

09-11525 (MFW) (Bankr. D. Del., May 15, 2009) (Court approved break-up fee and expense

reimbursement of 3.68%, or $810,000 in connection with sale of debtor's assets for purchase

price of $22,000,000); *In re Western Nonwovens, Inc.*, et al., Case No. 08-11435 (PJW) (Bankr.

D. Del., July 28, 2009) (Court approved break-up fee and expense reimbursement or $250,000 in

connection with sale of debtor's assets for purchase price of $4,000,000 to $6,500,000 purchase

price); and *In re Point Blank Solutions, Inc., et al.*, Case No. 10-11255 (PJW) (Bankr. D. Del,

Oct. 5, 2011) (Court approved break-up and expense reimbursement of 3.75% or $750,000 in

connection with sale of debtor's assets for purchase price of $20,000,000).

        41.    For these reasons, the Debtors request approval of the Break-Up Fee

pursuant to the terms and conditions in the APA.

**C.**    **Good Faith Under Section 363(m) of the Bankruptcy Code**

        42.    Section 363(m) of the Bankruptcy Code provides:

> The reversal or modification on appeal of an authorization under
> subsection (b) or (c) of this section of a sale or lease of property
> does not affect the validity of a sale or lease under such
> authorization to an entity that purchased or leased such property in
> good faith, whether or not such entity knew of the pendency of the
> appeal, unless such authorization and such sale or lease were
> stayed pending appeal.

11 U.S.C. § 363(m).  While the Bankruptcy Code does not define "good faith", the Third Circuit

in *In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143 (3d Cir. 1986) has held that:

> [t]he requirement that a purchaser act in good faith . . . speaks to
> the integrity of his conduct in the course of the sale proceedings.
> Typically, the misconduct that would destroy a purchaser's good
> faith status at a judicial sale involves fraud, collusion between the
> purchaser and other bidders or the trustee, or an attempt to take
> grossly unfair advantage of other bidders.

788 F.2d at 147 (citations omitted).

        43.    The APA was negotiated at arm's-length, in which RDP acted in good

faith and in compliance with the *Abbotts Dairies* standards.   Prior to the hearing on this Sale

Motion, the Debtors and RDP will either submit a declaration or provide testimony at the Sale

Hearing in support of the sales contemplated by the APA, or any other buyer that might result

from the auctions contemplated by this Sale Motion.  The Debtors thus request that the Court

find that RDP with respect to the APA purchased the Denver Branch Assets in good faith within

the meaning of section 363(m) of the Bankruptcy Code.

**D.**    **Authorization of Assumption and Assignment of Assumed Executory Contracts**

44.    As required by the APA, the Debtors request approval of the assumption

and assignment of the designated executory contracts and unexpired leases set forth in the

schedules annexed to the APA to RDP upon the closing of the transactions contemplated under

the APA.

45.    The Debtors will serve a proposed cure notice, substantially in the form

annexed hereto as **Exhibit D** (the "*Cure Notices*") on each counterparty to an assumed executory

contract or unexpired lease (the "*Assumed Contracts*").  The Cure Notice will identify the

amounts, if any, that the Debtors believe are owed to each counterparty to an Assumed Contract

necessary to cure any defaults that exist under such contract (the "*Cure Costs*").  If an Assumed

Contract is assumed and assigned pursuant to the Court's order approving same, then unless the

affected counterparty properly files and serves an objection to the Cure Costs contained in the

Cure Notice, the counterparty will receive at the time of the closing (or as soon as reasonably

practicable thereafter), the Cure Costs as set forth in the Cure Notice, with payment made

pursuant to the terms of the APA.  If an objection is filed by a counterparty to an assumed

executory contract or unexpired lease, the Debtors propose that such objection must set forth a

specific default in any executory contract or unexpired lease and claim a specific monetary

amount that differs from the amount (if any) specified by the Debtors in the Cure Notice or, alternatively, state why the counterparty believes any Cure Cost is owing.

