## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| *In re*: | Chapter 11 |
| HIGHWAY TECHNOLOGIES INC., *et al.*,[1] | Case No. 13-11326 (KJC) |
| Debtors. | Jointly Administered |
| | **Hearing Date: August 14, 2013 at 3:00 p.m. (ET)**<br>**Objection Deadline: August 2, 2013 at 4:00 p.m. (ET)** |

### THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS' MOTION PURSUANT TO RULE 9019 TO APPROVE THE SETTLEMENT AGREEMENT AMONG THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS, THE PREPETITION AGENT, THE PREPETITION LENDERS, THE DIP LENDERS AND THE EQUITY SPONSORS

The Official Committee of Unsecured Creditors (the "Committee") of Highway Technologies, Inc. and its affiliated debtors (collectively, the "Debtors") hereby submits this motion (the "Motion"), pursuant to 11 U.S.C. § 105 and Federal Rule of Bankruptcy Procedure 9019, for the entry of an order (the "Proposed Order"), substantially in the form attached hereto as Exhibit A, authorizing and approving a settlement (the "Settlement") between (a) Ableco Finance LLC, in its capacity as administrative and collateral agent (in such capacity, the "Prepetition Agent") under that certain Financing Agreement, dated as of February 15, 2007 among Highway Technologies, Inc. and Highway Technologies, L.P. as borrowers and certain other related affiliates as guarantors (as amended and modified from time to time, the "Prepetition Financing Agreement"); (b) the lenders identified as signatories to the Prepetition Financing Agreement (collectively, the "Prepetition Lenders"); (c) Oak Hill Special

---

[1] The Debtors in these proceedings and the last four digits of each Debtor's federal taxpayer identification number are as follows: Highway Technologies Inc. (6608); and HTS Acquisitions Inc. (9831). The Debtors' mailing address is 6800 Dixie Drive, Houston, Texas 77087.

Opportunities Fund, L.P., Oak Hill Special Opportunities (Management) Fund, L.P. and Wynnchurch Capital Partners II, L.P. (collectively, the "DIP Lenders") in their capacity as post-petition lenders pursuant to the "Priming Superpriority Debtor-In-Possession Credit Facility Term Sheet" (the "DIP Term Sheet"), which was approved by the Court on May 24, 2013 (the "Interim DIP Order"); (d) Oak Hill Special Opportunities Fund, L.P., Oak Hill Special Opportunities Fund (Management), L.P., Oak Hill Advisors, L.P., Oak Hill Capital Management, LLC, Wynnchurch Capital Ltd., and Wynnchurch Capital Partners II, L.P. in their capacities as shareholders, officers or directors of the Debtors or HTS Holdings, Inc. (collectively, the "Sponsors"); and (e) the Committee (and together with the Prepetition Agent, the Prepetition Lenders, the DIP Lenders, and the Sponsors, the "Parties"). The settlement is memorialized in the Settlement Agreement, dated as of July 18, 2013, by and among the Parties (the "Settlement Agreement"), a copy of which is attached to the Proposed Order as Exhibit 1. In support of the Motion, the Committee respectfully states as follows:

## PRELIMINARY STATEMENT[2]

The Settlement is the result of over six weeks of intense negotiations between the Parties and provides an avenue for the maximization of value for all constituencies. While at the time that the Committee filed a motion to convert these cases to cases under chapter 7 it appeared that the prospects for recoveries for unsecured creditors was bleak, this Settlement provides for significant recoveries to unsecured creditors and payments to the estates, all while allowing the Debtors to focus on marketing and selling their assets. As set forth in more detail below, the Settlement provides for, among other things, the Prepetition Lenders to contribute to a

---

[2] Capitalized terms used but not defined in this Section shall have the meanings given to them herein.

trust, for the benefit of general unsecured creditors (not including the Prepetition Lenders as holders of a deficiency claim until certain thresholds are reached) 80% of the net recoveries from the sale of the Debtors' rolling stock; a sharing arrangement (described below) with respect to recoveries from certain potential litigation; provides $500,000 cash to the estates in exchange for a release granted to the Sponsors; provides a significant increased budget for the Committee's professional fees and expenses -- from $225,000 to $425,000 -- to allow, among other things, an investigation of possible causes of action; resolves the objection to the DIP Motion and the Conversion Motion (each as defined below); and provides mutual releases among the Parties. These compromises will avoid significant litigation costs and risks and provide value for all constituencies in these cases.

Accordingly, the Committee seeks approval of this valuable settlement. As set forth below at paragraph 10, this settlement is integrally tied with a revised Final DIP Order. The Committee also seeks, in the Final DIP Order, standing to settle claims on behalf of the estate and standing to prosecute other claims, as set forth below.

## JURISDICTION

1.    This Court has jurisdiction over this Motion under 28 U.S.C. §§ 157 and 1334. Venue is proper under 28 U.S.C. §§ 1408 and 1409. This is a core proceeding as defined in 28 U.S.C. § 157(b)(2).

2.    The basis for the relief requested herein is section 105(a) of the Bankruptcy Code and Bankruptcy Rule 9019.

3

## GENERAL BACKGROUND

A.    **Introduction**

3.      On May 21, 2013 (the "Petition Date"), each of the Debtors filed a voluntary chapter 11 petition.  The Debtors' chapter 11 cases are being jointly administered for procedural purposes only.  The Debtors are managing their properties as debtors in possession, pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in the Chapter 11 Cases.

4.      On May 30, 2013, the Office of the United States Trustee, at an organizational meeting of creditors, appointed seven of the Debtors' largest unsecured creditors to serve as members of the Committee.  The Committee is presently comprised of the following seven members:  (i) Ennis Paint, Inc.; (ii) TrueBlue, Inc.; (iii) Traffix Devices Inc.; (iv) 3M Company; (v) Automotive Rentals, Inc.; (vi) The Sherwin-Williams Company; and (vii) Aspen American Insurance Company.

