IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| HIGHWAY TECHNOLOGIES, INC., *et al.*, | Case No.: 13-11326 (KJC) |
| Debtors.[1] | (Jointly Administered) |

**Objection Deadline:  October 9, 2013 at 4:00 p.m. Eastern time**
**Hearing Date:  October 16, 2013 at 2:00 p.m. Eastern time**

## DEBTORS' MOTION TO CONVERT CASES FROM CHAPTER 11 TO CHAPTER 7 OF THE BANKRUPTCY CODE

The debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors") hereby file the *Debtors' Motion to Convert Cases from Chapter 11 to Chapter 7 of the Bankruptcy Code* (the "Motion") pursuant section 1112(a) of title 11, United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code") and Rules 1017(f)(2) and 9013 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") for entry of an order converting these cases from chapter 11 of the Bankruptcy Code to chapter 7 of the Bankruptcy Code.  In support of the Motion, the Debtors respectfully submit as follows:

### Preliminary Statement

1.      After the commencement of these chapter 11 cases, the Debtors marketed and sold substantially all of their assets.  The key asset sales closed prior to August 15, 2013.  Simultaneously, the Official Committee of Unsecured Creditors negotiated and settled disputes with the Debtors' pre and postpetition lenders and equity sponsors.  The Court approved that

---

[1] The Debtors in these proceedings and the last four digits of each Debtor's federal taxpayer identification number are as follows: Highway Technologies, Inc. (6608); and HTS Acquisition, Inc. (9831). The Debtors' mailing address is 2600 South Shore Blvd., Suite 300, League City, Texas, 77573.

settlement the day before the last key asset sale closed on August 14, 2013. Since that time, the Debtors have been collecting outstanding accounts receivable and winding down the remaining business. However, the Debtors, in consultation with the Official Committee of Unsecured Creditors and the agent for the prepetition secured lenders (the "Prepetition Agent"), and the postpetition secured lenders (collectively, the "Estate Parties"), determined that a plan in these cases will not likely be feasible in light of the Debtors' estimate of claims that might be asserted under section 503(b)(9) of the Bankruptcy Code (the "503(b)(9) Claims") and estimated claims that might be asserted under section 507(a)(4) of the Bankruptcy Code by asserted by former employees ("Employee Priority Claims").

2.    Although there are unencumbered funds in the estates and potential litigation claims, the Estate Parties determined that the payment of the 503(b)(9) Claims from those funds would likely be maximized in a chapter 7 case, rather than depleting them by the administrative costs of soliciting a chapter 11 plan. Moreover, 100% consent from the holders of 503(b)(9) Claims and Employee Priority Claims would be required to confirm a plan in these cases. The process of obtaining those consents would be time consuming and costly, and in any event cannot be assured. In addition, there is no agreement with the prepetition lenders to use their collateral past October 18, 2013. Based on these circumstances as set forth herein, the Debtors request that the Court grant the Motion to convert these cases from chapter 11 to chapter 7 as set forth herein.

3.       In addition, prior to filing this Motion, the Debtors and the Committee

discussed the Motion with the Office of the United States Trustee (the "U.S. Trustee") and

provided a draft of this Motion for review.

### Jurisdiction And Venue

4.       This Court has jurisdiction over the subject matter of the Motion pursuant

to 28 U.S.C. §§ 157 and 1334.  Consideration of this Motion is a core proceeding under 28

U.S.C. § 157(b)(2).  Venue of this proceeding is proper in this district pursuant to 28 U.S.C.

§§ 1408 and 1409.

5.       The statutory predicate for the relief sought herein is Bankruptcy Code

section 1112(a).  The procedural rules applicable to this request for relief are set forth in

Bankruptcy Rules 1017(f) and 9013.

### Relief Requested

6.       The Debtors respectfully request that the Court (a) enter an order, pursuant

to section 1112(a) of the Bankruptcy Code, converting these cases to cases under chapter 7 of the

Bankruptcy Code effective October 25, 2013 (the "Conversion Effective Date"), (b) setting a

deadline for the professionals of the Debtors and the Committee (as defined below) retained in

these cases (the "Estate Professionals") to submit monthly and quarterly fee applications, as

applicable, for the fees and expenses incurred through the Conversion Effective Date, and

(c) conferring standing upon the individual selected as trustee (the "GUC Trustee") established

in connection with the Committee Settlement Agreement (as defined below) and GUC Trust to

prosecute claim objections, and (d) discharge the Debtors' claims and noticing agent retained in these cases.

