# UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | : |
| | : Chapter 7 |
| | : |
| **HIGHWAY TECHNOLOGIES, INC.,**[1] | : |
| | : Case No. 13-11326 (KJC) |
| Debtors | : |
| | : |
| | : Re: D.I. 576 |

## MEMORANDUM[2]

Before the Court is the Motion of Wynne Systems, Inc. ("Wynne") for an Order (i) compelling payment of all outstanding post-petition fees and charges due under a master agreement pursuant to 11 U.S.C. Section 503(b)(1)(A), and (ii) compelling payment of attorneys' fees (the "Motion") (D.I. 576). Wynne seeks allowance and payment of an administrative expense claim based upon the Debtors' post-petition use of Wynne's software systems, and the legal fees incurred by Wynne to obtain payment of its post-petition claim. The Debtors filed an objection to Wynne's Motion, disputing the amount that should be paid to Wynne as an administrative expense claim under Bankruptcy Code § 503(b)(1)(A), and contesting the Debtors' obligation to pay legal fees. Wynne filed a reply to the Debtors' objection and the Court held an evidentiary hearing on the Motion. For the reasons set forth below, the Motion will be granted, in part, to allow Wynne an administrative expense claim in an amount that is less than that requested, and denied, in part, to deny Wynne's request for attorneys' fees.

---

[1] Joint administration of the chapter 11 cases of Highway Technologies, Inc. and HTS Acquisition, Inc. (Case No. 13-11325) (the "Debtors") was approved by Order dated May 23, 2013 (D.I. 43). The chapter 11 cases were converted to chapter 7 on December 20, 2013 (D.I. 812).

[2] This Memorandum constitutes the findings of fact and conclusions of law, as required by Fed.R.Bankr.P. 7052. This Court has jurisdiction to decide the Motion pursuant to 28 U.S.C. § 157 and § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (B).

## Facts

Prior to filing its chapter 11 petition, Highway Technologies was one of the largest traffic safety companies in the United States, providing temporary and permanent roadway traffic management and safety services, including pavement marking installations, permanent installations of highway guardrails, barrier walls and signage, and traffic control services for special events. Highway Technologies also offered a complete line of rental products including traffic control devices, trucks, signage and related equipment. (D.I. 3, ¶7.)

Wynne provides logistics software called "Rental Man" that allows customers to track shipments, process invoices, and generally manage their businesses (the "Software"). (Joint Pretrial Statement ("JPS"), D.I. 731, ¶ 2.) On or about February 15, 2007, Wynne and the Debtors entered into a Master Agreement[3] (the "Agreement") pursuant to which Wynne provided the Debtors with computer products and services relating to the Rental Man Software. (JPS, ¶2 The Agreement, which attaches a number of exhibits and appendices, "is a single unified contract that provides for the Debtors' use of the Rental Man [S]oftware for multiple geographic locations in exchange for an agreed upon price." (JPS, ¶ 2.)

Pursuant to the Agreement, Wynne granted the Debtors a non-exclusive license to use the Software (the "License") for an Initial Term of one year that would automatically renew for additional one-year periods. (JPS, ¶ 2; Agreement, § 7.1; Exhibit 1 to the Master Agreement ("Ex. 1"), § 1.) The Agreement also requires Wynne to provide the Debtors with "Hosting Services" (Ex. 1, § 3) and other technical support, maintenance and enhancement services related

---

[3] The Agreement is among Wynne and two companies that were predecessors to the Debtors (United Rentals Highway Technologies, Inc. and United Rentals Highway Technologies, L.P.) Copies of the Agreement, including the Exhibits, Appendices and Amendment No. 2, were admitted together as Exhibit 1 at the evidentiary hearing.

to the Software, as described in an attached "Service Level Agreement" (the "SLA") (Appx. A to Ex. 1). The fees under the Agreement were as follows:

(1) The annual fee for the License, SLA Services and Hosting Services, for use at up to 70 locations, was $3.1 million;[4]

(2) Additional locations would be assessed a fee of $36,000 per location; and

(3) If either party terminated the Hosting Services or SLA Services as permitted by the Agreement, the annual fee would be reduced to $1.1 million.