46.     Pursuant to the terms of the APA, RDP shall be exclusively responsible for payment of Cure Costs with respect to any assumed executory contract or unexpired lease under the APA.  RDP shall be responsible for satisfying any requirements regarding adequate assurances of future performance that may be imposed under section 365(b) of the Bankruptcy Code in connection with the proposed assignment of any of the respective assumed executory contracts or unexpired leases.  The Debtors propose that the Court make its determinations concerning adequate assurance of future performance under the Assumed Contracts pursuant to 11 U.S.C. § 365(b) at the Sale Hearing for those contracts to be assumed/assigned at closing.

47.     If any counterparty objects for any reason to the assumption and assignment of the Assumed Contracts, the Debtors propose that the counterparty must file any such objection by no later than (i) seven (7) days prior to the Sale Hearing or (ii) the date otherwise specified in the Cure Notice.

48.     The Debtors further request that the Sale Order provide that the assumed executory contract or unexpired lease will be assigned to, and remain in full force and effect for the benefit of RDP, notwithstanding any provisions in the assumed executory contracts or unexpired leases, including those described in sections 365(b)(2) and (f)(1) and (3) of the Bankruptcy Code, that prohibit such assignment.

49.     Section 365(f) of the Bankruptcy Code provides, in pertinent part, that:

The trustee may assign an executory contract or unexpired lease of the debtor only if –

       (A)     the trustee assumes such contract or lease in accordance
with the provisions of this section; and

       (B)     adequate assurance of future performance by the assignee
of such contract or lease is provided, whether or not there has been
a default in such contract or lease.

11 U.S.C. § 365(f)(2). Under section 365(a), a debtor, "subject to the court's approval, may

assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a).

Section 365(b)(1), in turn, codifies the requirements for assuming an unexpired lease or

executory contract of a debtor, providing that:

       (b)(1)  If there has been a default in an executory contract or
unexpired lease of the debtor, the trustee may not assume such
contract or lease unless, at the time of assumption of such contract
or lease, the trustee --

       (A) cures, or provides adequate assurance that the trustee will
promptly cure, such default;

       (B) compensates, or provides adequate assurance that the trustee
will promptly compensate, a party other than the debtor to such
contract or lease, for any actual pecuniary loss to such party
resulting from such default; and

       (C) provides adequate assurance of future performance under such
contract or lease.

11 U.S.C. § 365(b)(1).

       50.     Although section 365 of the Bankruptcy Code does not set forth standards

for courts to apply in determining whether to approve a debtor in possession's decision to

assume an executory contract, courts have consistently applied a "business judgment" test when

reviewing such a decision. *See, e.g., Group of Institutional Investors v. Chicago, Milwaukee, St.

Paul & Pacific Railroad Co.*, 318 U.S. 523, 550 (1953); *Matter of Talco, Inc.*, 558 F.2d 1369,

1173 (10th Cir. 1977). A debtor satisfies the "business judgment" test when it determines, in

good faith, that assumption of an executory contract will benefit the estate and the unsecured creditors. *In re FCX, Inc.*, 60 B.R. 405, 411 (Bankr. E.D. N.Y. 1986). The assumption and assignment of the Assumed Contracts, or any of them, set forth in the APA, will be a necessary part of the deal that the Debtors have struck with RDP and, as stated above, will benefit the Debtors' estates.

       51.     As set forth above, with respect to the Assumed Contracts to be assumed and assigned pursuant to the sale, the Debtors will send the Cure Notices to all counterparties (the "*Counterparties*") to the assumed executory contracts or unexpired leases. The Cure Notices serve to notify such Counterparties of the potential assumption by applicable Debtors and assignment to RDP of the assumed executory contracts or unexpired leases. The Cure Notices set forth the "cure" amounts owing on each of the assumed executory contracts or unexpired leases according to the Debtors' books and records.

       52.     The Counterparties will have sufficient opportunity to file an objection to the proposed cure amounts set forth in the Cure Notices. To the extent no objection is filed with regard to a particular cure amount, such cure amount shall be binding on the applicable contract or lease Counterparty. The payment of the cure amounts specified in the Cure Notices (or a different amount either agreed to by the Debtors, the Buyer, and the Counterparties or resolved by the Court as a result of a timely-filed objection filed by a contract or lease Counterparty) will be in full and final satisfaction of all obligations to cure defaults and compensate the Counterparties for any pecuniary losses under such contracts or leases pursuant to section 365(b)(1) of the Bankruptcy Code, unless the Debtors determine that a particular lease or

contract is not truly executory, and does not need to be cured to transfer the Denver Branch
Assets to RDP.