B.    **The Debtors' Business**

5.      Prior to the Petition Date, the Debtors were one of the largest traffic safety companies in the United States and a national leader in providing temporary and permanent installations of highway guardrails, barrier walls and signage, and traffic control services for special events.   The Debtors provided such special event services for the Democratic & Republican National Conventions, the Super Bowl, the Lollapalooza Music Festival and Ironman competitions.  In addition, the Debtors offered a complete line of rental products including traffic control devices, trucks, signage and related equipment.  Prior to the Petition Date, the Debtors operated from 32 locations in 13 states (Arizona, California, Colorado, Florida, Illinois, Louisiana, Minnesota, Missouri, Montana, Nevada, New Jersey, Oregon and Texas).

RLF1 8872152v.3

C.    **Chapter 11 Cases**

6.    On the Petition Date, the Debtors filed the *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing Debtors to Obtain Postpetition Financing and Use Cash Collateral, (II) Granting Adequate Protection, (III) Scheduling a Final Hearing, and (IV) Granting Certain Related Relief* [Docket No. 9] (the "DIP Motion"). The DIP Motion sought approval of a $3 million loan from affiliates of the Sponsors and use of cash collateral of the Prepetition Lenders to preserve the value of the Debtors' business pending the sales of substantially all of their assets, satisfy payroll obligations and other administrative expenses incurred in these cases. Among the terms of the DIP facility proposed in the DIP Motion was a requirement that the DIP Lenders and the Prepetition Lenders receive liens on substantially all of the theretofore unencumbered assets of the Debtors' estates, the most significant of which were the Debtors' Rolling Stock (as defined in the Interim DIP Order) and causes of action including avoidance actions and commercial tort claims.

7.    On May 24, 2013, the Court conducted an interim hearing on the DIP Motion as part of the first day hearing in the cases. Ennis Paint, Inc., which ultimately became a member of the Committee, appeared and objected to the DIP Motion. At the conclusion of the Interim Hearing, the Court granted the DIP Motion on a modified and interim basis. Thus, the Interim DIP Order granted the DIP Lenders a lien only on the Prepetition Collateral (as defined in the Interim DIP Order) as well as the Rolling Stock and the proceeds of each. In addition, it provided the Prepetition Lenders with replacement liens and an adequate protection claim against that same collateral package on an interim basis. The Interim DIP Order permitted the DIP Lenders and the Prepetition Lenders to seek, at a final hearing on the DIP Motion, a lien on everything originally requested in the DIP Motion. To the extent the Debtors, the DIP Lenders

and the Prepetition Lenders are successful in prosecuting the DIP Motion on a final basis, there will be no remaining unencumbered assets unless a lien challenge proves to be successful.

8.      Thus, upon its formation, the Committee undertook an investigation into the validity, extent and perfection of the prepetition liens.  At the same time, it took three other significant actions.   One was approaching the DIP Lenders, the Prepetition Agent and the Prepetition Lenders, on an informal basis, with its significant concerns and objections to the DIP Motion in an attempt to resolve them. The second was filing, on June 6, 2013, the *Motion of the Official Committee of Unsecured Creditors to Convert Cases to Chapter 7* [Docket No. 147] (the "Conversion Motion").  The Conversion Motion argued that general unsecured creditors would be harmed by maintaining a chapter 11 case if the only way to obtain financing was to grant liens on previously unencumbered assets, and that only the secured lenders would benefit from the cases, which is an inappropriate use of chapter 11.  Third, the Committee submitted an extensive document request to the Parties to this Settlement as well as the Debtors.

9.      These actions led the Parties to engage in extensive negotiations to resolve all issues as part of a global settlement.

**D.      Summary of the Settlement**

10.      The Parties intend that the Settlement be a global settlement of all issues between and among them.   Those disputes, of course, in part arose out of the Committee' informal objection to the DIP Motion.   Accordingly, the Proposed Order approving the Settlement and the Final DIP Order are meant to be integrally tied.   To accomplish this, the effectiveness of terms of the Proposed Order are specifically conditioned upon entry of the Final DIP Order and, conversely, the terms of the Final DIP Order are specifically conditioned on entry of the Proposed Order.  Thus, in a sense all of the terms of the Final DIP Order are, in effect, terms of the Settlement as well.  Among the terms of the proposed Final DIP Order is a

6

waiver and release of section 547 preference actions against creditors other than insiders, lawyers, accountants, financial advisors, auditors and other professional, a waiver and release of avoidance actions against the Prepetition Agent, the Prepetition Lenders, and the DIP Lenders, and a grant of standing to pursue claims against the Sponsor Parties (as defined in the Settlement Agreement), which are being waived and released pursuant to this Settlement.

11.    The significant terms of the Settlement are as follows:[3]

| Distribution Sharing from Collateral Proceeds and Limited Waiver of Deficiency Claim | Subject to the occurrence of the Effective Date (as defined in the Settlement Agreement): |
|---|---|
| | • The Prepetition Agent (on behalf of the Prepetition Lenders) agrees to distribute to the GUC Trust (as defined in the Settlement Agreement) cash equal to 80% of the Net Rolling Stock Proceeds (as defined in the Settlement Agreement) that have been Indefeasibly Paid by the Debtors' estates to the Prepetition Agent. For the purposes of the Settlement Agreement, payments to the Prepetition Lenders shall be deemed "Indefeasibly Paid" if the Challenge Period has expired and no Challenge has been commenced that could result in disgorgement of such payments to the Prepetition Agent. |
| | • The Prepetition Lenders agree to waive any recovery on account of their Deficiency Claim (as defined in the Settlement Agreement) from the GUC Trust until after all other general unsecured claims receive a distribution equal to 10% of their allowed claims, after which point the Prepetition Agent shall be entitled to a pro rata distribution from the GUC Trust on account of the Deficiency Claim. |
| | • The Prepetition Lenders agree to waive any recovery on account of the Prepetition Obligations |