## Background

7.        On May 22, 2013 (the "Petition Date"), the Debtors commenced these cases by each filing a voluntary petition for relief under chapter 11 the Bankruptcy Code.

8.        The Debtors have continued in possession of their property and have continued to operate and manage their businesses as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

9.        An official committee of unsecured creditors was appointed by the Office of the United States Trustee on May 30, 2013 (the "Committee"). No request has been made for the appointment of a trustee or an examiner in this case.

10.        The factual background regarding the Debtors, including their current and historical business operations and the events precipitating the chapter 11 filings, are set forth in detail in the *Declaration of Robert Hookstra in Support of First Day Motions* [Docket No. 3] and fully incorporated herein by reference.

A.        **DIP Financing and Use of Cash Collateral**

11.        On the Petition Date, the Debtors filed the *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing Debtors to Obtain Postpetition Financing and Use Cash Collateral, (II) Granting Adequate Protection, (III) Scheduling a Final Hearing, and (IV) Granting Certain Related Relief* [Docket No. 9] (the "DIP Motion"). By the DIP Motion, the

Debtors requested authorization to borrow up to $3,000,000 and up to $2,000,000 on an interim

basis and authority to use cash collateral in accordance with the budget.

12.    On May 24, 2013, the Court entered the *Order (Interim) (I) Authorizing*

*Debtors to Obtain Postpetition Secured Financing, (II) Authorizing Use Cash Collateral, (III)*

*Granting Adequate Protection, (IV) Scheduling Final Hearing, and (V) Granting Certain Relief*

[Docket No. 55] (the "Interim DIP Order"), which granted the DIP Motion on an interim basis

and authorized the Debtors' to borrow $2,000,000 on a secured basis and the use of cash

collateral in accordance with the budget.  The postpetition borrowings enabled the Debtors to

market and sell substantially all of their assets as discussed below.

13.    As provided in Paragraph 13 of the Interim DIP Order, the Debtors were

permitted to use the prepetition secured lenders' and postpetition secured lenders' cash collateral

to pay the professional fees and expenses incurred by the Estate Professionals in amounts not to

exceed the approved budget annexed to the Interim DIP Order. So long as a "Termination

Event"[2] had not occurred (which has not to date), the Debtors are authorized to fund the

budgeted amounts of the Estate Professionals into a trust account (the "Professional Fee Trust

Account") held by the Debtors' counsel. Since entry of the Interim DIP Order, the Debtors have

funded the Professional Fee Trust Account on a weekly basis equal to the budgeted amount for

all of the Estate Professionals.

14.    The funds in the Professional Fee Trust Account constitute the prepetition

lenders' collateral. Upon maturity of the use of cash collateral, any excess cash in the

---

[2] A Termination Event occurs upon a default or the maturity of the postpetition financing.  Interim DIP Order, ¶ 18.

Professional Fee Trust Account after all Estate Professionals have been paid in full the amount of their allowed administrative claims must be paid back to the Prepetition Agent, which holds a lien on such funds for the benefit of the prepetition lenders.

15.    On or about July 16, 2013, the Debtors repaid the amounts borrowed under the Interim DIP Order.

16.    On August 14, 2013, the Court entered the *Order (Final) (I) Authorizing Debtors to Obtain Postpetition Secured Financing, (II) Authorizing Use Cash Collateral, (III) Granting Adequate Protection, and (IV) Granting Certain Relief* [Docket No. 501] (the "Final DIP Order"). By the Final DIP Order, the borrowing of $2,000,000 was approved on a final basis and the approved budget was increased and extended through September 13, 2013. The Final DIP Order was granted in connection with the settlement between the Committee and the lenders as set forth in the Committee Settlement Agreement (as defined below) and discussed below. Further, the prepetition secured lenders agreed to extend the use of cash collateral through October 18, 2013.

**B.**      **The Sales of the Debtors' Assets**

        17.      On June 5, 2013, the Debtors filed the *Motion for an Order: (I) Approving Bidding Procedures, Bid Protections, and Lease of Assets, (II) Approving Asset Purchase Agreements and Authorizing the Sale of Certain of The Debtors' Branches; (III) Authorizing the Sales Free and Clear of All Liens, Claims, Encumbrances and Interests Pursuant to Sections 363(B), (F) and (M) of the Bankruptcy Code; (IV) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (V) Granting Related Relief* [Docket No. 133], by which the Debtors sought to sell their Minnesota branch assets and Montana branch assets to separate buyers.