(Agreement, Appx. A at A-1.) The Agreement provided that the Debtors would be invoiced monthly in an amount equal to one-twelfth of the annual fee. (Appx. A at A-2.) Payments were due thirty days following the date of receipt of the invoice. (*Id.*)

Exhibit 1 to the Agreement included an indemnification clause which provided as follows:

4.1 Customer shall indemnify, defend, and hold Wynne, its officers, directors, and agents harmless from and against all claims, demands, actions, costs, liabilities, and losses (including reasonable attorney's fees) of any kind and nature that may be asserted, granted, or imposed against Wynne, its officers, directors, or agents directly or indirectly arising from or in connection with: (a) any misrepresentation made by Customer under this Agreement; (b) a breach of Customer's obligations under this Agreement.

(Ex. 1, § 4.1.)

On or about July 25, 2011, the parties entered into Amendment No. 2 to the Agreement, which, among other things, changed the fees as follows:

3. Pricing. Anything in the Agreement to the contrary notwithstanding, during the Current Term, [the Debtors] shall pay Wynne a subscription fee equal to $1,860,000 per year, payable in equal monthly installments of $155,000, for the following services:

---

[4]The Agreement provides that $2 million of the annual fee is subject to annual adjustments based upon the "Consumer Price Index" ("CPI"), which is specifically defined in the Agreement. (Agreement, § 1.12; Appx. A at A-1).

    i.      License, SLA Services and Hosting Services for up to 100 locations;

    ii.     $1,550 per month for each additional location greater than 100 locations;

    iii.    As part of the Hosting Fee, Company shall provide [the Debtors] with 1,250 hours of Development Services per year for each year during the Current Term . . . .

(Amendment No. 2, ¶3.)

On May 1, 2013, Wynne issued an invoice (the "May Invoice") to the Debtors in the amount of $160,766, which was not paid.[5] (JPS, ¶3.) On May 22, 2013 (the "Petition Date"), the Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.[6]

On July 9, 2013, the Debtors issued a notice of rejection of the Agreement that became effective on July 19, 2013 (the "Rejection Date"). (JPS, ¶5.) Wynne did not contest rejection of the Agreement. (*Id.*) On July 26, 2013, the Debtors remitted a payment to Wynne in the amount of $160,766, the only post-petition payment made to Wynne (the "July Payment"). (JPS, ¶ 4.)

Wynne submitted two proofs of claim dated August 20, 2013, based upon the Agreement, including a claim for post-petition breach of contract damages in the amount of $160,766.00, and a claim for pre-petition breach of contract damages, rejection damages and attorney fees in the total amount of $2,102,232.00. (JPS, ¶ 5; Claims Register, Claim nos. 86 and 87.)

After the Petition Date, the Rental Man Software was accessed by the Debtors as follows:

    (i)     between May 22-30, 2013, the software was accessed at eight locations;

    (ii)    between June 1-30, 2013, the software was accessed at eighteen locations;

    (iii)   between July 1-19, 2013, the software was accessed at five locations;

---

[5] The May Invoice included the one-twelfth portion of the subscription fee ($155,000) plus a CPI increase of $5,766, for a total of $160,766.00.

[6] The bankruptcy cases were converted to chapter 7 on December 20, 2013.

(iv) between July 20- 31, 2013, the software was accessed at ten locations; and

(v) between August 1 - 9, 2013, the software was accessed at two locations.

The Debtors' last log-in was on August 9, 2013. (JPS, ¶7.)