53.    As set forth in the APA, RDP (or the Successful Bidder(s)), are
responsible for providing evidence of "adequate assurances of future performance" to the extent
required in connection with the assumption and assignment of any Assumed Contracts.  The
meaning of "adequate assurance of future performance" for the purpose of the assumption of the
Assumed Contracts pursuant to section 365 of the Bankruptcy Code depends on the facts and
circumstances of each case, but should be given "practical, pragmatic construction." *See
Carlisle Homes, Inc. v. Arrari (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D.N.J.
1989).  *See also In re Natco Indus., Inc.*, 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (adequate
assurance of future performance does not mean an absolute assurance that debtor will thrive and
pay rent); *In re Bon Ton Rest. & Pastry Shop, Inc.*, 53 B.R. 789, 803 (Bankr. N.D. Ill. 1985).  If
necessary, RDP or the Successful Bidder shall provide evidence of its ability to provide adequate
assurance to Counterparties.

## NOTICE

54.    Notice of this Motion has been given to the following parties:  (a) the
Office of the United States Trustee; (b) counsel to the DIP Lenders; (c) counsel to the prepetition
secured lender; (d) counsel to the Official Committee of Unsecured Creditors, (e) those parties
asserting an Encumbrance in the Denver Branch Assets; (f) the Debtors' Colorado and Federal
regulatory agencies; (g) the sureties of the Debtors, or their counsel; (h) those persons who have
requested notice pursuant to Bankruptcy Rule 2002; (i) the personal property and real property

taxing authorities for the City and County of Denver, Colorado and Arapahoe, Adams and Jefferson Counties in Colorado (j) the Colorado Department of Revenue and (k) counter-parties to any contracts that may be subject to assumption pursuant to this motion. The Debtors submit that, in light of the nature of the relief requested, no other or further notice be given.

55.    The Debtors submit that the notice that it has provided and intends to provide of this Sale Motion and the Sale Hearing is reasonable and appropriate and should be approved by this Court as adequate and sufficient notice.

56.    The Debtors request, pursuant to Bankruptcy Rules 6004(g) and 6006(d), that the order approving this Sale Motion become effective immediately upon its entry.

## CONCLUSION

57.    The Debtors' proposed sales of the Denver Branch Assets to RDP as described in this Sale Motion, including the assumption and assignment of the assumed executory contracts or unexpired leases (as applicable), is supported by sound business reasons, as set forth herein. The sale is proper, necessary and serve the best interests of the Debtors, their estates and creditors and all parties in interest. The Debtors thus request that the Court approve the proposed sale of the Denver Branch Assets free and clear of all Encumbrances including successor liabilities, but excluding assumed liabilities, as requested, including, without limitation, the assumption and assignment of the assumed executory contracts or unexpired leases, to.

## NO PRIOR REQUEST

58.    No prior request for the relief sought in this Sale Motion has been made to this or any other court.

WHEREFORE, the Debtors respectfully request that this Court:  (i) grant this Sale Motion and authorize the sale of the Denver Branch Assets to RDP and approve the proposed APA in substantially the form attached to this Sale Motion, pursuant to the proposed order submitted herewith; (ii) approve the assumption and assignment of the assumed executory contracts or unexpired leases in accordance with the APA; (iii) approve the form and manner of notice of this Sale Motion, and of the proposed Sale and assumptions and assignments; and (iv) grant such other and further relief as is just and proper.

Dated:    June 20, 2013          PACHULSKI STANG ZIEHL & JONES LLP

/s/ Peter J. Keane
_____
Richard M. Pachulski (CA Bar No. 90073))
Debra I. Grassgreen (CA Bar No. 169978)
Bruce Grohsgal (DE Bar No. 3583)
Maria A. Bove (NY Bar No. 8687)
John W. Lucas (NY Bar No. 4288379)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE  19899-8705
Telephone: 302/652-4100
Facsimile: 302/652-4400
E-mail:    rpachulski@pszjw.com
           dgrassgreen@pszjlaw.com
           bgrohsgal@pszjlaw.com
           mbove@pszjlaw.com
           jlucas@pszjlaw.com

Proposed Counsel for the Debtors and Debtors in Possession