---

[3] The following summary is qualified in its entirety by reference to the provisions of the Settlement Agreement. In the event of any inconsistencies between the provisions of the Settlement Agreement and this summary, the terms of the Settlement Agreement shall control. Unless otherwise defined herein, capitalized terms shall have the meanings given to them in the Settlement Agreement.

|  | from the proceeds ("Litigation Proceeds") of any Avoidance Actions or commercial tort claims (as defined in 9-102(a)(13) of New York's Uniform Commercial Code) or fraud or malpractice claims related to such claims (collectively, the "Litigation Claims") until $1,000,000 of such proceeds have been distributed to general unsecured creditors or the GUC Trust. Any Litigation Proceeds after $1,000,000 of Litigation Proceeds has been distributed to general unsecured creditors or the GUC Trust, shall be split equally (on a 50/50 basis; and not pro rata) between general unsecured creditors or the GUC Trust (without the Prepetition Lenders sharing on account of their Deficiency Claim) and the Prepetition Agent (for the benefit of the Prepetition Lenders). If the Prepetition Lenders or Agent come into possession of Litigation Proceeds prior to the distribution of $1 million to the GUC Trust, they shall turn over such Litigation Proceeds to general unsecured creditors or the GUC Trust. |
|---|---|
| **Standing** | The Parties acknowledge that the Committee is granted standing to prosecute the Litigation Claims and Sponsor Actions under the Final DIP Order, and the Parties support the Committee's request that the GUC Trustee be granted standing in or upon confirmation of a plan or dismissal of the Cases. |
| **Claim and Lien Acknowledgment** | Subject to the occurrence of the Effective Date, no Challenge (as defined in the Interim DIP Order) shall be asserted by the Committee against the Prepetition Agent or Prepetition Lenders and the Committee agrees to the same stipulations about the liens as did the Debtors in the Interim DIP Order (the "Claim and Lien Acknowledgment"). In addition, any general unsecured creditor that elects to receive a distribution from the GUC Trust (a "Distribution Creditor") shall be deemed bound by the Claim and Lien Acknowledgment and the Releases (as described below). |

| | |
|---|---|
| **Cash Contribution** | In full settlement and release of the Sponsor Actions, within 10 days of the occurrence of the Effective Date, the Sponsors shall contribute $500,000 to the Debtors' estate for distribution to creditors whose claims are not otherwise accounted for in the Budget, in accordance with the priorities set forth in the Bankruptcy Code (the "Cash Contribution"). |
| **Distributions** | Within 5 days of the occurrence of the Effective Date and after satisfaction in full of the DIP Loan Obligations, all Excess Sale Proceeds shall be distributed to the Prepetition Agent (for the benefit of the Prepetition Lenders) to satisfy the Prepetition Obligations and the obligations under the Settlement Agreement. |
| **Committee Professional Fees and Expenses** | Subject to the occurrence of the Effective Date, the Approved Budget shall be amended to increase the line-item for fees and expenses of the professionals retained by the Committee ("Committee Professionals") from $225,000 to $425,000 (the "Committee Cap"), subject to the Committee Professionals' application to and approval by the Court for allowance and payment of fees and expenses. None of the Committee Professionals' fees shall be used to challenge any claims, liens or interests of any of the DIP Lenders, Prepetition Agent, Prepetition Lenders or the Sponsors.<br><br>In the event that allowed fees and expenses of the Committee Professionals are less than the Committee Cap (the "Committee Fee Surplus"), then the Committee Fee Surplus shall be Indefeasibly Paid by the estates to the Prepetition Agent on account of the Prepetition Obligations, and the Prepetition Agent shall fund the Committee Fee Surplus directly to the GUC Trust. In the event that allowed fees and expenses of the Committee Professionals exceed the Committee Cap, the deficiency shall be paid from distributions payable to the GUC Trust. |
| **Releases** | Upon the Effective Date, paragraphs D(i)-(xii), 15(b) and 17 of the Interim DIP Order (which shall be included in the Final DIP Order) shall be binding on the estate, the Committee, its members, any trustee appointed under chapter 11 or chapter 7 of the Code, and all Distribution Creditors (the "Releasors"); |

| | |
|---|---|
| | *provided further*, subject to payment of the Cash Contribution, the releases (collectively, the "Releases") shall be extended to include the Sponsors (acting in all capacities) and each of their respective current and former officers, employees, directors, agents, representatives, owners, members, partners, financial advisors, legal advisors, managers, consultants, accountants, attorneys, and predecessors in interest (such parties collectively, the "Sponsor Parties") in connection with all matters directly or indirectly arising out of or relating to the relationship of the Sponsor Parties with the Debtors.  Further, the Releasors and the trustee of the GUC Trust (collectively, an "Estate Plaintiff") shall be bound to a judgment reduction as follows:  if an Estate Plaintiff commences action against any third party and such third party cross claims or otherwise brings a Sponsor Party or Releasee into such suit, to the extent that the Court or jury finds liability and attributes a portion of such liability to the third party and another portion to the Sponsor Party or Releasee, the Estate Plaintiff shall only recover the percentage attributable to the third party and shall surrender all rights to recovery, direct or indirect, with respect to the portion attributable to the Sponsor Party or Releasee. |
| **Conversion Motion** | Upon the Effective Date, the Committee shall withdraw the Conversion Motion and shall make no further motion to convert the Cases to cases under chapter 7 without the consent of the Parties. |
| **Asset Sales** | Upon the Effective Date, the Committee shall not object to any motion by the Debtors to sell or otherwise dispose of Collateral or DIP Collateral (including but not limited to the Debtors' proposed settlement with Automotive Rentals, Inc.); provided, however, the Committee shall be permitted to object to any motion to approve the sale, in whole or in part, of Rolling Stock. |
| **Final DIP Order and Adjournment of Final DIP Hearing** | The Parties will seek entry of the Final DIP Order in substantially the form attached as Exhibit A to the Settlement Agreement.    It shall be a condition precedent to the occurrence of the Effective Date hereunder that a Final DIP Order substantially in the form attached as Exhibit B to the Settlement Agreement has been entered. |