        18.      On June 27, 2013, the Court entered the *Order Approving Motion for an Order: (I) Approving Bidding Procedures, Bid Protections, and Lease of Assets, (II) Approving Asset Purchase Agreements and Authorizing the Sale of Certain of The Debtors' Branches; (III) Authorizing the Sales Free and Clear of All Liens, Claims, Encumbrances and Interests Pursuant to Sections 363(B), (F) and (M) of the Bankruptcy Code; (IV) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (V) Granting Related Relief* [Docket No. 301] approving the sale of the Debtors' Minnesota related assets to SSJS, Inc. The sale to SSJS, Inc. closed on or about July 12, 2013 and the Debtors received $5,600,000 in sale proceeds.

        19.      On June 28, 2013, the Court entered the *Order  (I) Approving Bidding Procedures, Bid Protections, and Lease of Assets, (II) Approving Asset Purchase Agreements and Authorizing the Sale of Certain of The Debtors' Branches; (III) Authorizing the Sales Free*

and Clear of All Liens, Claims, Encumbrances and Interests Pursuant to Sections 363(B), (F) and (M) of the Bankruptcy Code; (IV) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (V) Granting Related Relief [Docket No. 303] approving the sale of the Debtors' Montana related assets to Mountain West Holding Company. The sale to Mountain West Holding Company closed on or about July 12, 2013 and the Debtors received $2,750,000 in sales proceeds.

20.     On June 20, 2013, the Debtors filed the Motion for an Order: (I) Approving Bidding Procedures, Bid Protections, and Lease of Assets, (II) Approving Asset Purchase Agreement and Authorizing the Sale of Certain of the Debtors' Denver Branch; (III) Authorizing the Sales Free and Clear of All Liens, Claims, Encumbrances and Interests Pursuant to Sections 363(B), (F) and (M) of the Bankruptcy Code; (IV) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (V) Granting Related Relief [Docket No. 239], by which the Debtors sought to sell their Denver branch related assets to RDP Barricade, LLP.

21.     On July 11, 2013, the Court entered the Order Approving Motion for an Order: (I) Approving Bidding Procedures, Bid Protections, and Lease of Assets, (II) Approving Asset Purchase Agreement and Authorizing the Sale of Certain of the Debtors' Denver Branch; (III) Authorizing the Sales Free and Clear of All Liens, Claims, Encumbrances and Interests Pursuant to Sections 363(B), (F) and (M) of the Bankruptcy Code; (IV) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (V) Granting Related Relief [Docket No. 363] approving the sale of the Debtors' Denver branch

related assets.  The sale to RDP Barricade, LLP closed on or about July 17, 2013 and the Debtors

received $775,000 in sale proceeds.

22.    On July 29, 2013, the Court entered the *Order Approving Asset Purchase*

*Agreement Between Highway Technologies, Inc. and Ritchie Bros. Auctioneers (America) Inc.*

[Docket No. 429] (the "Ritchie Bros. Bulk Sale Order").  By entry of the Ritchie Bros. Bulk Sale

Order, the Debtors sold substantially all of their remaining assets to Ritchie Bros. Auctioneers

(America) Inc.  On or about July 31, 2013, the sale closed and after the price adjustments, the

Debtors received $5,059,826 in sale proceeds.

23.    Following the closing of the above sales, the Debtors have sold some of

their remaining *de minimis* assets, *Order Authorizing and Approving the Sale of Certain Assets*

*to Plasticade Products Corporation* [Docket No. 469], and continue their efforts to sell

additional assets. *See, e.g.*, *Notice of Third Bulk Sale Pursuant to Bulk Sale Procedures Order*

[Docket No. 564] and *Notice of Fourth Bulk Sale Pursuant to Bulk Sale Procedures Order*

[Docket No. 565].

C.    **Settlement Between Lenders and Committee**

24.    Upon its formation, the Committee undertook an investigation into the

validity, extent, and perfection of the prepetition liens asserted against the Debtors' assets. In

connection with this investigation, the Committee (a) engaged in discussions with the prepetition

and postpetition lenders regarding the terms of the Debtors' postpetition financing, (b) filed the

*Motion of the Official Committee of Unsecured Creditors to Convert Cases to Chapter 7* [Docket

No. 147] (the "Conversion Motion"), which argued, among other things, that general unsecured

creditors would be harmed by the continued administration of the chapter 11 case by the granting

of liens on previously unencumbered assets, and (c) submitted an extensive document request.