At the hearing, Wynne's general manager, John Bureau, testified that the May Invoice was due on May 31, 2013, and that the July Payment was applied to the amount due post-petition. (Tr. 32:9-15.)[7] He also testified that Wynne maintained the Software's infrastructure and access for the Debtors' locations post-petition, at significant cost to Wynne. (Tr. 32:25-33:5). Bureau also testified that Wynne did not shut down the Debtors' access to the Rental Man Software until mid-August 2013. (Tr. 32:13-15.) He also stated that Wynne would not deactivate the Debtors' passwords unless instructed to do so by the Debtors. (Tr. 34:10-17.)

The Debtors' witness, Robert Hookstra, was employed by the Debtors since 1999, working as the controller since October 2010, and as the interim president since shortly before the Petition Date. (Tr. 36:2-10.) He was one of the main users of the Rental Man Software. (Tr. 36:17-18.) He agreed that the Debtors used the Rental Man Software to run the business pre-petition, including use of the Software to: (i) produce daily reports, (ii) schedule and track the companies' labor, equipment and inventory, (iii) create monthly invoices, (iv) post accounts receivable payments, and (v) process and certify payroll reports. (Tr. 37:8-21.) He testified that that the Debtors used the Rental Man Software to generate reports overnight, which provided the data necessary for the Debtors' employees to create spreadsheets and other reports that could be disseminated to managers to help run the day-to-day operations. (Tr. 38:1-12.)

Hookstra also testified that the last report he received was dated around May 23, 2013 (which is just after the Petition Date) and that "the job cost reports could not be updated after that time." (Tr. 38:20-25.) Because of the problems, the company "took everything offline" and

---

[7] Citations are to the transcript of the evidentiary hearing held on November 14, 2013 (D.I. 750).

5

created a spreadsheet to track the equipment and create invoices. (Tr. 39:6-20.) He testified that some key users did not have access to the Software between the Petition Date and May 30, 2013. (Tr. 39:22-40:5.) Although more users could access the Software in June 2013, some never got access back. (Tr. 41:8-23.) He is not aware of anyone asking Wynne to deactivate access to the Software, and he did not authorize any deactivation. (Tr. 40:14-17.) The Debtors were reducing their work force between the Petition Date and the end of July (Tr. 41:19-23.)

In summary, Wynne argues that three monthly payments of $160,766.00 each are due for post-petition services in May, June and July 2013. After applying a credit for the July Payment, Wynne seeks an administrative expense claim in the amount of two monthly payments ($321,532.00), plus attorney fees. (Tr. 56:21-23.) The Debtors dispute the amount of Wynne's administrative expense claim, arguing that it exceeds the value of the Debtors' actual post-petition use of the Software.

### Discussion

Bankruptcy Code § 503(b)(1) provides that, after notice and a hearing, Bankruptcy Courts shall allow the "actual and necessary costs and expenses of preserving the estate" as administrative expenses. Administrative expenses receive priority payment over other claims pursuant to Bankruptcy Code § 507(a)(2). To qualify for an administrative priority, an expense (i) must arise from a post-petition transaction with the debtor-in-possession, and (ii) must be beneficial to the debtor-in-possession in the operation of the business. *In re Marcal Paper Mills, Inc.*, 650 F.3d 311, 314-15 (3d Cir. 2011) citing *Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.)*, 181 F.3d 527, 532-33 (3d Cir. 1999). In *Marcal*, the Third Circuit noted:

> These requirements balance two important goals. By giving priority to those claims that help keep the debtor-in-possession functioning, sections 503 and 507 advance the estate's interest in survival above all other financial goals. By limiting priority to those claims that are actual and necessary, the Code prevents the estate from being consumed by administrative expenses, and preserves the estate for the benefit of the creditors.

*Marcal*, 650 F.3d at 315 (internal punctuation and citations omitted). *See also In re ID Liquidation One, LLC,* 503 B.R. 392, 399 (Bankr.D.Del. 2013) quoting *In re Bernard Tech., Inc.,* 342 B.R. 174, 177 (Bankr.D.Del. 2006) ("In order to 'hold administrative expenses to a minimum and to maximize the value of the bankruptcy estate, section 503(b) is narrowly construed.'") The burden of proving that an expense deserves administrative priority lies with the party asserting such priority. *Marcal,* 650 F.3d at 315.