RLF1 8872152v.3

| | The Parties agree to adjourn the hearing to approve the Final DIP Order, as necessary, to obtain entry of the Settlement Approval Order. |
|---|---|
| **Withdrawal of Committee Discovery** | The Committee's discovery with respect to any objection to entry of a Final DIP Order or Challenge shall be stayed and shall be withdrawn upon the Effective Date. |
| **GUC Trust** | The Committee shall form a trust for the benefit of the Debtors' general unsecured creditors (the "GUC Trust"), which will be formed pursuant to a trust agreement among the Debtors, a nominee of the Committee (as the GUC Trustee) and the Committee (the "GUC Trust Agreement") and will be funded with the portions of the lenders' collateral (the "GUC Trust Funds"). |
| | The GUC Trust is to be administered by an individual or entity (the "GUC Trustee") who will hold the GUC Trust Funds in a separate account (the "GUC Trust Account") which, in addition to satisfying the fees, costs and expenses of the GUC Trustee and its professionals (including, without limitation, for investigation and/or litigation of claims not released as part of the Settlement Agreement) and the administration of the GUC Trust, shall be disbursed by the GUC Trustee to holders of allowed general unsecured claims in these Cases in accordance with the Settlement Agreement (the "General Unsecured Creditors"). As set forth in the "Standing" section *supra*, it is contemplated that upon confirmation of a Plan or dismissal in these cases, the GUC Trust shall also be empowered to bring, and will succeed to all rights of the Debtors with respect to, any and all claims or causes of action belonging to the Debtors and/or their estates. |

## REQUESTED RELIEF

12.     By this Motion, the Committee seeks the entry of an order (a) granting it standing to pursue Litigation Claims and claims against the Sponsors and immediately settle the claims against the Sponsors, and (b) approving the Settlement Agreement pursuant to section 105 of the Bankruptcy Code and Bankruptcy Rule 9019.

RLF1 8872152v.3

**BASIS FOR RELIEF**

**A.     The Settlement Satisfies the Standard for Approval Pursuant to Bankruptcy Rule 9019**

13.     Section 105 of the Bankruptcy Code provides in pertinent part that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions" of the Bankruptcy Code.  11 U.S.C. § 105(a).  Bankruptcy Rule 9019 authorizes bankruptcy courts to approve a compromise following the filing of a motion and a hearing with notice to the creditors.  Fed R. Bankr. P. 9019.  Under Section 105(a) and Bankruptcy Rule 9019, the approval of a proposed compromise and settlement is committed to the sound discretion of the Court.  See In re Louise's, Inc., 211 B.R. 798, 801 (D. Del. 1997).

14.     In reviewing a proposed settlement, the Court must determine whether the proposed compromise is "fair and equitable."  Protective Comm. For Ind. Stockholders of TMT Trailer Ferry, Inc. v. Anderson, 390 U.S. 414, 424 (1968).  This court has described the ultimate inquiry to be whether "the compromise is fair, reasonable, and in the interest of the estate."  In re Louise's, Inc., 211 B.R. at 801.  The approval of a settlement under Bankruptcy Rule 9019 is within the sound discretion of the bankruptcy court.  Myers v. Martin (In re Martin), 91 F.3d 389, 396 (3d Cir. 1996); In re Washington Mut., Inc., 442 B.R. 314, 327 (Bankr. D. Del. 2011).  However, the bankruptcy court need not substitute its judgment for that of the parties.  See In re Neshaminy Office Bldg. Assoc's, 62 B.R. 798, 803 (Bankr. E.D. Pa. 1986).

15.     Two principles should guide the determination of whether a proposed settlement is fair and equitable.  First, the Supreme Court has noted that court approved settlements are a "normal part of the reorganization process", see Anderson, 390 U.S. at 424 (citation omitted), and are favored in bankruptcy in that they minimize litigation and expedite administration of the bankruptcy estate.  See Myers v. Martin (In re Martin), 91 F.3d 389, 393

12

(3d Cir. 1996) (citations omitted) (providing that the bankruptcy court must examine:  (1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of the creditors); In re A & C Properties, 784 F.2d 1377, 1381 (9th Cir. 1986) ("The law favors compromise and not litigation for its own sake..."); In re World Health Alternatives, Inc., 344 B.R. 291, 296 (Bankr. D. Del. 2006) (approving settlement involving gift of lenders' collateral); Nellis v. Shugrue, 165 B.R. 115, 123 (S.D.N.Y. 1994) (Court recognizes "the general rule that settlements are favored...").

16.     Second, settlements should be approved if they fall above the lowest point on the continuum of reasonableness.  "[The] responsibility of the bankruptcy judge...is not to decide the numerous questions of law and fact raised by the appellants but rather to canvass the issues and see whether the settlement 'fall[s] below the lowest point in the range of reasonableness.'"  Cosoff v. Rodman (In re W.T. Grant Co.), 699 F.2d 599, 608 (2d Cir. 1983) (citations omitted); In re Planned Protective Servs., Inc., 130 B.R. 94, 99 n.7 (Bankr. C.D. Cal. 1991); see generally In re Blair, 538 F.2d 849, 851 (9th Cir. 1976) (court should not conduct a "mini-trial" on the merits of a proposed settlement).  Thus, the question is not whether a better settlement might have been achieved, or a better result reached if litigation was pursued, but rather whether settlement meets a minimal threshold of reasonableness. Nellis, 165 B.R. at 123; Vaughn v. Drexel Burnham Lambert Group, Inc. (In re Drexel Burnham Lambert Group, Inc.), 134 B.R. 499, 505 (Bankr. S.D.N.Y. 1991) (settlement need not result in the best possible outcome for the debtor, but must not "fall beneath the lowest point in the range of reasonableness") (citations omitted); In re Tech. for Energy Corp., 56 B.R. 307, 311-312 (Bankr.