25.    These actions resulted in extensive negotiations among the Committee, the

prepetition and postpetition lenders, and equity sponsors to resolve these issues on a global basis.

On July 19, 2013, the Committee filed the *Motion Pursuant to Rule 9019 to Approve the*

*Settlement Agreement Among the Official Committee of Unsecured Creditors, the Prepetition*

*Agent, the Prepetition Lenders, the DIP Lenders and the Equity Sponsors* [Docket No. 386],

seeking Court approval of a settlement agreement among the Committee, the Prepetition Agent,

the Prepetition Lenders, the DIP Lenders, and the Equity Sponsors (the "Committee Settlement

Agreement").

26.    By the Committee Settlement Agreement, the parties agreed, among other

things, that (a) the prepetition lenders would distribute 80% of the "Net Rolling Stock Proceeds"

(as defined in the Committee Settlement Agreement) to a general unsecured claim liquidating

trust ("GUC Trust"), (b) the prepetition lenders would waive any recovery from the GUC Trust

on account of their deficiency claim until all other unsecured creditors received 10% of their

allowed claims, at which time the prepetition lenders would share *pro rata* in distributions from

the GUC Trust, (c) the prepetition lenders agreed to waive any recovery resulting from

avoidance actions and other claims until $1,000,000 in proceeds have been distributed to the

holders of allowed general unsecured claims, at which time the prepetition lenders and the GUC

Trust would split the foregoing proceeds on a 50/50 basis, and (d) $500,000 was paid to the

Debtors' estate by the Debtors' equity sponsors in exchange for the releases granted to such sponsors.[3]

27.     On August 14, 2013, the Court entered the *Order Authorizing and Approving the Settlement Agreement Among the Official Committee of Unsecured Creditors, the Prepetition Agent, the Prepetition Lenders, the DIP Lenders and the Equity Sponsors* [Docket No. 499] approving the Committee Settlement Agreement. As a result of the Committee Settlement Agreement, the sale proceeds discussed above were paid to the Prepetition Agent (on behalf of the prepetition secured lenders), certain proceeds of which will then be allocated to the GUC Trust pursuant to the terms of the Committee Settlement Agreement.

**D.     Other Activities**

28.     Following the closing of the sales, the Debtors completed the process of resolving transition issues and post-closing obligations and continue to collect accounts receivable as they wind down what is left of their operations.

29.     Other than claims arising under section 503(b)(9) of the Bankruptcy Code, the Debtors believe that all administrative expenses have been paid by the hearing date on this Motion or will be paid in connection with the next quarterly hearing on professional fee applications.  As of the date of filing this Motion, the deadline to file claims arising under section 503(b)(9) of the Bankruptcy Code has not yet passed; the deadline is September 27, 2013, 7:00 p.m. (Eastern Time) (the "503(b)(9) Bar Date").

---

[3] The description of the Committee Settlement Agreement is intended a summary only.  The terms and conditions of the Committee's settlement control in the event there is an inconsistency between the summary above and the actual settlement.

30.    Prior to the Conversion Effective Date, the Debtors will transfer to the Prepetition Agent all of the remaining encumbered funds, including outstanding accounts receivable ("A/R") owed to the Debtors as contemplated in Paragraph 23 of the Final DIP Order.[4] The Prepetition Agent will provide notice to the Debtors' estates of amounts it has collected on the A/R once all such collections are completed to allow for a corresponding reduction in the Prepetition Obligations (as defined in the Final DIP Order) equal to the amounts realized in collection of the A/R, net of the cost and expenses of collection. As a result of this transfer and the Committee Settlement Agreement, approximately $480,000 ("Unencumbered Funds") will remain in the Debtors' estates on the Conversation Effective Date.[5] While the 503(b)(9) Bar Date has not yet passed, the Debtors expect the filed amount of the 503(b)(9) Claims to exceed the amount of the Unencumbered Funds.

31.    The Estate Parties believe that it is in the best interest of the estates to convert these chapter 11 cases to cases under chapter 7 of the Bankruptcy Code and allow a chapter 7 trustee to distribute the Unencumbered Funds to the holders of allowed 503(b)(9) Claims on a *pro rata* basis, and, if appropriate, investigate and/or pursue the litigation claims preserved by the terms of the Committee Settlement Agreement.