In this case, the parties agree that the Debtors used the Rental Man Software post-petition, but they sharply disagree on how to value the benefit of that post-petition use to the estate.[8] Wynne argues that it is entitled to payment at the full contract rate, while the Debtors argue in response that Wynne's administrative claim should be limited to the value of the Debtors' *actual use* of the Software post-petition, especially in light of the problems the Debtors encountered in using the Software post-petition. The Debtors also contend that the contract rate should not be used, since it is based upon use of the Rental Man Software for up to 100 locations and the Debtors used the Software at far fewer than 100 locations post-petition.

---

[8] Bankruptcy Code Section 365(d)(5) provides that "[t]he trustee shall timely perform all of the obligations of the debtor . . . first arising from or after 60 days after the order for relief in a case under chapter 11 of this title under an unexpired lease of personal property (other than personal property leased to an individual primarily for personal, family, or household purposes), until such lease is assumed or rejected notwithstanding section 503(b)(1) of this title, unless the court, after notice and a hearing and based on the equities of the case, orders otherwise with respect to the obligations or timely performance thereof." Under Section 365(d)(5), a lessor of personal property is entitled to recover automatically, as an administrative expense, any rent claim coming due between the 60th day after the bankruptcy filing and the acceptance or rejection of the lease. *In re Pettingill Enter., Inc.,* 486 B.R. 524, 532 (Bankr.D.N.M. 2013). In this case, however, the Agreement was rejected within 60 days of the Petition Date. Therefore, Wynne cannot seek payment for a post-petition, pre-rejection claim under § 365(d)(5), but is instead limited to an "actual and necessary" administrative expense claim under § 503(b)(1).

When determining the reasonable value of services for purposes of calculating an administrative expense claim, "there is a presumption that the contract terms and rate represent the reasonable value of the services or goods provided under the contract." *ID Liquidation*, 503 B.R. at 399. However, "[t]his presumption can be overcome if the objecting party provides convincing evidence to the contrary." *Id.* at 399-400 quoting *In re Smurfit-Stone Container Corp.*, 425 B.R. 735, 741 (Bankr.D.Del. 2010) (internal quotation marks omitted). *See also In re Continental Airlines, Inc.*, 146 B.R. 520, 529 (Bankr.D.Del. 1992) (deciding that, even assuming the aircraft lease rate was presumptively reasonable, that presumption was overcome by evidence of other post-petition aircraft leases at substantially lower rates).

Other courts have likewise looked beyond the contract rate and determined that the amount of an administrative expense claim must be based upon the debtors' actual use of the leased property. *In re CNB Int'l, Inc.*, 307 B.R. 363, 372 (Bankr. W.D.N.Y. 2004) (deciding that the debtor rebutted any presumption that the contract rate represented the value of the debtor's limited post-petition use of software); *In re Kmart Corp.*, 293 B.R. 905, 910-11 (Bankr.N.D. Ill. 2003) (deciding that a software provider was not entitled to an administrative expense claim for post-petition modifications made to the software at the debtor's request, because the debtor never used the modified software); *In re Enron Corp.*, 279 B.R. 695, 706 (Bankr.S.D.N.Y. 2002) ("Where only part of the leased property is used by a debtor-in-possession, an administrative claim priority is accorded only to the portion used."). In *Enron*, the Court determined that a pipeline company's administrative expense claim should be based upon the debtors' actual use (or subleasing) of the pipeline, rather than the amount of pipeline capacity that was available post-petition. *Id.* at 707. The *Enron* Court wrote: "[t]here must be a concrete, discernible benefit from actual use because a speculative benefit or the mere potential for benefit is not

8

enough to warrant an administrative claim priority." *Id.* at 706. "[D]uring the period when there was no usage . . . the [claimant] . . . is not entitled to any administrative expense priority." *Id.* at 707.