13

E.D. Tenn. 1985); In re Mobile Air Drilling Co., Inc., 53 B.R. 605, 608 (Bankr. N.D. Ohio 1985); 10 COLLIER ON BANKRUPTCY ¶ 9019.02, at 9019-4.

17.     Here, the Committee believes that a prompt settlement is warranted and that the proposed Settlement, which will maximize and expedite creditor recoveries and lower potential administrative and professional expenses, is well above the "lowest point in the range of reasonableness." The Settlement resolves, among other things, significant litigation regarding the proposed debtor in possession financing, the Debtors' ability to continue to manage its assets in chapter 11, potential claims and causes of action against the Prepetition Agent, the Prepetition Lenders, and the Sponsors.

18.     As in any other case, litigating these various issues would involve significant cost, time, and risk, so resolving them will allow the Debtors, their creditors and their estates to avoid the costs, risks, and delay attendant upon any such litigation. But here, there is more. First, there was insufficient funding to pay for protracted litigation, so the mere need for litigation itself could have diminished opportunities to maximize value and caused a conversion. Second, the Settlement addresses the Committee's concerns that these Chapter 11 Cases were being administered for the benefit of the Prepetition Lenders at the expense of unsecured creditors because the Settlement provides for a path towards a potentially significant recovery for general unsecured creditors and the estate: 80% of the net proceeds from the sale of Rolling Stock to unsecured creditors without a deficiency claim until certain thresholds are hit, $500,000 cash from the Sponsors to the estate, and a sharing of litigation proceeds with funding to investigate such claims.

19.     To say the least, this result is significantly better for general unsecured creditors and for the estate than prospects looked on the day the Conversion Motion was filed --

14

when it appeared that all remaining unencumbered assets would be encumbered and there would be insufficient funds for the Committee to investigate whether claims (to the extent not already encumbered) existed.  As a result, if the Settlement is approved, the Committee will withdraw its Conversion Motion and will support the entry of the Final DIP Order.

20.     Moreover, there is a strong policy favoring settlements in Chapter 11 Cases, and a failure to resolve such matters at this time could delay or diminish distributions to creditors.  In addition, the Settlement represents a fair compromise considering the various claims settled, the time and expense of litigating such claims, and the likelihood of success on those various claims.  Accordingly, a settlement of disputes and cooperation between the Parties will allow for the orderly liquidation of the Debtors' assets to maximize value for all constituents.  The claims being settled by the Parties are complex and multifaceted. The litigation to resolve such disputes would be time consuming and expensive, and would delay any distribution to creditors for months or years, if it could even be funded.  The Settlement, in contrast, allows the Debtors to continue with the sale of their assets in chapter 11 and will allow for distributions to creditors in a timely manner.

21.     For the foregoing reasons, the Committee believes that the Settlement Agreement is fair and reasonable, is in the best interests of the Debtors, their creditors and their estates, and, respectfully, should be approved by the Court.

**B.    The Settlement Does Not Implicate, and Therefore Does Not Violate, the Absolute Priority Rule.**

22.     Settlement agreements involving distributions from secured creditors' collateral to unsecured creditors are sometimes contested as violating the so-called "absolute priority rule."  As set forth below, the Settlement here does not violate that rule.  One payment to be made under the Settlement Agreement -- the 80% of the net proceeds of the Rolling Stock

sales -- will be made directly to a GUC Trust by the Prepetition Lenders. This structure has ample support for the reasons set forth in this Section B. First, though, it bears noting that the other aspects of the Settlement, such as the $500,000 cash provided by the Sponsors and the agreement with respect to Litigation Claims, will be available for distribution to creditors generally and not only the GUC Trust.

23.    The Settlement here is outside of the context of a chapter 11 plan and does not dictate the terms of a chapter 11 plan and, as such, does not implicate the absolute priority rule. Indeed, the Parties have a lot of work to do before a chapter 11 plan can even be contemplated in these Cases. The Settlement is simply a step towards that end. The absolute priority rule embodied in Section 1129(b)(2)(B) of the Bankruptcy Code is not implicated where no plan is being proposed. In re World Health Alternatives, Inc., 344 B.R. 291, 298 (Bankr. D. Del. 2006) ("Section 1129(b)(2)(B) and the absolute priority rule . . . are not implicated . . . because the settlement does not arise in the context of a plan of reorganization."). In World Health, Judge Walsh approved a settlement in the context of a Section 363 sale between the debtors, the unsecured creditors' committee, and a secured lender pursuant to which settlement (i) the committee agreed to withdraw its objections to the sale and the secured lender's prepetition liens and claims and release the secured lender from any and all causes of action; (ii) the secured lender agreed to carve out from its collateral certain funds to be distributed to general unsecured creditors (after payment of the committee's professional fees and expenses) and/or for investigation and prosecution of certain estate causes of action (other than against the secured lender); (iii) the secured lender capped its claim against the estate in an amount less than its asserted claim; and (iv) the committee would pursue certain causes of action including avoidance actions and claims against directors and officers. Id. at 294-95.

16

24.     In World Health, the United States Trustee objected to the settlement on
the basis that the Third Circuit's decision in In re Armstrong World Indus., Inc., 432 F.3d 507
(3d Cir. 2005) prohibited such an agreement. World Health, 344 B.R. at 295. Specifically, the
U.S. Trustee argued that Armstrong prohibited the bankruptcy court from approving a settlement
that paid anything to general unsecured creditors before paying priority claimants. Id. Judge
Walsh rejected this argument, holding that the settlement was not prohibited by the Bankruptcy
Code because the absolute priority rule did not apply outside of a plan and distinguished
Armstrong on the basis that it specifically dealt with a plan of reorganization. Id. at 298.
Significantly, the three grounds Armstrong used to distinguish the seminal gifting doctrine case,
Official Unsecured Creditors Comm. v. Stern (In re SPM Mfg. Corp.), 984 F.2d 1305 (1st Cir.
1993), before holding that a distribution of warrants to a debtor's existing equity holders was in
violation of the absolute priority rule when unsecured creditors were impaired, are directly
applicable in the instant context. Armstrong, 432 F.3d at 509, 514.