---

[4] For the avoidance of doubt, the Debtors will retain the funds (subject to the prepetition lenders' liens) that are in the Professional Fee Trust Account through the hearing on fee applications for the Estate Professionals for the period(s) through the Conversion Effective Date. Such funds will be used to pay the allowed administrative claims of Estate Professionals as provided in Paragraph 13 of the Final DIP Order. To the extent any funds remain in the Professional Fee Trust Account after the approval at a final fee application hearing of the allowed administrative claims of Estate Professionals, the Debtors will transfers such funds to the Prepetition Agent as required under Paragraphs 18 and 23(c) of the Final DIP Order.

[5] Approximately $20,000 in expenses was used to file and serve notice of the general claims and 503(b)(9) Claims bar dates.

**Basis for Relief**

32.    Section 1112(a) of the Bankruptcy Code governs the voluntary conversion

from chapter 11 to chapter 7.  Section 1112(a) provides that a debtor may convert a chapter 11

case to a case under chapter 7 at any time as of right.  Specifically, section 1112(a) states:

33.    The debtor may convert a case under this chapter to one under chapter 7 of

this title unless —

> (1)    the debtor is not a debtor in possession;
>
> (2)    the case originally was commenced as an involuntary case under
> this chapter; or
>
> (3)    the case was converted to a case under this chapter other than on
> the debtor's request.

11 U.S.C. § 1112(a).

34.    Section 1112(a), therefore, gives a chapter 11 debtor the right to convert to

chapter 7 unless one of the enumerated exceptions in section 1112(a)(1)-(3) is applicable.  *See,*

*e.g., In re Dieckhaus Stationers of King of Prussia, Inc.*, 73 B.R. 969, 971 (Bankr. E.D. Pa. 1987)

(stating that section 1112(a) "gives a debtor in possession an absolute right to convert, unless the

case is governed by one of the enumerated exceptions"); *Abbott v. Blackwelder Furniture Co.*,

33 B.R. 399, 401 (W.D.N.C. 1983) ("Congress provided the Chapter 11 debtor with the absolute

right to accomplish voluntary conversion to a Chapter 7 liquidation without Court approval.");

*see also* Fed. R. Bankr. P. 1017(f)(1) and 1017(f)(2) (conversion under section 1112(a) is

requested by motion under Rule 9013 but is not to be treated as a contested matter under Rule

9014).

35.     In the Debtors' cases, none of the enumerated exceptions under section 1112(a) of the Bankruptcy Code apply: (1) the Debtors are debtors in possession under sections 1107 and 1108 of the Bankruptcy Code; (2) these cases were commenced by the filing of voluntary chapter 11 petitions; and (3) these cases were not converted to chapter 11 from another chapter of the Bankruptcy Code. Thus, the Debtors are entitled, as a matter of right, to convert these cases to cases under chapter 7 of the Bankruptcy Code.

36.     In addition to the legal right to convert these cases to chapter 7, the Debtors and the other Estate Parties believe that converting these cases to chapter 7 is in the best interest of their estates and creditors. The Debtors' continue to incur administrative expenses in these chapter 11 cases and have insufficient cash to prosecute a chapter 11 plan. Accordingly, the Debtors respectfully request that the Court enter an order converting these cases from chapter 11 to chapter 7.

## Monthly and Quarterly Fee Applications

37.     As of the date of the hearing on this Motion, the Debtors believe that all Estate Professionals will have submitted their monthly fee applications and quarterly fee applications through August 2013. However, there will be approximately one and half months of time and expenses incurred between the end of the first quarterly fee applications and the hearing on the Conversion Effective Date.

38.     As a result, the Debtors propose setting November 8, 2013 as the deadline for all professionals to submit fees and expenses incurred through the Conversion Effective Date.

The Debtors propose that the hearing on these fee applications will occur after the Conversion

Effective Date and on regular notice at the next scheduled omnibus hearing.

**The Trustee of the GUC Trust Should Have Standing to Prosecute Claim Objections**

39.    As discussed above, after conversion of the Debtors' chapter 11 cases to

cases under chapter 7 of the Bankruptcy Code, the chapter 7 trustee will have approximately

$480,000 of unencumbered cash to administer the chapter 7 cases. With those funds, the trustee

will first pay the allowed 503(b)(9) Claims and Employee Priority Claims. The Debtors believe

that the total of such claims will likely exceed the amount of the funds to satisfy such claims, and

those funds alone will also be insufficient to pay valid general unsecured claims. The Debtors,

however, believe there could be distributions to unsecured creditors resulting from recoveries by

the chapter 7 trustee from litigation claims but not in the immediate future.