Wynne, in turn, argues that decisions by the Court of Appeals for the Tenth Circuit and the Bankruptcy Appellate Panel of the Tenth Circuit stand for the proposition that an administrative expense claim should be allowed in an amount based on the full contract rate when the debtor obtained a benefit from the post-petition *availability* of services, even if those services were not *used*. *Peters v. Pikes Peak Musicians Ass'n*, 462 F.3d 1265 (10th Cir. 2006); *Peters v. Enterasys Networks, Inc. (In re Native American Sys., Inc.)*, 351 B.R. 136 (10th Cir. BAP 2006).

A thorough analysis of the *Pikes Peak* and *Native American* decisions, however, reveals that they are not inconsistent with the cases cited by the Debtors, because both decisions involved contracts for *availability*. In other words, rather than contracting for a particular item (such as an aircraft or pipeline), the contracts required the non-debtor counter-party to be on-call to perform a personal service.

In *Pikes Peak*, the musicians union sought payment under § 503(b)(1) from the debtor-employer (a symphony orchestra) of wages and benefits earned by employees after the filing of a chapter 11 petition, even though those employees did not rehearse or perform during the post-petition period.[9] The *Pikes Peak* Court examined the collective bargaining agreement and determined that "the service specifically bargained for was *availability*," concluding that "by foregoing other opportunities and remaining ready, willing and able to play, the musicians performed 'services' under the terms of the contract." *Id.* The Court further determined that the

---

[9] The case subsequently converted to chapter 7, and the trustee objected to payment of post-petition wages and benefits as chapter 11 administrative claims. *Id.* at 1272.

9

musicians' "availability" was necessary to the preservation of the orchestra's estate, finding that "after filing its petition, the Orchestra took steps to survive its financial difficulties, which included alternately scheduling and cancelling rehearsals and performances in an attempt to execute a workable business strategy." *Id.* at 1273. The Court further concluded that "it is clear that during this unsettled period, the availability of the musicians was essential to the success of the attempted reorganization." The *Pikes Peak* Court also noted that this result "recognize[s] the literal language of § 503(b)(1)(A) [and] avoids conflict with § 1113 because it does not permit the debtor to unilaterally alter the terms of a collective bargaining agreement." *Id.*

Likewise, in *Native American*, the debtor resold technical services contracts to governmental entities. The debtor's customer (the Department of Energy ("DOE")), paid the debtor to receive telephonic technical support, and the debtor contracted with an entity called Enterasys to provide those services. *Native Am.*, 351 B.R. at 137. The debtor continued to operate post-petition and received full payment from the DOE. *Id.* Enterasys sought payment of an administrative expense from the debtor's estate for the portion of its service contract that covered the post-petition period. The trustee objected to Enterasys's administrative expense claim arguing that the DOE had not sought technical support services post-petition, even though Enterasys stood ready to provide them. *Id.* The *Native American* Court approved Enterasys' administrative expense claim, deciding that the debtor received a post-petition benefit, writing:

> The [d]ebtor's business was the resale of technical services contracts. The [d]ebtor could not have performed the service contracts itself, and its profit was therefore dependent upon the provision of services by providers such as Enterasys. Had Enterasys failed to responsibly carry out its duties under the contracts, the [d]ebtor would have faced breach of contract claims and, perhaps worse, loss of its goodwill in the industry. Similarly, had the [d]ebtor rejected the Enterasys contracts during their terms, it would have had to find another source of coverage for its customers or cause them to make additional unsecured claims on the [d]ebtor's estate. Either way, the estate would have been depleted, and the

likelihood of a successful reorganization would have been significantly diminished.

*Id.* at 140. The Court agreed that the Enterasys contract was like an insurance contract. *Id.* at 142.