25.     Armstrong distinguished SPM because (i) SPM involved a distribution
under chapter 7 which did not trigger the absolutely priority rule; (ii) the proceeds in SPM were
not subject to the Bankruptcy Code priority scheme because the secured creditor had a perfected
security interest; and (iii) the distribution in SPM was a carve out whereby a secured creditor
whose claim is secured by substantially all assets allows a portion of its proceeds to be
distributed to others. Id. at 514; see also World Health, 344 B.R. at 298. Here, as in SPM and
World Health and in contrast to Armstrong, (i) the distribution of the net Rolling Stock proceeds
to unsecured creditors arises in the context of the Settlement Agreement and not a chapter 11
plan; (ii) the Prepetition Lenders have perfected security interests, through their adequate

17

protection lien and claim, over the Rolling Stock proceeds; and (iii) the distribution is a carve-out from the proceeds due to the Prepetition Lenders.

26.    These cases have not yet evolved to a stage where a chapter 11 plan has been proposed or even negotiated, and, while the Settlement does not presuppose the possibility that these cases will be resolved through a chapter 11 plan, the Settlement also does not dictate that manner of resolution let alone its terms (as described in greater detail below).  Moreover, while the Settlement does contain an agreement among certain creditors as to how certain payments from the Prepetition Lenders' collateral will be distributed as between them, the Settlement does not seek to classify or reconcile claims against the Debtors' estates, does not seek to transfer any assets or rights from the Debtors' estates or to any other entity, and does not seek to discharge the Debtors from any claims, each in the manner that a chapter 11 plan would. The absence of a chapter 11 plan with these types of provisions is not merely a technical deficiency in the application of the absolute priority rule – it makes the application of the rule outright impossible.

27.    Even putting aside the fact that the Settlement is not in a chapter 11 plan context, the Rolling Stock aspect of the Settlement here is proper because the proceeds of the Prepetition Lenders' collateral are property of the Prepetition Lenders, and not the estate, once distributed to the Prepetition Lenders.  In World Health, Judge Walsh approved the settlement before him on the basis of a line of cases approving settlements in which the secured lender gave up a portion of its collateral proceeds to junior creditors, which cases were distinguished, but not disapproved of, by the Third Circuit in Armstrong.  344 B.R. at 297 ("[T]he payout to the general unsecured creditors is a carve out of the secured creditor's lien and not estate property.  I believe the Bankruptcy Code does not prohibit this arrangement and reported cases so hold. . . .

18

Armstrong distinguished, but did not disapprove of, a line of authority that approved this type of

agreement.") (citing SPM, 984 F.2d 1305; In re MCorp Fin. Inc., 160 B.R. 941 (Bankr. S.D. Tex.

1993); In re Genesis Health Ventures, Inc., 266 B.R. 591 (Bankr. D. Del. 2001)).  Judge Walsh

noted that those cases distinguished by the Third Circuit in Armstrong *"allowed a senior creditor*

*to agree to give up part of its collateral to another class*, skipping other classes in between," and

that "even if the absolute priority rule applied, which it does not, *an ordinary carve out such as*

*here would not offend the rule*." Id. at 298 (emphasis added).

    28.    The approach of Judge Walsh in World Health has been followed by other

courts in this district in approving payments to junior creditors from proceeds of collateral or

other non- estate property.  See In re G.I. Joe's Holding Corp., Case No. 09-10713 (Bankr. D.

Del. Mar. 10, 2011) (Judge Gross approving a settlement in the context of a structured

liquidation in which an undersecured creditor agreed to partially fund an escrow account with

collateral proceeds to be distributed to general unsecured and priority creditors on a *pari passu*

*basis*.); In re Kainos Partners Holding Co. LLC, Case No. 09-12292 (BLS) (Bankr. D. Del. Apr.

1, 2010) (approving, *inter alia*, a carve out of a secured creditor's collateral in the context of a

sale for the repayment of the creditors' committee's professionals and distributions to unsecured

creditors in exchange for a release of claims against the secured creditor); Official Comm. of

Unsecured Creditors v. Perseus Partners VII, L.P. (In re Distributed Energy Sys. Corp.), 2009

WL 1458175 (Bankr. D. Del. May 18, 2009) (Judge Gross approving a settlement in the context

of a sale in which a secured creditor agreed to distribute proceeds from the sale of its collateral to

unsecured creditors because such proceeds are not property of the estate); In re TSIC, Inc., 393

B.R. 71 (Bankr. D. Del. 2008) (Judge Gross approving a settlement in a sale context in which the

funds of the Section 363 sale purchaser were remitted to unsecured creditors because the funds

were not property of the estate); In re PSA Successor Corp., Case No. 04-13030 (Bankr. D. Del. Feb. 10, 2006) (Judge Walrath approving a settlement in a sale context and despite a high probability that the case would convert to a chapter 7 holding that a "secured creditor may agree to give part of its collateral to another class skipping priority classes in between.").

29.     Here, as with the settlements in World Health and its progeny, the net Rolling Stock proceeds to be distributed to the general unsecured creditors are not property of the estate; rather, they represent a carve-out of the Prepetition Lenders' property. The payments under the Settlement are structured to be paid only as distributions of cash proceeds actually *received* by the Prepetition Lenders (in the specified percentages and after specified hurdles) from their collateral. Accordingly, *only* the Prepetition Lenders' property will be distributed pursuant to the Settlement (and not through a chapter 11 plan) and the absolute priority rule is not implicated or violated by the Rolling Stock aspect of the Settlement. Further, the Rolling Stock proceeds are to be distributed to the GUC Trust, which will distribute such funds on a pro rata basis to the general unsecured creditors without any attendant discrimination.