40.    The GUC Trust that is being formed as a result of the Committee

Settlement Motion will be funded with cash to pay a *pro rata* portion of valid general unsecured

claims. The GUC Trustee has an immediate interest to review and investigate and to object and

reconcile the claims of unsecured creditors as necessary to ensure that distributions to the holders

of unsecured claims are maximized and not diluted by invalid, overstated, or duplicate claims.

Because the GUC Trustee will begin the claims reconciliation sooner than the chapter 7 trustee,

the GUC Trustee's reconciliation will benefit the Debtors' chapter 7 estates at no cost and pave

the way for the chapter 7 trustee to make distributions to unsecured creditors in the event the

chapter 7 trustee recovers any litigation proceeds.

41.     While the Debtors and the Committee believe the GUC Trustee already has standing to bring such claim objections pursuant to section 502 of the Bankruptcy Code, the Debtors are requesting the Court to provide the GUC Trustee with standing, out of an abundance of caution, so that the GUC Trustee can proceed with this process promptly.

**Disposition of Prepetition Collateral After Conversion Effective Date**

42.     Proceeds realized by the chapter 7 trustee from the disposition of any Prepetition Collateral (as defined in the Final DIP Order) remaining in the Debtors' estates after the Conversion Effective Date, should be promptly disbursed to the Prepetition Agent for the satisfaction of the Prepetition Obligations (as defined in the Final DIP Order) in accordance with the terms of the Prepetition Agreements (as defined in the Final DIP Order); *provided, however,* any allowed trustee commissions under section 326(a) of the Bankruptcy Code earned in connection with such disbursements should be satisfied from unencumbered funds in the debtors' estates and amounts carved out under the Final DIP Order for payment of post Termination Event (as defined in the Final DIP Order) Case Administration Fees and Professional Fees (each as defined in the Final DIP Order).

**Discharge of Kurtzman Carson Consultants as Debtors' Notice and Claims Agent**

43.     On May 23, 2013, the Court entered the *Order Approving Application Appointing Kurtzman Carson Consultants, LLC as Claims and Noticing Agent for the Debtors Pursuant to 28 U.S.C. 156(c)* [Docket No. 44], which permitted the Debtors to retain Kurtzman Carson Consultants ("KCC") as its claims and noticing agent. Upon the conversion of the cases to chapter 7, retaining a claims and notice agent will be at the discretion of the chapter 7 trustee

appointed to administer the chapter 7 cases.  Accordingly, the Debtors request authorization to discharge KCC from providing any further services after the Conversion Effective Date.

### Notice

44.    Notice of this Motion has been given to the following parties or, in lieu thereof, to their counsel, if known: (a) the Office of the United States Trustee; (b) counsel to the Committee; (c) counsel to the postpetition lenders; (d) counsel to the prepetition agent of the secured lenders, (e) all of the Debtors' creditors as set forth on their schedules, and (f) those persons who have requested notice pursuant to Rule 2002 of the Federal Rules of Bankruptcy Procedure. The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

### No Prior Request

45.    No prior motion for the relief requested herein has been made to this or any other Court.

WHEREFORE, the Debtors respectfully request that the Court enter an order substantially in the form attached hereto converting these cases from chapter 11 to chapter 7 of the Bankruptcy Code and grant the Debtors such additional relief as necessary and appropriate.

Dated:    September 20, 2013        PACHULSKI STANG ZIEHL & JONES LLP

                                    _____
                                    Richard M. Pachulski (CA Bar No. 90073)
                                    Debra I. Grassgreen (CA Bar No. 169978)
                                    Bruce Grohsgal (DE Bar No. 3583)
                                    John W. Lucas (NY Bar No. 4288379)
                                    Peter J. Keane (DE Bar No. 5503)
                                    919 North Market Street, 17th Floor
                                    P.O. Box 8705
                                    Wilmington, DE  19899-8705
                                    Telephone: 302/652-4100
                                    Facsimile: 302/652-4400
                                    E-mail:  rpachulski@pszjlaw.com
                                             dgrassgreen@pszjlaw.com
                                             bgrohsgal@pszjlaw.com
                                             jlucas@pszjlaw.com
                                             pkeane@pszjlaw.com

                                    Counsel for the Debtors and Debtors in Possession