The Debtors' use of the Rental Man Software more closely resembles the situation faced by the Court in *Enron*. Here, the Debtors bargained for use of the Software at up to 100 locations, but (due, in part, to technical problems with the Software and, in part, to the winding down of operations) the parties stipulated that, after the bankruptcy filing, the Debtors used the Rental Man Software at only a few locations per month. Amendment No. 2 to the Agreement changed the subscription fee to $1,860,000 per year, which may be broken down to $18,600 for each location annually, or $1,550 for each location monthly.[10] Pursuant to the Agreement, the fee was adjusted based upon an agreed-upon CPI formula, so that as of the Petition Date, the monthly fee was $166,766, or $1,607.66 per location. The parties stipulated that the Debtors used a total of 43 locations during the post-petition period. Therefore, Wynne is entitled to an administrative expense claim for its actual use of the Software at 43 locations post-petition in the amount of $69,129.38.

The annual subscription fee in the Agreement includes payment for the License Fee, SLA Services and Hosting Services associated with the Software. The License Fee is a fixed cost, not dependent on the number of locations. (Agreement, Appx. A-1.) The Debtors' partial use of the Software post-petition provided some benefit associated with the License Fee. *See In re B-K of Kansas, Inc.*, 99 B.R. 446, 448 (D.Kan. 1989) (limiting the franchisor's administrative expense

---

[10] The annual fee would not decrease if the Debtors used the Software at fewer than 100 locations, but the Amendment provides that the fee would increase by $1,550 for each additional location after 100 locations.

claim to the value of those benefits received under the franchise agreement post-petition, *i.e.*, post-petition use of trademarks). The value of the post-petition benefit of the License Fee is not easily quantified. However, after rejection of the Agreement in July 2013, the Debtors paid Wynne an amount that was based upon their estimate of the maximum benefit the Debtors would receive from the Software post-petition.[11]

While it is undisputed that the Debtors' use was limited, the Debtors found it to be advantageous to continue using the Software as it liquidated its locations, one after another. The Debtors' undisputed post-petition use of the Software spanned from May 22, 2013 to August 9, 2013, an approximately seven-week period. The July Payment was the only post-petition payment made to Wynne by the Debtors. I conclude that the amount of the July Payment sufficiently and fairly compensates, and does not overcompensate, Wynne for the Debtor's limited, but actual, use of the Software post-petition.[12]

Wynne also argues that the indemnification clause in the Agreement requires the Debtors to pay Wynne's attorneys' fees for bringing this Motion to obtain payment of its administrative expense claim. However, courts have declined to allow recovery of attorneys' fees as part of an administrative expense claim, because those fees are not an actual and necessary cost of preserving the estate as required by Bankruptcy Code § 503(b)(1)(A). *In re Juvennelliano*, 464 B.R. 651, 655 (Bankr.D.Del. 2011).

---

[11] At the evidentiary hearing, the Debtors' witness testified that the budget attached to the motion for approval of debtor-in-possession financing included a payment to Wynne based on an "amount [the Debtors] thought would be the maximum benefit we'd receive from the Wynne Systems . . . ." (Tr. at 44:18-45:1.)

[12] Because the Debtors did not assume the executory contract, Wynne's damages arising from the Debtors' rejection of the executory contract constitute a breach arising immediately before the date of filing of the petition. 11 U.S.C. § 365(g)(1). Accordingly, Wynne may assert a general unsecured claim for damages resulting from the rejection of the Agreement.

## Conclusion

For the reasons set forth above, the Motion is granted, in part, to allow Wynne a chapter 11 administrative expense claim in the amount of $160,766. Wynne has already received payment of this amount post-petition and, therefore, no further payment is due to Wynne based on its § 503(b)(1) administrative expense claim. The Motion is denied, in part, with respect to Wynne's request for payment of attorneys' fees.

BY THE COURT:

_____
KEVIN J. CAREY
UNITED STATES BANKRUPTCY COURT

DATED: January 30, 2015