30.     Moreover, the Settlement does not change the priority scheme in these cases and is not in any way prejudicial to any creditor. First, this follows from the Settlement's proposed distribution of Rolling Stock proceeds subject to the liens of the Prepetition Lenders and the DIP Lenders. Other creditors, secured or otherwise, would not have any entitlement or rights to such proceeds. Therefore, even if the principles of the absolute priority rule were applicable thereto – and they are not – the Settlement should be viewed as "fair and equitable" in accordance with those principles.

31.     Second, the other components of the Settlement -- the $500,000 cash from the Sponsors and the litigation proceeds -- will be paid to the estate rather than the GUC Trust.

C.    **The Settlement Does Not Constitute a *Sub Rosa* Plan.**

32.    Settlement agreements, including those between a secured creditor and a statutory creditors' committee, sometimes draw challenges as alleged "*sub rosa*" plans. A settlement agreement constitutes a *sub rosa* plan when, unlike here, it "has the effect of dictating the terms of a prospective chapter 11 plan." In re Capmark Fin. Group, 438 B.R. at 513. To dictate the terms of a plan, "the settlement must either (i) dispose of all claims against the estate or (ii) restrict creditors' rights to vote." Id. (citing Official Comm. of Unsecured Creditors v. Cajun Elec. Power Coop., Inc. (In re Cajun Elec. Power Coop., Inc.), 119 F.3d 349, 354-55 (5th Cir. 1997); Debenedictis v. Truesdell (In re Global Vision Prods., Inc.), 2009 WL 2170253 at *7 (S.D.N.Y. July 13, 2009); Official Comm. of Unsecured Creditors of Tower Auto. v. Debtors & Debtors in Possession (In re Tower Auto, Inc.), 241 F.R.D. 162, 169 (S.D.N.Y. 2006)).

33.    Here, the Settlement neither dictates the terms of a prospective plan, disposes of all claims against the estate, nor restricts voting rights. Instead, the Settlement achieves a consensual resolution of the objection to the DIP Motion, the Conversion Motion and potential litigation against the Prepetition Lenders and the Equity Sponsors in exchange for the distribution of collateral proceeds and cash to the settling parties. The Settlement is not a disguised plan because the agreement ***does not*** (i) modify or otherwise impair the statutory rights of non-settling parties vis-à-vis the estates, the Parties, or other parties in interest; (ii) prevent the Debtors from filing a plan; or (iii) restrict creditors' right to vote in connection with any such plan.

34.    For the reasons stated above, the Settlement Agreement is not a *sub rosa* plan and there are compelling reasons to approve it.

**D.**     **The Grant of Standing to the Committee to Pursue the Avoidance Actions and Commercial Tort Claims is Appropriate Under the Circumstances.**

35.     Finally, the Committee seeks authority, pursuant to Bankruptcy Code Sections 105(a), 1103(c)(5), and 1109(b), (1) to commence and prosecute the Avoidance Actions and commercial tort claims (as defined in 9-102(a)(13) of New York's Uniform Commercial Code) or fraud or malpractice claims related to such claims (collectively, the "Litigation Claims") and (2) to settle the estates' claims against the Sponsors ("Sponsor Claims"), both in accordance with the Settlement Agreement. The Settlement proposes that the Prepetition Lenders will share the proceeds of the Litigation Claims with other creditors in accordance with the terms of the Settlement Agreement.

36.     The Litigation Claims present plausible causes of action that would, if successful, greatly benefit the Debtors' estates and unsecured creditors. The Committee already has specific and express authority to (i) "investigate the acts, conduct, assets, liabilities, and financial condition of the debtor" (*see* 11 U.S.C. § 1103(c)(2)); (ii) perform such other services as are in the interest of those represented" (*see* 11 U.S.C. § 1103(c)(5)); and (iii) "raise and . . . appear and be heard on any issue" (*see* 11 U.S.C. § 1109(b)). The Third Circuit has recognized that "the ability to confer derivative standing upon creditors' committees is a straightforward application of bankruptcy courts' equitable powers." Official Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery, 330 F.3d 548, 568, 580 (3d Cir. 2003) (authorizing creditors' committee to sue derivatively to recovery property for the benefit of the estate); see Infinity Investors Ltd. v. Kingsborough (In re Yes! Entm't Corp.), 316 B.R. 141, 145 (D. Del. 2004) (authorizing derivative standing to pursue breach of fiduciary duty and fraudulent transfer claims). Generally, derivative standing requires (i) a colorable claim; (ii) that the debtor unjustifiably refused to pursue the claim (or a showing that a demand upon the debtor would be

22

futile); and (iii) the permission of the bankruptcy court to initiate the action.  <u>See</u> <u>Yes! Entm't</u>

<u>Corp.</u>, 316 B.R. at 143 (internal citations omitted).[4]

     37.    Courts in this District have adopted a plausibility standard with respect to

the showing of an existence of colorable claims and have looked at the import of what has been

alleged.  <u>See</u> <u>In re Distributed Energy Sys., Corp.</u>, Case No. 08-11101, Docket No. 315 at 44:15-

20 (Bankr. D. Del. July 30, 2008) (KG) ("And the colorable claim issue . . . is plausibility . . . . I

don't even have to find that it has merit; I just have to find that it's not without merit."); <u>In re</u>

<u>Fedders N.A., Inc.</u>, Case No. 07-11176, Docket No. 933 at 97:15-25, 98:1-12 (Bankr. D. Del.

Mar. 24, 2008) (BLS) ("So the allegations, the sufficiency of the allegations simply cannot be to

a Rule 12(b)(6) standard . . . . I don't think that the decisional law that deals with authorizing a

committee to prosecute litigation necessarily presumes the existence of [a] complaint before

authorization is granted."); <u>see also</u> <u>Adelphia Commc'ns Corp. v. Bank of America, N.A. (In re</u>

<u>Adelphia Commc'ns Corp.)</u>, 330 B.R. 364, 376 (Bankr. S.D.N.Y. 2005) ("Caselaw construing

requirements for 'colorable' claims has made it clear that the required showing is a relatively

easy one to make.").

     38.    The Committee continues to investigate the Litigation Claims and to the

extent plausible causes of action exist the best party suited to commence and prosecute such

actions remains the Committee.  As further described below, the Committee and its constituency

---

[4]  Many other courts have recognized that a creditors' committee has an implied, but qualified, right to sue on behalf of the estate. *See Unsecured Creditors Comm. of STN Enters., Inc. v. Noyes (In re STN Enters., Inc.)*, 779 F.2d 901 (2d Cir. 1985); *see, e.g., Fogel v. Zell*, 221 F.3d 955 (7th Cir. 2000); *Canadian Pac. Forest Prods. Ltd. v. J.D. Irving, Ltd. (In re Gibson Group, Inc.)*, 66 F.3d 1436 (6th Cir. 1995); *La. World Exposition v. Fed. Ins. Co.*, 858 F.2d 233 (5th Cir. 1988); *Official Comm. of Unsecured Creditors of Nat'l Forge Co. v. Clark (In re Nat'l Forge Co.)*, 326 B.R. 532 (W.D. Pa. 2005); *In re Tribune Co.*, Case No. 08-13141, Docket Nos. 6150, 6657, 6658 (Bankr. D. Del.) (KJC) (orders granting derivative standing); *Official Comm. of Unsecured Creditors v. Credit Suisse First Boston (In re Exide Techs., Inc.)*, 299 B.R. 732, 739 (Bankr. D. Del. 2003).

are the parties whose interests Litigation Claims serve to protect and thus, the Committee should be granted standing, pursuant to the Final DIP Order, to pursue the Litigation Claims revealed through the Debtors' and Committee's continuing investigation.

39.     In considering the second factor (whether a debtor has unjustifiably refused to pursue a claim), the Court may excuse the Committee from making a formal demand on the Debtors when it is apparent that such demand would be futile. See, e.g., Nat'l Forge, 326 B.R. at 544-45 (affirming finding that formal demand request would have been futile). Demand on the Debtors with respect to the Litigation Claims is both futile and unnecessary under the circumstances.

40.     First, the Committee clearly is the proper party to be granted standing, and then to settle, the Sponsor Claims. After all, the members of the Debtors' Board of Directors were appointed by the Sponsors and, as a result, have a conflict of interest regarding pursuit of claims against the Sponsors. See, e.g., La. World Exposition v. Fed. Ins. Co., 832 F.2d 1391, 1397-98 (5th Cir. 1987) (conflict of interest would prevent debtor from pursuing litigation adverse to its directors and officers so demand was unnecessary).

41.     Second, the Debtor has consented to granting standing to the Committee to pursue the Litigation Claims and to settle the Sponsor Claims. As a result, a formal demand upon the Debtors is unnecessary. Courts have held that a creditor may acquire standing to pursue the debtor's causes of action if "(1) the [creditor] has the consent of the debtor in possession or trustee, and (2) the [bankruptcy] court finds that suit by the [creditor] is (a) in the best interest of the bankruptcy estate, and (b) is necessary and beneficial to the fair and efficient resolution of the bankruptcy proceedings." In re Commodore Int'l Ltd., 262 F.3d 96, 100 (2d Cir. 2001); see also In re Racing Services, Inc., 540 F.3d 892, 902-03 (8th Cir. 2008); Liberty

Mut. Ins. Co. v. Official Unsecured Creditors' Comm. of Spaulding Composites Co.), 207 B.R. 899, 904 (9th Cir. BAP 1997) ("The debtor in possession has an obligation to pursue all actions that are in the best interests of creditors and the estate. An unsecured creditors' committee has a close identity of interests with the debtor in possession in this regard. Allowing the debtor in possession to coordinate litigation responsibilities with an unsecured creditors' committee can be an effective method for the debtor in possession to manage the estate and fulfill its duties. . . . Rather than a flat prohibition, impartial judicial balancing of the benefits of a committee's representation better serves the bankruptcy estate."). Here, the Debtors consent to providing the Committee with standing to pursue the Litigation Claims and to settle the Sponsors Claim. Additionally, as noted above, the Debtors' board of directors is conflicted, so the Committee's pursuit of these actions is in the best interests of the estates and necessary for the fair and efficient resolution of the proceedings.

42.    Thus, the Committee is seeking prior Court permission to commence and prosecute the plausible Litigation Claims on behalf of the Debtors' estates for the benefit of all stakeholders and submits that it should be granted such authority, in the Final DIP Order, as it is in the best interests of the Debtors' estates and their creditors.

## NOTICE

43.    No trustee or examiner has been appointed in the Chapter 11 Cases. Notice of this Motion has been provided to:  (i) the U.S. Trustee; (ii) the Debtors; (iii) the Parties; and (iv) all parties entitled to receive notice in the Chapter 11 Cases pursuant to Bankruptcy Rule 2002. In light of the nature of the relief requested, the Committee submits that no further notice is required.

RLF1 8872152v.3

**NO PRIOR REQUEST**

44.    No prior request for the relief sought in this Motion has been made to this or any other court in connection with the Chapter 11 Cases.

WHEREFORE, the Committee respectfully requests that the Court enter the Proposed Order, substantially in the form attached hereto as <u>Exhibit A</u>, approving the terms of the Settlement Agreement and certain related relief and granting such other and further relief as the Court may deem just and proper.

Dated: July 19, 2013
        Wilmington, Delaware

Respectfully submitted,

Mark D. Collins (No. 2915)
Russell C. Silberglied (No. 3462)
L. Katherine Good (No. 5101)
Amanda R. Steele (No. 5530)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone:  (302) 651-7700
Facsimile:  (302) 651-7701
Email:  collins@rlf.com
        silberglied@rlf.com
        good@rlf.com
        steele@rlf.com

*Proposed Counsel to the Official Committee of Unsecured Creditors of Highway Technologies Inc., et al.*

RLF1 8872152v.3